# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

ESTATE OF MELINDA DUCKETT,
by and through her personal representative,
KATHLEEN CALVERT, and BETHANN EUBANK
and WILLIAM GERALD EUBANK,
as legal parents of MELINDA DUCKETT,
and as grandparents and next friends of T.D., a child,
and M.E., a minor sibling of MELINDA DUCKETT,

      Plaintiffs,

v.                              CASE NO. 5:06-cv-444-WTH-GRJ

CABLE NEWS NETWORK LLLP (CNN),
a Delaware corporation, NANCY GRACE,
individually and as an employee/agent of CNN,
various unnamed producers of the "Nancy Grace" show,
JOSHUA DUCKETT,

      Defendants.

_____/

## DEFENDANTS CNN AND NANCY GRACE'S DISPOSITIVE
## MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

Defendants Cable News Network, LP, LLLP (CNN)[1] and Nancy Grace, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, move for entry of an order dismissing the Complaint against them for failure to state a claim under Florida law for which relief could be granted. The grounds for the motion are as follows:

---

[1] Plaintiffs erroneously sued "Cable News Network LLLP," an entity that does not now exist. "CNN" is the acronym for Cable News Network, Inc., formerly known as Cable News Network LP, LLLP.

## INTRODUCTION

Plaintiffs[2] seek to recover damages because a nationally televised journalist, as part of her network's effort to garner nationwide help to find a missing little boy, asked the parents where they were when their child was reported as missing.  The subsequent suicide of the child's mother, which Plaintiffs make the focus of this lawsuit, is certainly tragic.  But the real center of this terrible story is two-year-old Trenton Duckett, who remains missing after eleven months.   The law does not permit people to recover money from reporters who ask routine questions while covering ongoing stories of national significance to the public. Plaintiffs have no valid cause of action, and this misguided lawsuit should be dismissed with prejudice.

## BACKGROUND

For reasons no one would dispute, Trenton's August 27, 2006 disappearance from a bedroom in his mother's Leesburg apartment (Complaint ¶ 4) drew intense media focus.  The "Nancy Grace" show, an hour-long program on CNN's sister network, Headline News, decided to devote an episode to the search for Trenton.  *Id.* ¶ 6.  The show, which covers crimes and legal issues, routinely publicizes stories of missing persons or abducted children to aid in search and recovery efforts. *Id.* ¶ 4.

In preparation for the broadcast about Trenton's disappearance, host Nancy Grace taped simultaneous interviews with a number of sources.   On the tape she repeatedly displayed the telephone and website information for viewers to report any leads that might

---

[2] In this Memorandum, CNN and Nancy Grace refer to Plaintiff the Estate of Melinda Duckett, by and through her Personal Representative Kathleen Duckett, as the "Estate."  Plaintiffs Bethann and Gerald Eubank, and the minor child "M.E.," will be referred to collectively as the "Eubanks."

aid in the search, and she implored viewers to contact the authorities with any information. *See* DVD of September 8, 2006 "Nancy Grace" Broadcast, attached hereto as Exhibit A[3]; Transcript of September 8, 2006 "Nancy Grace" Broadcast, attached hereto as Exhibit B.[4]

Trenton's estranged parents, Joshua and Melinda Duckett, were guests on the show, Joshua appearing on camera and Melinda by telephone.  Grace asked similar questions of each about the details of the disappearance and their level of involvement with the police investigation.  *Id.*  For example she asked both parents whether they had submitted to lie-detector tests and to discuss their specific whereabouts near the time Trenton was reported missing.  *Id.*  Joshua Duckett answered all of the questions.  *Id.*  Melinda Duckett answered some, but she declined to reveal whether she had taken a polygraph test or what specific stores she had visited during a shopping trip with Trenton on the day he disappeared.  *Id.*  Grace repeated her questions and, prompted by another guest on the show, prevailed on Melinda to name the stores she had visited in the event it might help people remember seeing Trenton that day.  *Id.* at pp. 11-13.  Grace explained that perhaps a video surveillance camera in a store that Melinda and Trenton visited might have captured video of someone watching or following Melinda that could aid authorities in the search for Trenton.  *Id.* at p. 12. Melinda would only answer that she had been advised not to share the information, and she

---

[3] Exhibit A, the DVD, has been separately filed with the Court on August 3, 2007 with a Notice of Filing.
[4] Under Rule 12(b)(6), the Court may consider a document attached to a motion to dismiss if it is "incorporated by reference" into the plaintiff's complaint, i.e. if the attached document is (1) central to the plaintiff's claim and (2) undisputed.  *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)).  "'Undisputed' in this context means that the authenticity of the document is not challenged."  *Horsley*, 304 F.3d at 1134.  Courts specifically permit the introduction of the written and video recordings of broadcasts that are the subjects of lawsuits.  *See, e.g., id.* at 1135 (approving attachment to motion to dismiss of wire service article quoted in plaintiff's complaint); *Van Buskirk v. Cable News Network*, 284 F.3d 977 (9th Cir. 2002) (approving attachment to motion to dismiss of transcripts and tapes of allegedly defamatory news reports).

terminated the interview.  *Id.* at pp. 12-13.  Grace continued the show with her other guests. *Id.* at pp. 13-14.  On the day following the interview, before the broadcast aired, Melinda Duckett killed herself.  Complaint ¶¶ 15, 18.  Headline News aired the broadcast as planned, (*id.* ¶ 18), on September 8, 2006, and included information about the suicide at the bottom of the screen.

Plaintiffs filed this lawsuit in the Florida state court on November 20, 2006, against Defendants CNN and Nancy Grace, as well as Joshua Duckett.  On December 20, 2006, on the basis of diversity of citizenship and the fraudulent joinder of Joshua Duckett, CNN and Grace removed the lawsuit to this Court.  Plaintiffs challenged the removal in a Petition to Remand to State Court filed with this Court on January 17, 2007.  This Court denied Plaintiffs' Petition to Remand in an Order issued on July 16, 2007, dismissing Defendant Joshua Duckett as fraudulently joined.  The Court further denied Plaintiffs' Motion for Leave to File Amended Complaint and Plaintiffs' Motion for Leave to File Second Amended Complaint and ordered that the case go forward in federal court against Defendants CNN and Nancy Grace on the claims of wrongful death, intentional infliction of emotional distress, and misappropriation of image/likeness as stated in Plaintiffs' original Complaint.[5]

## SUMMARY OF ARGUMENT

For several independent reasons well-supported by Florida and First Amendment law, the Estate cannot support a wrongful death action (Count I) grounded in either the intentional infliction of emotional distress or fraudulent misrepresentation theories pleaded, or any other theory.  As a matter of law, Nancy Grace's questioning of the guests on the broadcast – the

---

[5] As this Court's July 16, 2007 Order holds that only Counts I, II and IV of Plaintiffs' original Complaint will go forward, Defendants CNN and Grace do not address Count III.

conduct that Count I alleges was "outrageous" – does not meet the stringent standard for an emotional distress claim.   Additionally, the statements alleged in the Complaint are too indefinite to form the basis for the Estate's fraud claim.   Moreover, Trenton's mother Melinda Duckett's suicide breaks the chain of legal causation necessary to maintain a wrongful death action.

The Eubanks' claims of intentional infliction of emotional distress (Count II), grounded in CNN's and Grace's decision to air the broadcast after the suicide, is untenable as well.   As a matter of law, the conduct of airing the broadcast is not outrageous, and families may not recover for alleged distress resulting from broadcasts like this one about a relative.

Finally none of the Plaintiffs can bring a successful misappropriation claim (Count IV). Melinda Duckett's photograph and voice were lawfully broadcast as part of the coverage of a newsworthy event, not as an endorsement of a commercial product, and the Estate lacks standing for this claim.

CNN and Nancy Grace have complete protection under the law to ask questions and inform the public in a diligent and sincere effort to find this missing little boy.   Indeed, the media's efforts to locate missing children unquestionably serves the public interest, and this lawsuit could severely chill those efforts.   The Court therefore should dismiss Plaintiffs' claims with prejudice.

## ARGUMENT

### I.   STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss is granted where, "assuming the truth of the factual allegations of plaintiff's complaint, there is a dispositive legal issue which precludes relief."

*U.S. Equal Employment Opportunity Comm'n v. Florida Gulf Coast Univ.*, Nos. 2:06-cv-326-FtM-29SPC, 2:06-cv-395-FtM-29DNF, 2007 WL 2077577, at *1 (M.D. Fla. July 16, 2007). While a plaintiff is not required to plead "detailed factual allegations" in the complaint, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (*citing Bell Atl. Corp. v. Twombly*, -- U.S. --, --, 127 S. Ct. 1955, 1964-65 (2007)). A plaintiff must make factual allegations that are "enough to raise a right to relief above the speculative level" and sufficient to "state a plausible basis for a claim." *Id.* (citing *Twombly*, 127 S.Ct. at 1965). This action is governed by state substantive law, and where the Florida Supreme Court "has not spoken to an issue, a federal court 'must adhere to the decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise.'" *Id.* (*quoting Ins. Co. of N. Am. v. Lexow*, 937 F.2d 569, 571 (11th Cir.1991)).

## II.     THE ESTATE'S WRONGFUL DEATH ACTION MUST FAIL (COUNT I).

The journalism reflected in the Complaint and the broadcast cannot constitute actionable predicate conduct under Florida's Wrongful Death Act, FLA. STAT. §§ 768.16-768.26. The statute only permits recovery where "the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person, . . . and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued . . . ." FLA. STAT. § 768.19 (2005). The Estate has not, and cannot, allege that the journalism complained of would be actionable by Melinda Duckett were she still alive.

6

**A.    Melinda Duckett would not have a valid emotional distress claim, as Nancy Grace's asking questions of her and Joshua Duckett about Trenton's disappearance, as a matter of law, are not "outrageous" conduct.**

A cause of action for intentional infliction of emotional distress in Florida requires: "(1) deliberate or reckless infliction of mental suffering by defendant; (2) by outrageous conduct; (3) which conduct of the defendant must have caused the suffering; and (4) the suffering must have been severe. *DeShiro v. Branch*, No. 96-800-CIV-T-17E, 1996 WL 663974, at *2 (M.D. Fla. Nov. 4, 1996) (*citing Metropolitan Life Insurance Co. v. McCarson*, 467 So. 2d 277, 278 (Fla. 1985)) (dismissing claim for intentional infliction of emotional distress on Rule 12(b)(6) motion to dismiss). "[W]hether a person's conduct is sufficiently outrageous or intolerable as to form the basis for a claim of intentional infliction of emotional distress is a matter of law for the court, not a question of fact." *Id.* at *4. Florida courts "ha[ve] evinced a comparatively high standard" for these claims. *Id.* at *2 (quotations omitted). "[T]he conduct by a defendant must be so 'outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Id.* (*quoting Metropolitan Life Insurance*, 467 So. 2d at 278-79).

The Estate bases its entire claim on Nancy Grace's act of asking Melinda Duckett questions. Despite the Complaint's bald allegations of offensiveness, however, the newsgathering technique involved here was not, as a matter of law, outrageous. The Complaint alleges that Nancy Grace "verbally assault[ed] and harrass[ed]" Melinda Duckett with "a cross examination" and "verbal[] accosting" (Complaint ¶ 11). Even taking those allegations as facts that the Court must deem true on this motion, Plaintiffs fail to state a

cause of action, because aggressive newsgathering alone is neither outrageous nor actionable.

Time and again, the courts have rejected various tort claims arising from a journalist's allegedly aggressive newsgathering.  For example, in *Van Buskirk v. CNN*, 284 F.3d 977, 982 (9th Cir. 2002), the Ninth Circuit upheld the dismissal of a defamation claim in which an interview subject alleged that a journalist "coerced him into adopting" a false and defamatory version of events by subjecting him to  hours of "repetitive suggestive questioning".  The court held that the journalist's allegedly aggressive questioning could not convert his lawful, accurate report of the plaintiff's statements into unlawful, actionable conduct.

> The journalist's right to use aggressive and abrasive tactics in
> an attempt to ferret out information from reluctant individuals
> is well established.

*Id.* at  982.  The Seventh Circuit is in accord that a journalist's vigorous pursuit of information from sources, in and of itself, is not actionable even if the tactics are "surreptitious, confrontational, unscrupulous, and ungentlemanly".  *Desnick v. ABC*, 44 F.3d 1345, 1355 (7th Cir. 1995) (holding that, "If the broadcast itself does not contain actionable defamation . . . then the target has no legal remedy[.]")

Courts have applied the same reasoning to reject claims that specifically alleged a journalists' questioning of sources is an outrageous act under state tort law.  Accordingly, in *Weinstein v. Bullick,* 827 F. Supp. 1193, 1203-05 (E.D. Pa. 1993), the federal district court held that a television journalist had not committed an outrageous act by interviewing a police officer who questioned the veracity of a sexual assault victim, even though the news station had been warned that the victim would be upset by the broadcast.  Similarly, a Maryland appeals court held that even if the journalists had committed a trespass to gain entry to the

nursing home in which he resided, their questioning of a retired congressman about his financial difficulties was not outrageous conduct under state tort law. *Mitchell v. Baltimore Sun Co.*, 883 A.2d 1008 (Md. Ct. Spec. App. 2005). *See also, A.H. Belo Corp. v. Corcoran,* 52 S.W.3d 375, 383-84 (Tx. Ct. App. 2001) (court holds not outrageous for reporter to arrange interview with fugitive mother and kidnapped daughter but fail to notify father or authorities of the interview or the location of the mother and daughter); *Howell v. New York Post Co.*, 81 N.Y.2d 115, 126 (N.Y. Ct. App. 1993) (court holds photographer's trespass onto grounds of private psychiatric facility to photograph plaintiff "does not remotely approach the required standard" for an emotional distress claim);

Here, Nancy Grace did nothing more than ask questions of a guest who voluntarily appeared on a news broadcast to publicize the search for her missing child.  Grace asked virtually identical questions to the mother and father, and only when the mother's answers were less than forthcoming did the host repeat the questions in an effort to secure more informative responses.  Courts around the nation have acknowledged the well-established right of journalists to ask questions aggressively, and therefore as a matter of law, this conduct cannot support an intentional infliction of emotional distress claim.  Thus, regardless of the Estate's disapproval of Nancy Grace's persistence, it is simply not "beyond all possible bounds of decency" or in any sense "outrageous" for a journalist to attempt to help unearth clues about a child's disappearance by asking questions of his mother in a voluntary interview.[6]  For this reason alone, the Estate has failed to state a claim.

---

[6] To the extent the Estate relies upon Grace's tone-of-voice during the course of the telephone interview, (*see* Complaint ¶ 6, 10, 11), such a basis for outrageousness would be similarly unavailing.  A rough or aggressive tone-of-voice is insufficient to support a claim for emotional distress. *See Scarborough v. Wachovia Bank*

**B.**     **Melinda Duckett would not have a valid fraud claim, as the Estate has failed to allege an actionable misrepresentation of material fact and has alleged only statements about future conduct.**

The Estate's claim of fraud is grounded in allegations that Melinda Duckett was told that the purpose of this "Nancy Grace" show was ""to ask the public for help in finding her missing child," (Complaint ¶¶ 7, 10, 11).  Yet that is precisely what the show did.  Even more fundamentally, however, as a matter of law, the Complaint does not allege a valid fraud claim.   Fraudulent misrepresentation claims only will lie where the defendant (1) made a misrepresentation of a material fact; (2) knew or should have known of the falsity of the statement; (3) intended that the representation would induce the plaintiff to rely and act on it; and (4) the plaintiff suffered injury in justifiable reliance on the representation.  *Hillcrest Pacific Corp. v. Yamamura*, 727 So. 2d 1053, 1055 (Fla. 5th DCA 2004) (dismissing claim on motion to dismiss where plaintiffs failed to allege sufficient facts to support elements of fraud).  Here, the statement that the Estate alleges is not actionable as a matter of pleading law, as it is too vague, indefinite, and forward-looking to support a fraud claim.

No fraud claim will lie unless "the pleading identifies specific facts and states how

---

*Corp.*, No. 3:04CV249, 2006 WL 2828683, at * 5 (W.D.N.C. Sept. 29, 2006) (dismissing intentional infliction of emotional distress claim as plaintiff's claims that he was addressed with a rude tone of voice by employer and subsequently discriminatorily discharged not outrageous as a matter of law); *cf. Stokes v. Potter*, No. CV-06-79 BLGRFC, 2007 WL 30274, at *3 (D. Mont. Jan. 4, 2007) (holding no defamation where mail carrier ridiculed in a "contemptuous, malicious, belittling fashion" as "libel law does not punish harsh criticism, nasty tone, or rudeness"); *Gaydosh v. Procop*, No. 23194, 2006 WL 3616712, *4 (Ohio Ct. App. Dec. 13, 2006) (denying claim that plaintiff was defamed by implications inherent in mayor's tone of voice during televised interview, as "a mere pejorative tone is not sufficient to sustain a cause of action for defamation" where "the language used is inherently imprecise and subject to myriad subjective interpretations"); *Hanash v. WFLD Fox Television,* No. 98 C 1220, 1998 WL 781113, at *2 (N.D. Ill. Nov. 4, 1998) (dismissing defamation claim where reporter's skeptical tone of voice was only fact pleaded in support of defamatory innuendo); *Hunt v. Tangel*, No. 01A01-9705-CV-00199, 1997 WL 778989 (Tenn. Ct. App. Dec. 19, 1997) (holding no defamation where police chief used sarcastic tone of voice in reporting officer's resignation and refusal to take a polygraph test after allegations of theft, as "[n]o artificial and unreasonable construction placed upon innocent words by the evil-minded can add a defamatory meaning not fairly to be found in the light of the circumstances").

they were false." *Simon v. Celebration Co.*, 883 So. 2d 826, 833 (Fla. 5th DCA 2004). Vague statements, by definition, are insufficient to support a claim of fraud as no one may reasonably rely on them.   For example, in *Pitts Sales, Inc. v. King World Productions, Inc.*, 383 F. Supp. 2d 1354 (S.D. Fla. 2005), the district court rejected a fraud claim against a national broadcaster based on plaintiff's employment of an undercover journalist.   Though the plaintiff claimed that it believed the journalist-employee would work longer than he did, Florida fraud law would not support such a claim where the plaintiffs could not demonstrate that the journalist made any express representations concerning how long he would be associated with the company. *Id.* at 1364.

Courts elsewhere in claims against the news media have held that vague statements – such as an alleged promise that a story will be "positive" or "fair" – cannot give rise to the reasonable reliance necessary to support a fraud claim.  In *Veilleux v. National Broadcasting Company*, 206 F.3d 92 (1st Cir. 2000), for example, a trucking company and its driver that granted NBC journalists access to employees were unsuccessful in efforts to recover for the network's alleged misrepresentation that the story would portray the trucking industry in a "positive light." *Id.* at 119.  Although the First Circuit noted that the story instead "focused on how some truck drivers falsified logs, drove longer hours than regulations allowed, and used drugs," the Court nonetheless held the alleged representation was not actionable, as it was vague and "did not pertain to a concrete, easily ascertainable fact." *Id.* at 119, 121.  The *Veilleaux* court concluded that "premising a finding of misrepresentation on such a vague term [as "positive coverage"] would place too great a burden on speech protected by the state and federal constitutions." *Id.* at 123.

Similarly, in *Desnick v. American Broadcasting Companies, Inc.*, 44 F.3d 1345 (7th Cir. 1995), the Seventh Circuit rejected a fraud claim premised on ABC's "PrimeTime Live" producers' alleged promise to the subject of a news report that the story would present a "fair and balanced" picture of an ophthalmic clinic's operations. *Id.* at 1351.  The Court held that although the network produced a report critical of the clinic, the alleged promise was not actionable:

> A great many promises belong to the realm of puffery, bragging, 'mere words,' and casual bonhomie, rather than to that of serious commitment.  They are not intended to and ordinarily do not induce reliance; a healthy skepticism is a better protection against begin fooled by them than the costly remedies of law.

*Id.* at 1354.[7]

As with *Veilleux* and *Desnick* in the news-gathering context — which are consistent with Florida's general law of fraud — the Complaint's alleged statements are too vague, indefinite, and forward-looking to justify reasonable reliance or to otherwise support the Estate's wrongful death claim premised on fraud theory.  The alleged promise to Melinda Duckett that the show would focus on the effort to locate Trenton contains no specific facts and says nothing about any specific questions which would or would not be asked, or specific

---

[7] The *Desnick* court also held that the plaintiffs also could not justifiably rely on ABC's promise not to use undercover surveillance, finding that any such reliance would be unreasonable:

> Investigative journalists are well known for ruthlessness promise to wear kid gloves.  They break their promise, as any person of normal sophistication would expect.  If that is 'fraud,' it is the kind against which potential victims can easily arm themselves by maintaining a minimum of skepticism about journalistic goals and methods.

*Id.* at 1354.

topics that would or would not be covered in the course of the interview.[8]  Melinda therefore would not have a cause of action for fraud based on these alleged facts, and the Estate's claim must fail as well.

Moreover, the broadcast itself belies any claim that Nancy Grace and CNN failed to produce a show encouraging the public to help find Trenton.  As the broadcast clearly demonstrates, the interview was entirely focused on the missing child, the details of the child's disappearance, and theories regarding the child's whereabouts.  (*See* Exhibits A and B) The broadcast included all public information available at the time about his disappearance, pictures of the little boy in various attire and poses, as much information about his whereabouts before the disappearance as Melinda Duckett was willing to disclose, and the telephone number and website where people could share information about him.  Indeed, in the segment to which the Estate objects, Nancy Grace can be heard telling Melinda that fully disclosing her and Trenton's path that day was an important element in the efforts to maximize the chance that an eyewitness would remember seeing the boy and come forward. The broadcast itself proves that no fraud occurred.

### C.   Melinda Duckett's Voluntary Act of Suicide is an Intervening Act Which Breaks the Causal Chain.

The Estate also cannot sustain the wrongful death claim because, where the decedent dies by suicide, Florida will only allow an action under very narrow circumstances

---

[8] To the extent the Estate argues that CNN and Nancy Grace did not specifically tell Melinda that she would be asked her whereabouts the day of Trenton's disappearance, or whether she had taken a polygraph, Florida law will provide no help to the fraud cause of action.  Even were the Court to deem this an alleged withholding of a material fact, in Florida, "a defendant's knowing concealment or non-disclosure of a material fact" may only support a claim of fraud "where there is a duty to disclose."  *Kelly*, 2002 WL 598427 at *7; *see also Pitts Sales*, 383 F. Supp. 2d at 1632-64 (undercover journalist hired as employee under no duty to disclose that he did not intend to hold the position long-term where employer made no assumptions about how long a sales agent would remain with the company).  Here, the Complaint alleges no cognizable duty to disclose, and none exists at law.

inapplicable here.  Under Florida law:

> The overwhelming weight of authority is to the effect that a suicide absent insanity is a new and independent agency which breaks the causal connection between the wrongful act and death, precluding an action under the wrongful death statutes.

*Nelson v. Seaboard Coast Line Railroad Co.*, 398 So. 2d 980, 982 (Fla. 1st DCA 1981) (quoting *Tate v. Canonica*, 180 Cal. App. 2d 898, 914 (1960)). [9]

Courts have not permitted actions for wrongful death following suicide to proceed unless (1) a special relationship exists between the decedent and the defendants that imposed a duty to prevent suicide, *and* (2) where the defendants had notice of the decedent's suicidal tendencies.  Florida courts have narrowly viewed what constitutes a "special relationship" which gives rise to a duty to prevent suicide.   For example,  a routine doctor-patient relationship does not even give rise to such a duty in Florida.  *See, e.g., Garcia v. Lifemark Hospitals of Florida*, 754 So. 2d 48, 49 (Fla. 3d DCA 2000) (doctor is generally not liable for the suicide of a patient unless admitted into the custody, care and treatment of a psychiatric hospital and the hospital fails to take appropriate protective measures); *Lawlor v. Orlando*, 795 So. 2d 147, 148 (Fla. 1st DCA 2001) (outpatient care eliminates duty of therapist to provide custodial supervision and care).

Plaintiffs here have alleged no special relationship between CNN, Nancy Grace and

---

[9] Florida is in the mainstream of jurisdictions that hold a suicide breaks the causal chain.  22A Am. Jur. 2d Death § 41 (2006); *see also, e.g., Jarvis v. Stone*, 517 F. Supp. 1173 (N.D. Ill. 1981) (no wrongful death claim for suicide where defendant had conspired to damage decedent's business and reputation); *Lancaster v. Montesi*, 390 S.W.2d 217 (Tenn. 1965) (no wrongful death claim for suicide where decedent was in physically and mentally abusive relationship with defendant); *Jones v. Stewart*, 191 S.W.2d 439 (Tenn. 1946) (no wrongful death claim for suicide where decedent was falsely accused of having been guilty of housebreaking and larceny); *Salsedo v. Palmer*, 278 F. 92 (2d Cir. 1921) (no wrongful death claim for suicide where decedent was wrongfully arrested and physically and verbally assaulted); *Stevens v. Steadman*, 79 S.E. 564 (Ga. 1913) (no wrongful death claim for suicide where letter was written to decedent calling on him to resign as vice president of corporation for undisclosed reasons).

Melinda Duckett that would give rise to a duty to prevent suicide, nor could they allege that any relationship of the sort may be found at law. Indeed, courts directly confronted with similar questions have held there is no special duty of care between a journalist and interview subject, and therefore no liability will lie for independent, voluntary post-interview conduct. *See, e.g., Graves v. Warner Bros.*, 656 N.W.2d 195, 205 (Mich. Ct. App. 2003) (media defendants owed no duty, and therefore not liable for wrongful death where, after show, television guest murdered second guest who had revealed secret homosexual crush on show).

Even where the courts have imposed a duty on a defendant with a "special relationship," the defendant also must have had specific notice of the decedent's suicidal tendencies. "[A] defendant is not liable for injuries resulting to a plaintiff when there is an independent intervening cause, unless that independent intervening cause is a foreseeable and probable consequences of the wrongful actions of the defendant." *Guice v. Enfinger,* 389 So. 2d 270, 271 (Fla. 1st DCA 1980) (court holds sheriff not liable for suicide of inmate who never threatened or attempted suicide in the past, had demonstrated no overt suicidal tendencies, and was expected to bond out the next morning). Foreseeability "by an entity responsible for the welfare of another" requires "evidence of 'suicidal tendencies' of which the defendant was or should have been aware and against which it should have been guarded." *Rafferman v. Carnival Cruise Lines, Inc.*, 659 So. 2d 1271, 1273 (Fla. 3d DCA 1995) (court holds shipowner not liable for suicide of crewman where he did not exhibit any signs that he was suicidal, though he was visibly and obviously depressed due to death of close relative); *see also Lawlor*, 795 So. 2d at 148 (court holds psychotherapist treating decedent as outpatient not liable where he showed no signs of suicidal tendencies, past

attempts, or threats).

Here, there was no special relationship at all between Melinda Duckett and CNN or Grace that imposed a duty on Defendants to prevent Melinda's suicide.  Further, Plaintiffs' allegations that CNN and Grace knew that Melinda was distressed because of the loss of her son, (*see* Complaint ¶¶ 10, 11(e), 13) do not approach the strict and specific notice required under Florida law in order to impose a duty on someone who does have a special relationship. For these reasons, the Court should dismiss Count I for failure to state a claim.

## III.    MELINDA DUCKETT'S FAMILY CANNOT SUSTAIN A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT II).

The Eubanks, who are Melinda Duckett's parents and younger sibling, allege their own claims of emotional distress based, not on Nancy Grace and CNN's conduct in securing or conducting the interview with Melinda, but on CNN's broadcast of the Nancy Grace show in which Melinda was interviewed.  The law, however, does not recognize an outrage claim merely because a relative is unhappy with news coverage.

Florida courts have repeatedly held that publication that someone deems offensive is not, in and of itself, "extreme and outrageous" behavior.  For example, a woman could not sustain an emotional distress claim where she was photographed on the street immediately after being released from a kidnapping, clad only in a dishtowel, *Cape Publications, Inc. v. Bridges*, 423 So. 2d 426 (Fla. 5th DCA 1982), and a family could not recover where a deceased airline pilot was portrayed in fictionalized accounts as a ghost. *Loft v. Fuller*, 408 So. 2d 619 (Fla. 4th DCA 1982) (portrayal of deceased airline pilot as "ghost" in both novelization and movie of airline crash not outrageous); *see also, Tyne v. Time Warner Entertainment Co.*, 336 F.3d 1286, 1292 (11th Cir. 2003) (court, applying Florida law, rejects

as "heavily disfavored" claim by decedent's relatives for relational invasion of privacy for portrayal of decedent in motion picture).[10]

A family's particular sensitivities to viewing the program are not relevant where behavior is not objectively outrageous. *See Chastain v. Valley Broadcasting Co.,* No. 96-A-355163-C, 1996 WL 807390, at *1 (Nev. Dist. Ct. June 5, 1996) (dismissing claim by father where news broadcast was his first indication of daughter's death, noting First Amendment does not permit every viewer upset by a broadcast about a deceased family member to recover). By contrast, Florida courts have only permitted families to recover for emotional distress where photographs or footage depict gruesome details about the victim's death. *See Armstrong v. H & C Comm'ns, Inc.,* 575 So. 2d 280, 281-82 (Fla. 5th DCA 1991) (permitting recovery where an Orlando television station broadcast the decomposed remains of a murdered child); *Fletcher v. Fla. Publishing Co.,* 319 So. 2d 100, 112 (Fla. 1st DCA 1975) (permitting allegation of emotional distress, but finding insufficient evidence for claim, where newspaper published photograph of silhouette of plaintiff's deceased daughter on floor of bedroom after fire), *rev'd in part on other grounds,* 340 So. 2d 914 (Fla. 1976); *Williams v. City of Minneola,* 575 So. 2d 683, 691-93 (Fla. 5th DCA 1991) (permitting recovery where police officer gratuitously disclosed photographs and videotape of autopsy, as courts are especially concerned with disrespect or indignity directed at a dead body).

---

[10] Case law from outside of Florida is also replete with examples of newsworthy publications that, as matters of law, courts do not deem sufficiently outrageous to sustain emotional distress claims. *See, e.g., Hustler Magazine v. Falwell,* 485 U.S. 46 (1988) (court holds not outrageous caricature of Jerry Falwell suggesting he was an alcoholic and had sex with mother); *Fry v. Ionia Sentinel-Standard,* 300 N.W.2d 687, 691 (Mich. Ct. App. 1980) (court holds not outrageous newspaper's report on decedent's fire-related death, including that decedent was last seen with a woman other than his wife); *Galvin v. Gallagher,* 401 N.E.2d 1243, 1246 (Ill. App. Ct. 1980) (court holds not outrageous newspaper's article concerning teenager's drug death that expressed harsh opinions about teenagers' problems with alcohol and drug).

Here, the broadcast of the voluntary interview between Melinda Duckett and Nancy Grace – where only Melinda's voice was recorded – was not outrageous, as Trenton's kidnapping was a newsworthy event, and the story warrants the public's ongoing attention until we learn his fate.  Unlike *Armstrong*, there were no unsavory or highly offensive details publicized in the broadcast.  Therefore, there is no conduct Plaintiffs can point to which would justify recovery.[11]

## IV.  COUNTS I AND II ARE IMPERMISSIBLE END-RUNS AROUND A DEFECTIVE DEFAMATION CLAIM THAT COULD NOT BE BROUGHT BY ANY OF THE PLAINTIFFS.

The Complaint repeatedly alleges that during the broadcast, Nancy Grace and CNN falsely implied that Melinda was culpable in Trenton's disappearance.  (*See* Complaint ¶¶ 6, 10, 11(d), 21.)  The broadcast, however, makes no such allegation.  Regardless, to the extent that Plaintiffs try to frame a claim around an allegedly defamatory publication, that action cannot be brought by the Estate or Melinda's survivors.  Courts consistently reject end-runs around defective defamation claims where the alleged defamation was not of and concerning a living plaintiff. [12]  *See Loft v. Fuller*, 408 So. 2d 619, 624 (Fla. 4th DCA 1981) ("A libel

---

[11] Plaintiffs also seek an injunction in Count II to restrict the future broadcast of the Nancy Grace show in which Melinda Duckett was interviewed.  (*See* Complaint at 7 and *ad damnum* to Count II.)  Though Plaintiffs have not have yet formally moved for an injunction, the Complaint impermissibly asks this Court to enter an unconstitutional prior restraint.  *See CBS v. Davis*, 510 US 1315, 1317 (1994) ("the gagging of publication has been considered acceptable only in "exceptional cases.") (Blackmun, Circuit Judge, in chambers); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558-559 (1976) ("prior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights"); *Clear Channel Communications, Inc. v. Murray*, 636 So. 2d 818, 820-21 (Fla. 1st DCA 1994); *State v. Globe Communications Corp.*, 648 So. 2d 110 (Fla. 1994).

[12] While Florida law permits survival actions, *see* Fla. Stat. § 45.021, the purpose of the statute is to preserve liability already existing at the time of the decedent's death.  *Martin v. United Sec. Services, Inc.*, 314 So. 2d 765, 770 n.18 (Fla. 1975); *Williams v. Bay Hospital, Inc.*, 471 So. 2d 626, 629 (Fla. 1st DCA 1985); *Levy v. Baptist Hospital of Miami, Inc.*, 210 So. 2d 730, 731 (Fla. 3d DCA 1968) . The Plaintiffs here, however, do not claim that Melinda was defamed before she died, but afterwards, when the "Nancy Grace" show aired. That claim, therefore, did not accrue before Melinda's death, and the statute does not apply.

upon the memory of the deceased person that does not directly cast any personal reflection upon his relatives does not give them any right of action."); RESTATEMENT (SECOND) OF TORTS § 560 (1977); *see also, e.g., Casamasina v. Worcester Telegram & Gazette, Inc.*, 307 N.E.2d 865 (Mass. App. Ct. 1973) (rejecting father's defamation action brought against article detailing daughter's death and implying drug use); *Gonzales v. Times Herald Printing Co.*, 513 S.W.2d 124 (Tx. Ct. Civ. App. 1974) (defamation plaintiff, not referenced herself, lacked standing to bring defamation claim where article implied that her deceased husband was murdered in drug war); *Johnson v. KTBS, Inc.*, 889 So. 2d 329 (La. Ct. App. 2004) (children of decedents could not maintain action against news station for reporting deceased parents were brother and sister); *Saari v. Gillett Comm'ns of Atlanta*, 393 S.E.2d 736 (Ga. Ct. App. 1990) (administrator of estate could not maintain action where news report identified decedent's death as being "drug-related").

In addition to this common law obstacle, the First Amendment will not permit plaintiffs to circumvent the strictures of defamation claims by recasting causes of action.  For example, in *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988), the Supreme Court held that a satirical cartoon about Rev. Falwell was not actionable under emotional distress theory unless Falwell could establish the same "actual malice" required in public figures' defamation claims.  Similarly, in *Cowras v. Hard Copy*, 56 F. Supp. 2d 207 (D. Conn. 1999), the Court held that "a plaintiff may not use a claim for emotional distress to circumvent the established and carefully balanced framework of constitutional and state libel law," *id.* at 209, and rejected emotional distress and privacy claims arising out of a legally protected broadcast of video of plaintiff being arrested for drunken driving. *Id.* (holding that emotional dress claims

fall with the privacy and defamation claims "where those claims are based on constitutionally protected conduct"); *see also Packard v. Central Maine Power Co.,* 477 A.2d 264 (Me. 1984) (no action for infliction of emotional distress unless defendant is also liable for underlying defamation, where distress resulted from defendant's allegedly false communication to plaintiff's employer); *Flynn v. Higham,* 149 Cal. App. 3d 677 (Cal. Ct. App. 1983) (no action for emotional distress for book which alleged plaintiff's father was homosexual and a Nazi spy as it "would allow plaintiffs to do indirectly that which they could not do directly" through a defamation claim); *Gugliuzza v. K.C.M.C., Inc.*, 606 So. 2d 790 (La. 1992) (family could not maintain action for emotional distress where news report alleged that decedent's death was related to gambling and organized crime where underlying claim of defamation could not be maintained).

In this action, the Eubanks were never even mentioned in the broadcast, and they certainly were not the subject of false or defamatory publicity. Moreover, the Estate cannot maintain a claim against an alleged defamation occurring after Melinda Duckett died. Thus, as the Complaint appears grounded in allegedly false and defamatory statements that were published about Melinda, the claims of Count I and II must be dismissed with prejudice.

## VI.   THERE WAS NO ACTIONABLE MISAPPROPRIATION OF MELINDA DUCKETT'S IMAGE OR LIKENESS (COUNT IV).

Finally, the Eubanks have failed to state an actionable misappropriation of Melinda Duckett's image or likeness under Florida law.[13]  Florida's statutory law will only permit this claim where the image or likeness is used "for purposes of trade or for any commercial or

---

[13] The Estate did not specify whether it was bringing a common law or statutory misappropriation claim in Count IV.  However, regardless of the basis of the claim, it cannot be sustained as a matter of law.

advertising purpose" without "express oral or written consent." FLA. STAT. § 540.08(1).  The statute parallels Florida common law.  *Lane v. MRA Holdings LLC,* 242 F. Supp. 2d 1205, 1220 (M.D. Fla. 2002).  The claim here fails for two independent reasons.

First, the Estate again has no standing to pursue a misappropriation claim.  The only person with standing to raise a claim on behalf of a decedent is someone with the right to consent to its use, § 540.08(2), which includes either a person with such written authorization or the decedent's surviving spouse or children, § 540.08(1)(c).[14]  The Estate through Melinda Duckett's personal representative has brought this misappropriation claim.  Complaint at 8-9 and *ad damnum* to Count IV.  The Estate does not allege that the personal representative had written authorization to license the use of Melinda's likeness, and it is not her spouse or child. The Estate therefore cannot bring this claim.

Count IV also must fail as the broadcast complained of is not a "commercial" use under Florida misappropriation law.  *Loft v. Fuller,* 408 So. 2d 619, 622-23 (Fla. 4th DCA 1982) (commercial use means the image or likeness is used to directly promote a produce or service); *see also Tyne v. Time Warner Entertainment Co.,* 901 So. 2d 802, 808 (Fla. 2005) (approving statutory construction as it been applied for decades and the legislature has never amended the statute to the contrary).  Florida courts in these claims look to the RESTATEMENT, which expressly provides that use of a person's likeness is commercial only if it is "used in advertising the user's goods or services, or [] placed on merchandise marketed by the user, or [] used in connection with services rendered by the user," and directly

---

[14] Even if the claim could be fairly read as being raised by Melinda Duckett's child Trenton, consent on behalf of minor children may be only given by the minor's guardian or parent.  FLA. STAT. § 540.08(5).  There has been no allegation that any of the Plaintiffs, and not his father Joshua Duckett, are Trenton's guardian, let alone demonstrated how a guardian may grant consent on behalf of a missing child.

excludes news reporting, commentary, and advertising incidental to that type of use. RESTATEMENT (THIRD) OF UNFAIR COMPETITION §47; *see also Lane*, 242 F. Supp. 2d at 1213 (use of image of girl in "Girls Gone Wild" video not actionable misappropriation, as it was not commercially associated with any product or service unrelated to the work); *Tyne*, 901 So. 2d 802 (use of a person's likeness in a motion picture is not a commercial use where the likeness was not used directly to promote product); *Loft*, 408 So. 2d at 623 (use of decedent's name and likeness in book not commercial, even if book sold for profit). The statute provides an explicit exemption for reporting the news:

> The publication, printing or use of the name or likeness of any person in any . . . news broadcast or telecast . . . as part of any bona fide news report or presentation having a current and legitimate public interest and where such name or likeness is not used for advertising purposes.

FLA. STAT. § 540.08(3)(a).

Apart from the statutory prohibition against this claim, the portrayal of Melinda Duckett in a newsworthy context also exempts the broadcast from misappropriation under Florida's common law. Misappropriation is one of the four branches of the invasion of privacy tort. *Armstrong v. H & C Comm'ns, Inc.*, 575 So. 2d 280, 282-83 (Fla. 5th DCA 1991) (also including intrusion, public disclosure of private facts, and false light in the public eye). Once a person becomes an actor in a newsworthy event, whether willingly or not, there is no actionable claim for misappropriation of likeness. *Jacova v. Southern Radio and Television Co.*, 83 So. 2d 34, 36 (Fla. 1955) (man present at gambling raid on cigar store and thereby depicted in telecast of same had no claim for invasion of privacy).

> At some point the public interest in obtaining information becomes dominant over the individual's right of privacy. . . . Just because the story and the photograph may be embarrassing or distressful to the plaintiff does not mean

the newspaper cannot publish what is otherwise newsworthy.

*Cape Publications, Inc. v. Bridges*, 423 So. 2d 426, 427-28 (Fla. 5th DCA 1982) (story accompanied by a photograph wherein plaintiff was rescued from hostage situation, nude, but for a dishtowel); *see also Armstrong*, 575 So. 2d 280 (parents do not have claim where daughter's remains were broadcast in newscast when discovered three years after her disappearance).

The Complaint and the broadcast itself reflect that Melinda Duckett consented to participate via telephone on this news broadcast to publicize the newsworthy event of her child's disappearance and seek help to find him.   Under the statutory or common law standards,  Melinda Duckett was an actor in a newsworthy event. The Court therefore should dismiss the misappropriation claim with prejudice.

## VII.   CONCLUSION

Under the Florida and First Amendment law, a journalist's questions regarding the details of a child's disappearance, and the station's broadcast of a newsworthy interview, cannot form the basis for an emotional distress claim on behalf of either the Estate or the family.  Nor can a vague statement about the purpose of the show uphold a fraud claim.  As such, Counts I and II cannot be maintained.  Finally, the Estate's misappropriation claim (Count IV) is based solely on the reporting of a newsworthy event of current and legitimate public interest, for which no recovery may be had.

For the foregoing reasons, Defendants CNN and Nancy Grace respectfully request that this Court dismiss Plaintiffs' Complaint in its entirety, with prejudice, and award such other relief as the Court deems appropriate.

23

Respectfully Submitted,

**HOLLAND & KNIGHT LLP**
Counsel for Defendants
200 S. Orange Avenue, Ste 2600
Orlando, Florida  32801-3453
Telephone:  (407) 425-8500
Facsimile:  (407) 244-5288

2099 Pennsylvania Ave., N.W.
Suite 100
Washington, D.C. 20006
Telephone:  (202) 955-3000
Facsimile: (202) 955-5564

By:   /s Judith M. Mercier
     Judith M. Mercier
     Florida Bar No. 32727
     Charles D. Tobin
     Florida Bar No. 0816345

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 3, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to the following parties of record:  Counsel for Plaintiffs, Jay Paul Deratany, Esquire and Kara Skorupa, Esquire, Deratany, Skorupa & O'Hara, P.A., Crystal Tree Centre, 1201 U.S. Highway One, Suite 315, North Palm Beach, Florida.

/s Judith M. Mercier