# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

ESTATE OF MELINDA DUCKETT, et al.
Plaintiffs,

v.                                                          CASE NO.:  5:06-cv-444-WTH-GRJ

CABLE NEWS NETWORK LLLP (CNN), et al.
Defendants.
_____/

## CABLE NEWS NETWORK AND NANCY GRACE'S
## MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

## ORAL ARGUMENT REQUESTED

HOLLAND & KNIGHT LLP

Judith M. Mercier #32727
200 S. Orange Avenue, Ste. 2600
Orlando, Florida  32801-3453

Charles D. Tobin #0816345
Drew E. Shenkman, *Of Counsel*
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006

*Counsel for Defendants*
*Cable News Network and Nancy Grace*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................................3

SUMMARY JUDGMENT STANDARD ..................................................................................14

ARGUMENT ............................................................................................................................14

I.    THE ESTATE OF MELINDA DUCKETT'S CLAIM FOR INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS (COUNT I) FAILS AS A
MATTER OF LAW. ................................................................................................16

    A.    Defendants truthfully asked Melinda Duckett to appear on *Nancy Grace*
to help find Trenton and inform the public of the circumstances of his
disappearance. ...................................................................................................18

    B.    Melinda Duckett was asked similar questions previously, publicized her
appearance on *Nancy Grace* in advance, and prepared for the interview
by creating a script of talking points. ................................................................22

    C.    Defendants' knowledge of Melinda Duckett's mental state was limited to
what she told them at the time she was interviewed. ..........................................27

    D.    Melinda Duckett was a public figure and the Estate cannot prove its
claim under the "clear and convincing evidence" standard mandated by
the First Amendment ..........................................................................................31

II.    THE EUBANK PLAINTIFFS' CLAIM FOR INTENTIONAL INFLICTION
OF EMOTIONAL DISTRESS (COUNT II) FAILS AS A MATTER OF LAW. ..............32

    A.    CNN's decision to broadcast the Trenton Duckett program was not
"outrageous" as a matter of law. .......................................................................32

    B.    CNN's decision to broadcast the Trenton Duckett program is protected by
the First Amendment..........................................................................................36

III.    NOTWITHSTANDING PLAINTIFFS' CLAIMS AS TO CNN,  BOTH
CLAIMS AS TO NANCY GRACE FAIL AS A MATTER OF LAW .............................38

CONCLUSION.........................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...............................................................................................14

*Armstrong v. H & C Comm's, Inc.*,
    575 So. 2d 280 (Fla. 5th DCA 1991) ..........................................................33, 34, 36

*Baker v. Florida National Bank*,
    559 So. 2d 284 (Fla. 4th DCA 1990) ...................................................................15

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001)..............................................................................................37

*Blue Cross/Blue Shield of Florida v. Weiner*,
    543 So. 2d 794 (Fla. 4th DCA 1989) ...................................................................16

*Byrd v. BT Foods, Inc.*,
    948 So. 2d 921 (Fla. 4th DCA 2007) ...................................................................19

*Canseco v. Cheeks*,
    939 So. 2d 1122 (Fla. 3d DCA 2006) ...................................................................16

*Cape Publications v. Bridges*,
    423 So. 2d 426 (Fla. 5th DCA 1982) ...................................................................33

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..............................................................................................14

*City of Deland v. Fla. Dep't of Transportation and Leasing Corp.*,
    293 So. 2d 800 (1974) ..........................................................................................16

*Della-Donna v. Gore Newspapers, Co.*,
    489 So. 2d 72 (Fla. 4th DCA 1986)...............................................................31, 32

*Dependable Life Ins. Co. v. Harris*,
    510 So. 2d 985 (Fla. 5th DCA 1987) ...................................................................16

*Doe v. Celebrity Cruises, Inc.*,
    394 F.3d 891 (11th Cir. 2004) .............................................................................16

*Eastern Airlines, Inc. v. King*,
    557 So. 2d 574 (Fla. 1990)...................................................................................18

*Fletcher v. Fla. Pub. Co.*,
   319 So. 2d 100 (Fla.1st DCA 1975) ...................................................33

*Florida Star v. B.J.F.*,
   491 U.S. 524 (1989).........................................................................37

*Ford Motor Credit v. Sheehan*,
   373 So. 2d 956 (Fla. 1st DCA 1979) .................................................16

*Foreman v. City of Port St. Lucie*,
   294 Fed. Appx. 554 (11th Cir. 2008).................................................15

*Gandy v. Trans World Computer Tech. Group*,
   787 So. 2d 116 (Fla. 2d DCA 2001) .................................................15

*Garcia v. Lifemark Hospitals of Florida*,
   754 So. 2d 48 (Fla. 3rd DCA 1999).................................................30

*Gibbs v. Republic Tobacco, LP*,
   119 F. Supp. 2d 1288 (M.D. Fla. 2000)............................................36

*Hernandez v. Tallahassee Medical Center, Inc.*,
   896 So. 2d 839 (Fla. 1st DCA 2005) .................................................28

*Hustler v. Falwell*,
   485 U.S. 46 (1988)..............................................................31, 37, 38

*Johnson v. Thigpen*,
   788 So. 2d 410 (Fla. 1st DCA 2001) .................................................16

*Kirksey v. Jernigan*,
   45 So. 2d 188 (Fla. 1950)................................................................33

*Koutsouradis v. Delta Air Lines, Inc.*
   427 F.3d 1339 (11th Cir. 2005) ........................................................19

*Kraeer Funeral Homes, Inc. v. Noble*,
   521 So. 2d 324 (Fla. 4th DCA 1988) ...........................................16, 33

*Lapar v. Potter*,
   395 F.Supp.2d 1152 (M.D. Fla. 2005)...........................................19, 39

*Lawlor v. Orlando*,
   795 So. 2d 147 (Fla. 1st DCA 2001) .................................................30

*LeGrande v. Emmanuel,*
    889 So. 2d 991 (Fla. 3d DCA 2004) ................................................................15, 19

*Liberty Mut. Ins. Co. v. Steadman,*
    968 So. 2d 592 (Fla. 2d DCA 2007) ................................................................15, 18

*Loft v. Fuller,*
    408 So. 2d 619 (Fla. 4th DCA 1982) ...........................................................................32

*Metro. Life Ins. Co. v. McCarson,*
    467 So. 2d 277 (Fla.1985)..............................................................................15, 36

*Miller v. Mutual of Omaha Ins. Co.,*
    235 So. 2d 33 (Fla. 1st DCA 1970) ..........................................................................16

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964)...................................................................................31, 38

*Paddock v. Chacko,*
    522 So. 2d 410 (Fla. 5th DCA 1988) .........................................................................30

*Rollins v. TechSouth, Inc.,*
    833 F. 2d 1525 (11th Cir. 1987) ............................................................................14

*Smith v. Daily Mail Publ'g Co.,*
    443 U.S. 97 (1979)....................................................................................37

*State Farm Mut. Auto. Ins. Co. v. Novotny,*
    657 So. 2d 1210 (Fla. 5th DCA 1995) .......................................................................16, 19

*Tyne v. Time Warner,*
    336 F.3d 1286 (11th Cir. 2003) ...........................................................................32

*Weinstein v. Bullick,*
    827 F. Supp. 1193 (E.D. Pa. 1993) ........................................................................28

*Williams v. City of Minneola,*
    575 So. 2d 683 (Fla. 5th DCA 1991) ...............................................................28, 33, 34, 36

*Williams v. Worldwide Flight SVCS., Inc.,*
    877 So. 2d 869 (Fla. 3d DCA 2004) ................................................................19, 33, 34, 36

*Zuliana de Aviacion, v. Herrera,*
    763 So. 2d 499 (Fla. 3d DCA 2000) ........................................................................16

**STATUTES**

U.S. Const. amend. I ............................................................................3, 16, 31, 36, 37, 38

Fla. Stat. § 789.19 ...........................................................................................................14

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56.............................................................................................................14

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

ESTATE OF MELINDA DUCKETT, et al.
Plaintiffs,

v.                                                CASE NO.:  5:06-cv-444-WTH-GRJ

CABLE NEWS NETWORK LLLP (CNN), et al.
Defendants.
_____/

**CABLE NEWS NETWORK AND NANCY GRACE'S**
**MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW**

Pursuant to Fed. R. Civ. P. 56 Defendants Cable News Network, Inc.[1] and Nancy Grace ("Defendants") hereby move for the entry of an order granting final summary judgment in their favor as to all Counts in Plaintiffs' Complaint.  The grounds for this Motion, and the substantial matters of law to be argued, are contained in the following Memorandum of Law:

**PRELIMINARY STATEMENT**

The only person who was not surprised during Melinda Duckett's appearance on the *Nancy Grace* program was Melinda herself. Less than two weeks after reporting her son Trenton missing, and following numerous other press interviews, Melinda meticulously prepared for a taped telephone interview on national television. A producer had told her, in the same fashion the program prepares all crime victims who voluntarily appear, the subjects that Melinda might be asked about. Melinda actively publicized her upcoming *Nancy Grace* interview on local radio the day she taped it, she used her laptop computer to prepare a script of her talking points for the interview,[2] she read from the script during the taping of the program,

_____

[1]  Plaintiffs erroneously sued "Cable News Network LLLP," an entity that does not exist.  "CNN" is the acronym for Cable News Network LP, LLLP, now known as Cable News Network, Inc.
[2]  Melinda's script, attached to the end of this brief for the Court's convenience, may also be found in the Declaration of Detective Richard Giles, which is Ex. 6-B to this Motion.

and she idly wrote to a friend on her computer while on hold during the taping. All of the evidence unequivocally shows that Melinda knew precisely what she might be asked on *Nancy Grace*, and – word-for-word – how she planned to respond.

For all of the Plaintiffs' allegations of nefarious ulterior motives, there is no real dispute that finding Trenton was precisely what everyone planning the program was trying to accomplish. The questions Nancy Grace asked Melinda were reasonably designed to provide the public with information about the investigation to help find Trenton. She asked the same questions that Melinda had been asked during press interviews all that week. Grace herself even reinforced to the program staff, minutes before the taping, that they were to avoid all issues surrounding Melinda's contentious divorce and custody dispute so that the focus remained on finding Trenton.

Melinda committed suicide in her grandparents' home the next afternoon as law enforcement, convinced that she was being deceptive and had withheld information about what happened to her son, prepared to interrogate her.  After Melinda's death, in the hopes that informing the public about the circumstances of his disappearance would still help find Trenton, CNN aired the program as scheduled.  Prior to the airing, Melinda's parents, William and Bethann Eubank, and her younger sister M.E. (collectively the "Eubank Plaintiffs"), all of whom Melinda had not seen for more than four years, learned of Melinda's suicide through a Niagara County, New York Sheriff's deputy.[3] Knowing that she had died that day, the Eubank Plaintiffs nonetheless watched the taped *Nancy Grace* program at 8:00 PM.

The Estate of Melinda Duckett's claim that Melinda was tricked into appearing on the program, for the purposes of accusing her of murdering Trenton, are, as the Court recently

---

[3] Bethann Eubank notified her husband, William, while at work that the deputy advised her of Melinda's suicide.

found in reviewing this issue, "a complete waste of time."[4]   Melinda scripted her own performance after pre-interview discussions with a producer, and she adhered to her script during the taping.  Likewise, the Eubank Plaintiffs, even though they had no legal right to control the broadcast and decided to watch it knowing Melinda had died, provide no basis in evidence for their emotional distress claim based on CNN's decision to air the program.  All Plaintiffs therefore fail as a matter of law to meet the very high standard in Florida, as the Court previously has recognized in this case, to raise a question of fact that Defendants' conduct was "outrageous," utterly atrocious, beyond all bounds of decency and utterly intolerable in civilized society.  Moreover, the claims run afoul of the First Amendment – and sound public policy – which fully support the news media's efforts to enlist the public's help to find a missing child, and to report the news that his mother had killed herself while he was still missing.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### August 27th Trenton Duckett "Amber Alert"

1.  On August 27, 2006, Melinda Duckett reported her two-year-old son, Trenton, missing in an apparent abduction through his bedroom window. Law enforcement issued an "Amber Alert," seeking the public's help to find Trenton. (*See* Ex. 1, Declaration of Leesburg Police Detective Jim Dunagan ("Dunagan Decl.") ¶ 3).[5]

2.  Almost immediately after reporting Trenton missing, Melinda implicated her estranged husband, Joshua Duckett, to her family members and the police. (*See* Ex. 2, Deposition of Plaintiff William Gerald Eubank ("W.G. Eubank Dep.") 450:5-451:18; Ex. 3, Deposition of Plaintiff Bethann Eubank ("B. Eubank Dep.") 289:4-13; Ex. 4, Deposition of

---

[4] *See* Order Denying Plaintiffs' Motion For Leave To File Amended Complaint, April 19, 2010, p.10 n.14. (Dkt. No. 156).
[5] All exhibits to this Motion have been separately filed with this Court in Defendants' Appendix of Exhibits in Support of Their Motion for Summary Judgment.

Plaintiff Kathleen Calvert ("Calvert Dep.") 125:16-126:25).

3.  Melinda and Joshua had battled over Trenton's custody since his August 2004 birth, but married in July 2005. (Ex. 5, Deposition of Kimberly Schulte ("Schulte Dep.") 30:11-32:22). By July 2006, Melinda was actively pursuing a divorce, and she had received a temporary restraining order for an email she swore that Joshua sent to her on MySpace.com threatening to hunt down and kill her and Trenton. (*Id.* at 37:8-39:9; Ex. 6, Declaration of Leesburg Police Detective Richard Giles ("Giles Decl.") ¶15; Ex. 1, Dunagan Decl. ¶10).

4.  Police later determined that Melinda had hacked into Joshua's MySpace account and sent the fake email to herself.  (Ex. 6, Giles Decl. ¶15; Ex. 1, Dunagan Decl. ¶10).  Before her suicide, Leesburg Police were ready to arrest Melinda for the fake email and related perjury in securing a temporary restraining order against Joshua on the basis of her false report. (*Id.*)  However, the police chose not to arrest Melinda because they believed she would lead investigators to Trenton. (*Id.*)

5.  After ten days of an intense investigation by the Leesburg Police, assisted by the Florida Department of Law Enforcement and the Federal Bureau of Investigation, Trenton had not been found. Trenton's disappearance also received substantial coverage in the local press, in which Melinda participated.  She spoke at a police press conference, convened her own press conference, gave several TV interviews, and twice appeared on the radio, the second time to publicize her appearance on the upcoming *Nancy Grace* broadcast. (Ex. 1, Dunagan Decl. ¶¶ 8-9; Ex. 7, Declaration of Jeff Duncan a/k/a "Doc Holliday" ("Holliday Decl.") ¶¶4-7).

### *Nancy Grace's* Coverage of the Trenton Duckett Disappearance

6.  The staff of *Nancy Grace*,[6] a nationally telecast justice-themed cable television

---

[6] At all times relevant, *Nancy Grace* aired weeknights from 8:00-9:00 PM on CNN's sister network, Headline News, now known as "HLN."

program devoted to finding missing persons and solving unsolved crimes, learned of Trenton's disappearance. (Ex. 8, Grace's Resp. to Pl's Interrog. No. 11). The program's host Nancy Grace, and its producers, wanted to help give national coverage to Trenton's disappearance.[7]  (Ex. 9, Deposition of Nancy Grace ("Grace Dep.") 34:6-35:2; Ex. 10, Deposition of Dean Sicoli ("Sicoli Dep.") 21:11-22:22; Ex. 11, Deposition of Elizabeth Yuskaitis, 14:21-16:10).

7.   After airing a brief segment highlighting Trenton on August 30th, 2006, Grace and the program's Executive Producer, Dean Sicoli, chose to devote an entire program to help finding Trenton. (Ex. 10 Sicoli Dep. 21:11-22:22; Ex. 9, Grace Dep. 34:16-35:2). This program was to be taped on Thursday, September 7th and to air Friday, September 8th, at 8:00 PM. (*Id.* 94:5-95:18).

8.   Consistent with the program's efforts to help find missing children, Trenton's parents, Melinda Duckett and Joshua Duckett, were invited on the program to increase public awareness and discuss the circumstances of Trenton's disappearance. (*Id.* 26:15-20).

### Melinda Duckett Agrees to be a Guest on *Nancy Grace*

9.   Keren Schiffman, a *Nancy Grace* producer, was the only person with the program who spoke directly to Melinda Duckett prior to taping.

10. On Wednesday, September 6th, Schiffman attempted to contact Melinda through her family law attorney, Kimberly Schulte. Schiffman asked to be put in touch with Melinda in order to invite her on the program and obtain pictures of Trenton to show the audience. (Ex. 12, Deposition of Keren Schiffman ("Schiffman Dep.") 32:5-39:6; 108:19-23). Schulte responded that she would pass along Schiffman's contact information to Melinda, and did so. (Ex. 5, Schulte Dep. 73:3-78:4, 132:22-133:9; Ex. 12, Schiffman Dep. 38:13-21).

---

[7] CNN directly employs all producers of the *Nancy Grace* television program, as well as its host, Nancy Grace. (Ex. 8, Grace's Resp. to Pl's Interrog. Nos. 4-5).

11. Schulte recommended to Melinda that she not appear on the program, but left it to Melinda to speak directly with the program and decide. (*Id.* 79:23-81:7, 132:22-134:10, 197:21-198:7). Schulte was concerned that Melinda had appeared emotionless at a police press conference the week before, and she therefore advised her to avoid media appearances. (*Id.* 53:4-54:18, 133:20-135:19). Schulte and Melinda did not speak again prior to her death. (*Id.* 86:18-87:5). Melinda did not advise Schulte that she had decided to participate in the *Nancy Grace* program, and in fact Schulte did not find out Melinda had appeared on the program until the day after it had aired.[8] (*Id.* 136:11-20).

12. Also on September 6th, Schiffman attempted to call Melinda at the home of her grandparents, Nancy and Billy Eubank, who had been her legal guardians since age seventeen.[9] (Ex. 12, Schiffman Dep. 76:4-23). Schiffman first spoke to Nancy Eubank, who then handed the phone to Melinda. (*Id.*; Ex. 13, Deposition of Nancy Eubank ("N. Eubank Dep.") 102:18-104:5). Schiffman invited Melinda to participate as a guest on *Nancy Grace*. (Ex. 12, Schiffman Dep. 52:7-54:23). Schiffman told Melinda that the purpose of the program was to help find Trenton. (*Id.*; *see also* Ex. 9, Grace Dep. 54:3-18). Melinda asked whether Joshua was also a guest, and Schiffman responded that he had agreed to appear. (Ex. 12, Schiffman Dep. 52:7-54:23, 60:17-20). Melinda told Schiffman that she would think about it, and that Schiffman should call her back. (*Id.*)

---

[8] As the Court recently noted, the facts that Schulte told Melinda not to appear on the program, and that Schulte did not again speak with Melinda or the CNN producer until after Melinda appeared on the program, reflect "an absence of any evidence of justifiable reliance by Ms. Duckett upon the alleged misrepresentations." Order Denying Plaintiffs' Motion For Leave To File Amended Complaint, April 19, 2010, p.10 n.14. (Dkt. No. 156). Nor is there any credible argument that, as Plaintiffs have suggested, as a television host who is also a member of the Bar, Nancy Grace could only speak to Melinda through counsel – especially as Schulte left it to Melinda to make contact on her own.

[9] On August 12, 2002, Melinda's adoptive parents, Plaintiffs Bethann and William Eubank, assigned all parental rights to Melinda's grandparents, Nancy and Billy Eubank. Melinda subsequently moved from their home in Lockport, New York to her grandparents' home in Lady Lake, Florida. (Ex. 3, B. Eubank Dep. 263:22-265:25). Melinda did not see her parents again in the ensuing four years before she died. (Ex. 3, B. Eubank Dep 432:25-433:3; Ex. 2 W.G. Eubank Dep. 445:14-21). Her parents never met their grandson Trenton. (Ex. 3, B. Eubank Dep. 286:9-11; Ex. 2 W.G. Eubank Dep. 445:14-21).

13. Melinda and Schiffman spoke again later that evening. (*Id*. 57:9-61:5). When asked whether she had made a decision, Melinda again inquired about Joshua. (*Id*. 57:9-61:5, 71:3-17). When Schiffman reiterated that Joshua had agreed to appear, Melinda agreed to participate. (*Id.*) Melinda was to appear via telephone from her grandparents' home rather than in a studio with Joshua due to the restraining order she received against Joshua, and because Melinda anticipated leaving the taping early. (*Id*. 60:13-61:5, 69:2-71:20).

**Melinda Duckett's Pre-Interview Discussion with *Nancy Grace* Producer**

14. Guests scheduled to appear on *Nancy Grace* participate in a "pre-interview" discussion with a producer about general topics and questions they could be asked on the program. (Ex. 12, Schiffman Dep. 27:5-8). The night before the taping, Schiffman pre-interviewed Melinda. They discussed:

- what Trenton was like, and how he interacted with other people;
- the last time Melinda was with Trenton, including where she had been with him earlier that day;
- whether Melinda had taken a polygraph;
- whether the police had any suspects;
- the ongoing custody and divorce issues between Joshua and Melinda since Trenton's August 2004 birth.

(*Id*. 60:13-61:5, 142:23-149:22).

**Melinda Duckett told CNN her Baker Act Confinement was Simply "One of Josh's Dirty Tricks"; Defendants Knew Nothing Else of her Mental Health History**

15. In discussing her custody and divorce issues, Melinda volunteered to Schiffman that she was detained under Florida's Baker Act in April 2005.[10] (*Id*. 63:13-64:19; 137:17-25).

---

[10] During discovery, Defendants learned the details that Melinda was released from Lifestream Behavioral Center, the facility where she was brought under the Baker Act, after less than 24-hours. Melinda denied being depressed, having any past psychiatric history or suicidal or homicidal ideation or confusion. She stated that when she had threatened to "end it all," precipitating her Baker Act evaluation, she was referring to her relationship with Joshua. (Ex. 15, Deposition of Dr. Dimitrios Hatzivlassiou ("Hatzivlassiou Dep.") 8:7-29:4, NPP 574-76; Ex. 16, Declaration of Dr. W. Steven Saunders ("Saunders Decl.") ¶ 2 and NPP 0030-0034, DCFS 00539, B&W Eubank 0293; Ex. 17, Deposition of Susan Gregory, Lifestream Behavioral Center ("Gregory Dep.") and NPP566-67, 573, 791-94).

However, Melinda dismissed the incident as "one of Josh's dirty tricks" (*Id.* 64:12-19), and "she made it clear that it wasn't something to take seriously, simply a tool [Joshua] used to manipulate the custody dispute they were involved in." (*Id.* 63:13-22).

16. Prior to taping, Schiffman discussed the Baker Act with *Nancy Grace* producer Ellie Jostad. (*Id.* 63:13-64:19). The *Orlando Sentinel* had referred to the Baker Act in one article after Trenton disappeared. (Ex. 14, Deposition of Ellie Jostad ("Jostad Dep.") 61:6-65:3). Schiffman and Jostad determined that, because Melinda dismissed the Baker Act detention as part of their custody battle over Trenton (*Id.* 79:14-83:2, 97:15-98:23, 128:15-21; Ex. 12, Schiffman Dep. 63:13-64:19), and neither producer believed Melinda suffered from mental illness (Ex. 14, Jostad 115:16-116:2; Ex. 12, Schiffman Dep. 123:16-125:23), they would not prepare Grace to discuss the Baker Act at all during the interview (Ex. 14, Jostad Dep. 144:2-145:25). Nancy Grace therefore was never told about Melinda's Baker Act confinement prior to the taping, and she had no knowledge about it.  (Ex. 9, Grace 39:22-40:6; Ex. 14, Jostad Dep. 85:23-86:2).

17. No witness in this action believed that Melinda was suicidal: she never stated to anyone on the CNN staff that she was suicidal or had any mental illness; her parents and grandparents did not believe Melinda was suicidal and still believe the Baker Act confinement was a ploy by Joshua Duckett and did not reflect a mental illness. (Ex. 2, W.G. Eubank Dep. 427:22-428:21, 436:4-438:3; Ex. 3, B. Eubank Dep. 320:2-321:19; Ex. 4, Calvert Dep. 101:16-108:7, 268:13-16; Ex. 13, N. Eubank Dep. 39:4-42:23); her lawyer Kimberly Schulte did not believe Melinda was suicidal or mentally unfit and never stated to Defendants any belief that Melinda was suicidal. (Ex. 5, Schulte Dep. 16:21-22:1,149:15-152:10).

18. Law enforcement investigators similarly did not believe she was suicidal.  Had they

believed she was suicidal, they would have arrested her immediately for faking the MySpace.com email and the related perjury in a state court proceeding.  (Ex. 1, Dunagan Decl. ¶ 10-12; Ex. 6, Giles Decl. ¶¶ 14-17).

19. CNN and Nancy Grace were without knowledge of Melinda's prior mental health history.[11]

### Melinda Duckett's Preparation for, and Promotion of, her Appearance on *Nancy Grace*

20. On the evening before the *Nancy Grace* taping, on Wednesday, September 6th at 6:15 PM, Melinda created a script of talking points on her laptop computer.  Melinda titled her script "CNN Interview – September 7th 2006, From the Mother's point of view."  She named the computer file "Nancy Graves.wps." (Ex. 19, Declaration of FDLE Special Agent Mary E. "Molly" Akin ("Akin Decl.") ¶¶2-3, Ex. A; Ex. 20, Declaration of FDLE Analyst Barbara Ramos-Mendez ("Ramos-Mendez Decl.") ¶¶ 5-6, Ex. A; Ex. 6 Giles Decl. ¶¶ 4-8, Ex. A-C).

21. Melinda's script outlined topics she had prepared herself to address on the program, including:

- her divorce and custody issues with Joshua;
- her interactions with law enforcement after reporting Trenton missing;
- a prepared answer related to where she was the weekend Trenton went missing; and
- a paragraph of material anticipating a question about a polygraph examination.

(Ex. 6 Giles Decl. ¶ 6, Ex. B-C).  Melinda opened the script on her laptop again at 8:11 PM and 8:20 PM the night before the taping. (Ex. 20, Ramos-Mendez Decl. ¶ 6).  Investigators found a

---

[11] Defendants learned through discovery in this lawsuit that Melinda saw a psychiatrist and a psychologist, in May, June and July 2005, after the Baker Act detention.  Neither diagnosed her with any type of mental illness or disorder based on what Melinda told them. (Ex. 15, Hatzivlassiou Dep. 8:7-29:4, NPP 574-76; Ex. 16, Saunders Decl. ¶ 2 and NPP 0030-0034, DCFS 00539, B&W Eubank 0293; Ex. 17, Gregory Dep. and NPP566-67, 573, 791-94). Defendants also did not know, until discovery in this lawsuit, that Melinda had run away from her New York home on multiple occasions, was hospitalized in a youth mental health hospital at age 16 after she cut her wrist with a knife in front of her parents, and was administered mental health counseling in both New York and in Florida. (Comp. Ex. 18, Deposition of Dr. Christopher Martin 15:1-45:15, NPP 1189-1194; Deposition of Sarah Douglas 8:23-50:6;  Declaration of Clarice McClure (Casey House Youth Shelter) ¶ 3, NPP 954-56, 958-960, 961-64, 974; Declaration of Kristine Spada (Niagara Falls Memorial Medical Center) ¶ 3 NPP 654-58, 661-62).

printed copy of Melinda's script at the scene of her death. (Ex. 6 Giles Decl. ¶ 6, Ex. B).

22. After Melinda confirmed that she would be a guest, at approximately 9:00 PM that same night, September 6th, Keren Schiffman updated the computer file for the *Nancy Grace* guest list by adding Melinda's appearance by phone. (Ex. 12, Schiffman Dep. 57:18-24; Ex. 9, Grace Dep. 122:20-126:1, CNN 878-79).

23. Defendants learned during the course of this litigation that, on the morning of September 7th, prior to the taping, Melinda made an unsolicited call to a local radio program to publicize her upcoming appearance on *Nancy Grace*. Melinda said she was taking the search "national." The radio host asked if she would take a polygraph examination, to which Melinda responded, "I'm not going to get into that." (Ex. 7, Holliday Decl. ¶¶6-7).

### The September 7th *Nancy Grace* Taping

24. On the morning of September 7th, in a routine meeting to prepare for the day's program, CNN producers Ellie Jostad and Clark Goldband reviewed with Nancy Grace the status of the search for Trenton, as well as some of the recent custody and divorce issues between Melinda and Joshua. Concerned that attention might be diverted from finding Trenton, Grace specifically instructed Goldband to alert producers and guests that the focus of the program would be finding Trenton, and that Grace would not address the parents' custody issues. (Ex. 9, Grace Dep. 59:19-60:7, 82:5-83:15; Ex. 21, Deposition of Clark Goldband ("Goldband Dep.") 58:20-61:13, 73:18-75:16, CNN 194).

25. Immediately after the meeting with Grace, Goldband emailed the production team with the subject matter "URGENT FOR TAPING" and wrote:

> Please call your guests back ASAP! and instruct them
> We will not be going into any of the negative emails back and forth
> between parents, mom dying hair, or reported myspace page etc.

<u>THE FOCUS IS ON FINDING TRENTON</u>

(Ex. 21, Goldband Dep. 73:18-75:16, CNN 194) (emphasis in original).

26. Just prior to the taping, Melinda drafted a letter to a friend on her laptop stating that "right now I'm fixing to be on an interview with Nancy Grace from CNN and it's over the phone so I've got the phone in one ear, headset to my cell in another, and then I'm on my computer, but not hooked up to the internet.  Confusing as hell, but I'm doing fine so far." (Ex. 6, Giles Decl. ¶ 6.b, Ex. D).

27. As planned, Melinda conducted the entire interview by telephone. She therefore was able to hear but not see Nancy Grace or the other guests while the program was taped.  (Ex. 12, Schiffman Dep. 68:2-10; Ex. 22, DVD of 9/8/06 *Nancy Grace* Broadcast; Ex. 23, Transcript of 9/8/06 *Nancy Grace* Broadcast).

28. No less than five separate times throughout the program, Nancy Grace directly implored viewers to help find Trenton, repeatedly showing Trenton's picture and displaying the FBI's reward tip-line. (Ex. 22, DVD of 9/8/06 *Nancy Grace* Broadcast; Ex. 23, Transcript of 9/8/06 *Nancy Grace* Broadcast; Ex. 3, B. Eubank Dep. 364:11-365:16, 374:8-375:9, 381:10-382:9, 391:15-392:18).

29. Grace first asked Joshua Duckett the circumstances of Trenton's disappearance, and his involvement with the police investigation, before turning to Melinda to ask virtually identical questions.  For example, Grace asked both parents whether they had taken a polygraph examination and where they had been on the day Trenton was reported missing.  (Ex. 22, DVD of Broadcast; Ex. 23, Transcript of Broadcast).

30. Joshua answered all of the questions.  Melinda answered some, but she evaded questions about whether she had taken a polygraph or what specific stores she had visited

11

during a shopping trip with Trenton the day he disappeared.  Grace explained to Melinda that informing the audience of the specific stores could help the public and the authorities find Trenton and asked her again to respond.  Melinda again would not answer. (*Id.*)

31. While the taping was ongoing, and after Melinda avoided answering Grace's first question about a polygraph, producers Schiffman and Jostad confirmed that Leesburg Police had offered Melinda a polygraph, and that she refused to take it.  (Ex. 14, Jostad Dep. 87:7-98:23, CNN 225-227). Grace then clarified the question and asked whether the FBI offered a polygraph, and Melinda again avoided answering. (Ex. 22, DVD of Broadcast; Ex. 23, Transcript of Broadcast).

32. In her final question to Melinda during the taping, Grace prevailed on her to explain to the audience why she would not specify which stores she had visited with Trenton the day he disappeared.  Given the last word, Melinda again failed to answer and simply responded that she was not dealing with the media well. (Ex. 22, DVD of Broadcast; Ex. 23, Transcript of Broadcast).

### The September 8th *Nancy Grace* Broadcast

33. On the afternoon of September 8th, Melinda was found dead at the home of her grandparents, Nancy and Billy Eubank.  (Ex. 13, N. Eubank 137:25-139:8).

34. That afternoon, Schiffman learned that Melinda had killed herself.  (Ex. 12, Schiffman Dep. 162:15-17). Schiffman subsequently confirmed with Leesburg Police that it was the body of Melinda Duckett in an apparent suicide.  (*Id*. 169:9-16).

35. Immediately after learning of Melinda's death, Schiffman alerted *Nancy Grace* Executive Producer Dean Sicoli, who, in consultation with CNN News Standards and Practices and the CNN Legal Department, decided to air the program as planned, believing that the

broadcast still may help to find Trenton. (Ex. 12, Schiffman Dep. 162:15-163:13; Ex. 10, Sicoli Dep. 69:19-73:19). To provide viewers with the latest developments in the search for Trenton, the program was updated to include on-screen text informing viewers of Melinda's suicide. (Ex. 10, Sicoli Dep. 82:24-84:22).

36. Nancy Grace played no role in CNN's decision to air the taped program. (Ex. 9, Grace Dep. 134:11-21).

37. The taped *Nancy Grace* program was then broadcast at 8:00 PM on September 8, 2006. (Ex. 22, DVD of Broadcast).

### The Eubank Plaintiffs' Viewing of *Nancy Grace* on September 8th

38. Shortly after Melinda's body was discovered, a Niagara County, New York Sheriff's Deputy personally informed Melinda's mother, Bethann Eubank, that Melinda had died. (Ex. 3, B. Eubank Dep. 298:14-300:22). M.E., Melinda's minor sibling, watched the deputy tell her mother about Melinda's death, and in turn, Bethann informed M.E. that Melinda had committed suicide. (Ex. 24, Deposition of Plaintiff M.E., a minor sibling of Melinda Duckett ("M.E. Dep.") 47:11-48:18). Shortly thereafter, Bethann called her husband and Melinda's father, William Gerald Eubank. (Ex. 2, W.G. Eubank Dep. 102:2-103:5). A co-worker prepared Melinda's father to receive the news from Bethann, who then told him that Melinda was dead and had committed suicide.  (*Id*. 97:12-105:16).

39. At approximately 8:00 PM on September 8, 2006, the Eubank Plaintiffs watched the *Nancy Grace* program devoted to helping find Trenton, with the full knowledge that Melinda participated in the program over the phone and had committed suicide earlier that day. (Ex. B, W.G. Eubank Dep.103:10-104:1; Ex. 23, M.E. Dep. 45:9-48:25, 59:22-62:14; Ex. 3, B. Eubank Dep. 333:9-25).

**Melinda Duckett Was the Prime Suspect**

40. In October, 2006, the Leesburg Police Department announced that Melinda Duckett was the prime suspect related to Trenton's disappearance.  After an exhaustive investigation with the Leesburg Police, the FBI Behavioral Analysis Unit concluded that, "Melinda Duckett falsely alleged that her child was abducted in an effort to cover up a homicide." (Ex. 6, Giles Decl. ¶ 16, Ex. F).

41. After being missing for over three years, Trenton has never been found.

## SUMMARY JUDGMENT STANDARD

Summary judgment is required where, as here, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The non-moving party cannot refute a properly supported summary judgment motion with mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  *Id.* at 256; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Rollins v. TechSouth, Inc.*, 833 F. 2d 1525, 1529 (11th Cir. 1987).  For the reasons discussed below, Plaintiffs cannot meet these burdens and, as a result, Defendants CNN and Nancy Grace are entitled to summary judgment as a matter of law.

## ARGUMENT

Neither the Estate of Melinda Duckett nor the Eubank Plaintiffs, on this undisputed record and under the extremely high standard required by Florida law,[12] has established a jury question on their claims of intentional infliction of emotional distress – the only remaining claims in the case.

---

[12] The Estate has brought a claim for wrongful death pursuant to Fla. Stat. § 768.19 premised upon the underlying tort of intentional infliction of emotional distress.  *See* Opinion on Motion to Dismiss, Dkt. No. 50, p. 8-9, n.4. If there is no claim for intentional infliction of emotional distress, there can be no claim for wrongful death.

The elements of the tort of intentional infliction of emotional distress are:

> 1) the wrongdoer's conduct was intentional or reckless, that is, he knew or should have known that emotional distress would likely result;
>
> 2) the conduct was outrageous as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community;
>
> 3) the conduct caused emotional distress; and
>
> 4) the emotional distress was severe.

*LeGrande v. Emmanuel*, 889 So. 2d 991, 994-95 (Fla. 3d DCA 2004); *see also Metro. Life Ins. Co. v. McCarson,* 467 So. 2d 277, 278 (Fla.1985).   Under the extremely high burden here, "whether alleged conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a matter of law, not a question of fact." *Gandy v. Trans World Computer Tech. Group*, 787 So. 2d 116, 119 (Fla. 2d DCA 2001); *see also Baker v. Florida National Bank,* 559 So. 2d 284, 287 (Fla. 4th DCA 1990) (upholding summary judgment for defense on outrageousness element). Further, "the subjective response of the person who is the target of the actor's conduct does not control the question of whether the tort of [intentional infliction of emotional distress] occurred. Rather, the court must evaluate the conduct as objectively as is possible . . . ." *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. 2d DCA 2007).

Courts applying Florida law have routinely dismissed emotional distress claims under facts far more extreme than Plaintiffs allege here. *See e.g., Foreman v. City of Port St. Lucie*, 294 Fed. Appx. 554 (11th Cir. 2008) (affirming dismissal of intentional infliction of emotional distress claim under Florida law where on-duty police officer pointed empty gun at plaintiff's husband and pulled the trigger while plaintiff watched not knowing the gun was empty).   In fact, the standard is so high that "[i]t is not enough that the intent is tortious or criminal; it is not enough that the defendant intended to inflict emotional distress; and it is not enough if the

conduct was characterized by malice or aggravation which would entitle the plaintiff to punitive damages for another tort." *State Farm Mut. Auto. Ins. Co. v. Novotny*, 657 So. 2d 1210, 1213 (Fla. 5th DCA 1995) (overturning intentional infliction of emotional distress jury verdict).

CNN and Nancy Grace's alleged conduct here – either in preparing Melinda to the point that she was able to script her lines before the taping, or in deciding to air the broadcast in hopes of leading to Trenton's rescue – cannot meet the high standard for an emotional distress claim in Florida. Additionally, as CNN and Nancy Grace's actions are protected under the First Amendment to the U.S. Constitution, as a matter of law their conduct is not actionable under Florida's extremely high "outrageous" standard.

## I.  THE ESTATE OF MELINDA DUCKETT'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT I) FAILS AS A MATTER OF LAW.

In light of Florida case law and the Estate's very high burden,[13] this Court held that any

---

[13] The Court previously has noted that in only ten reported cases have Florida plaintiffs successfully recovered judgments for damages under the stringent emotional distress standards. (Opinion on Motion to Dismiss, Dkt. No. 50 at p.10). The conduct found outrageous in these cases is far different, and much more extreme, than alleged here. *See Canseco v. Cheeks*, 939 So. 2d 1122 (Fla. 3d DCA 2006) (baseball players attacked plaintiff unprovoked, repeatedly punching and "shoving him against a column, lifting him by the throat, and choking him"); *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891 (11th Cir. 2004) (cruise line strictly liable for rape of a passenger by crewmember); *Johnson v. Thigpen*, 788 So. 2d 410 (Fla. 1st DCA 2001) (employer made vulgar and explicit comments to employee; forced plaintiff to record dictation while urinating; left nude photo of self; and unwelcome touching of breasts and genitals); *Zuliana de Aviacion, v. Herrera*, 763 So. 2d 499 (Fla. 3d DCA 2000) (outrage where plaintiff's altercation with airline personnel over luggage resulted in her confinement in airport bathroom, strip-searched including a body-cavity search by a member of Venezuelan National Guard, and airline refused to provide food/lodging without signing release); *Blue Cross/Blue Shield of Florida v. Weiner*, 543 So. 2d 794 (Fla. 4th DCA 1989) (insured child became quadriplegic after accident, insurance company refused to cover child after age nineteen); *Kraeer Funeral Homes, Inc. v. Noble*, 521 So. 2d 324 (Fla. 4th DCA 1988) (funeral home mishandled remains of decedent); *Dependable Life Ins. Co. v. Harris*, 510 So. 2d 985 (Fla. 5th DCA 1987) (insurer wrongfully withheld disability benefits by falsely citing a preexisting condition and accusing plaintiff of being a cheat and a fraud); *Ford Motor Credit v. Sheehan*, 373 So. 2d 956 (Fla. 1st DCA 1979) (sustaining outrage claim where car repossession contractor, unable to locate debtor, falsely told debtor's mother that debtor's children were hospitalized due to serious car accident, inducing mother to provide debtor's home phone and address); *City of Deland v. Fla. Dep't of Transportation and Leasing Corp.*, 293 So. 2d 800 (1974) (police officer falsely represented authority to retake repossessed car under the implied threat of arrest); *Miller v. Mutual of Omaha Ins. Co.*, 235 So. 2d 33 (Fla. 1st DCA 1970) (after plaintiff of limited means and education diagnosed with serious

outrage claim the Estate tries to establish must come through "evidence…concerning Ms. Duckett's mental state and the Defendants' level of knowledge about it, as well as … evidence concerning what exactly was said to Ms. Duckett both during the initial conversations with the Defendants' producers and during the taping of the *Nancy Grace* show…."  (Order on Motion to Dismiss, Dkt. No. 50, p.12).  After eight depositions of *Nancy Grace* staff, and the disclosure of thousands of documents,[14] Plaintiff has failed to find *any* evidence supporting its conclusory theory.  Indeed, the Estate cannot show that (a) Defendants intentionally or recklessly misled Melinda when inviting her to appear on *Nancy Grace*, in order to aggressively question Melinda or cross examine and accuse her of having anything to do with Trenton's disappearance, or (b) Defendants had any knowledge that Melinda suffered from any mental illness or "precarious emotional and mental state." (Complaint ¶ 10).

To the contrary, it is undisputed that Melinda voluntarily participated in the program and was informed of the topics that may be discussed, including where she was the day Trenton went missing and her cooperation with law enforcement.  Armed with this knowledge, Melinda prepared and read from a script of talking points addressing these and other topics during the taping.  Finally, the record is clear that Defendants had no knowledge that Melinda suffered from any mental illness or "precarious emotional and mental state." Because Defendants had no knowledge that Melinda was unfit to be asked routine, simple questions about the circumstances of her son's disappearance and her involvement in the ongoing investigation, the

---

disease, insurer refused to pay medical bills and accused plaintiff of knowing she had the disease prior to buying insurance).

[14]  As the Court is aware, Plaintiffs' counsel delayed their review of Defendants' Rule 26 documents disclosure for more than eight months after they were first made available.  Additionally, some of the other documents on which the defense relies in this motion were obtained from the files of the Leesburg Police.  Plaintiffs' counsel also subpoenaed the police records, made appointments with police to review them, but cancelled the appointments. (Dunagan Decl. ¶15).  After the defense obtained these documents by subpoena, it offered Plaintiffs' counsel the opportunity to review them, but counsel chose not to do so. *See* Letters to Plaintiffs' Counsel dated March 16, 2010, February 4, 2010,December 23, 2009, September 23, 2009, and April 28, 2009 attached as Ex. 25.

Estate cannot support its theory of outrage under Florida's extremely high standard.

> **A.    Defendants truthfully asked Melinda Duckett to appear on *Nancy Grace* to help find Trenton and inform the public of the circumstances of his disappearance.**

The Estate cannot show that Defendants tricked Melinda into appearing by telephone on the *Nancy Grace* program.  Instead, the undisputed evidence demonstrates that Defendants truthfully informed Melinda about the purpose of the program and potential topics she could be asked to discuss, that Melinda had previously been asked similar questions by the press, that Melinda made the decision to participate after consulting with counsel, and that she had specifically prepared her responses to all issues on *Nancy Grace*.

Under Florida law, an intentional act is defined as one where "the actor desires to inflict severe emotional distress," and an act is reckless where it is done in "deliberate disregard of a high degree of probability that the emotional distress will follow where he knows that such distress is certain, or substantially certain, to result from his conduct."  *Eastern Airlines, Inc. v. King*, 557 So. 2d 574, 576 (Fla. 1990) (citing *Restatement (Second) of Torts*, Section 46, comment *i* (1965) (rejecting intentional infliction of emotional distress count that airline failed to properly inspect, maintain, and operate its aircraft as containing only conclusions)). Therefore, "[c]onduct cannot be in reckless disregard of the safety of others *unless the act or omission is itself intended* . . . ." *See id.* (citing Comment b to section 500 of the *Restatement*) (emphasis supplied). Accordingly, the question is not whether Melinda subjectively believed that she was misled – which the script she read from would conclusively belie – but whether Defendants *intended to* mislead and ambush her.  *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. 2d DCA 2007) (subjective response of the target of actor's conduct does not control whether intentional infliction of emotional distress occurred).  Even a claim of "fraud

requires inducing a person to take an action he has no obligation to take, nor intent to take without the misrepresentation." *State Farm Mut. Auto. Ins. Co. v. Novotny*, 657 So. 2d 1210, 1213 (Fla. 5th DCA 1995).[15]

The undisputed evidence disproves the Estate's allegation that Defendants intended to ambush Melinda "with accusations, questions, and verbal assaults clearly intending to intimate that she murdered her child." Complaint, ¶ 6; *see also* ¶ 11(c-e).[16]   On Wednesday, September 6th,  producer Keren Schiffman invited Melinda to be a guest on the program for the purpose of finding Trenton. The undisputed evidence further reflects Melinda decided to participate in the taping because Joshua had also agreed to be on the program, as Melinda was intensely fixated on whether he would participate. (Ex. 12, Schiffman Dep. 54:2-23).   Melinda advised Schiffman the day before the taping that she would participate if Joshua would. (*Id.* 57:9-61:5, 71:3-17). She finally "agreed to come on once she had heard that Josh confirmed. So she said if he was going to do it, she would do it."   (*Id.* 60:13-61:5).   Melinda deliberated over the invitation, asked about the one issue that seemed to matter to her – Joshua Duckett's participation – and, after receiving and rejecting the advice of her counsel (Ex. 5, Schulte Dep.

---

[15] Additionally, as this Court has already held, no independent claim of fraud exists here under Florida law. (Order on Motion to Dismiss at p.5, n.2). Still, to the extent the Estate continues to argue that Defendants failed to specifically tell Melinda that she would be asked about her whereabouts, or whether she took a polygraph, there is simply no evidence that Defendants intended to deceive her. (Complaint  ¶¶ 7, 10, 11). Because Melinda knew exactly what she might be asked and scripted her responses, no fraud claim exists to support Plaintiffs' ambush theory.

[16] To the extent the Estate asserts that Defendants intended to inflict severe emotional distress "by verbally accosting [Melinda] and intimating that she murdered her own child," (Complaint ¶11), Florida courts consistently hold that a plaintiff's perception that she was insulted or treated indignantly will not support an emotional distress claim. *See Koutsouradis v. Delta Air Lines, Inc.* 427 F.3d 1339, 1345 (11th Cir. 2005) (not outrageous where airline employees discovered sex toy in passenger's luggage, called her off plane to tarmac and made sexually suggestive gestures and comments in the view of other passengers); *Lapar v. Potter*, 395 F.Supp.2d 1152, 1160-62 (M.D. Fla. 2005) ("foot stomping, arm crossing, staring, and snapping…." regarding known bipolar disorder condition); *Williams v. Worldwide Flight SVCS., Inc.*, 877 So. 2d 869, 871 (Fla. 3d DCA 2004) (calling African-American racial epithets and threatening job termination). Further, an outrage claim also fails where based on a perceived negative tone.  *See Byrd v. BT Foods, Inc*., 948 So. 2d 921, 928 (Fla. 4th DCA 2007) (teasing HIV-positive employee); *LeGrande v. Emmanuel*, 889 So. 2d 991, 995 (Fla. 3d DCA 2004) (branding clergy thief in front of his parishioners).

79:23-81:7, 132:22-134:10, 197:21-198:7), she accepted.

Moreover, during direct conversations, including Melinda's "pre-interview" that day, she and Schiffman discussed topics that she could be asked during the program, including:

- what Trenton was like, and how he interacted with others;
- the last time Melinda was with Trenton, including where she had been with him earlier on the day he disappeared;
- whether Melinda had taken a polygraph;
- whether the police had any suspects;
- and information related to the custody and divorce issues between Joshua and Melinda since Trenton's August, 2004 birth. [17]

(Ex. 12, Schiffman Dep. 60:13-61:5, 99:20-100:18, 142:23-149:22).  In particular, Schiffman asked Melinda where she was the day Trenton went missing, told Melinda that Nancy Grace may ask about that issue, and advised that it was a simple question the program would have asked the parent of any missing child.  (*Id*.)

> Q    And you asked her to tell you about her boy Trenton, what he is like, correct?
> A   Correct.
> * * *
> Q    And then the third question down you also asked her when was last time you saw him; is that your understanding?
>  A   Correct.
> * * *
> Q    And then you asked . . . have you taken a polygraph test, question mark. Do you see that?
> A   I do.
> * * *
> Q    Okay.  Is there anywhere . . . you asked Melinda . . . where she was during the day that he was missing?
> A   That's in the question when was the last  time you saw him.
> * * *
> Q    Did you just ask when was the last time that you saw him and she explained that?
> A     That would have been a natural follow-up question that I would have asked to when was the last time you saw him, where were you.

---

[17] Indeed, because the program was concerned only with finding Trenton, Grace decided to avoid entirely the topic of Joshua and Melinda's custody battles and pending divorce.  (Ex. 9, Grace Dep. 59:19-60:7, 82:5-83:15; Ex. 21, Goldband Dep. 58:20-61:13, 73:18-75:16, CNN 194).

(*Id.* 142:23-147:9).  Schiffman made no promise to Melinda that any specific question or topic would or would not be covered during the taping. (Ex. 12, Schiffman Dep. 107:19-24).  Indeed, *Nancy Grace* does not agree to conditions on guests' appearances, and Grace did not consider any of these topics to be off limits. (Ex. 9, Grace Dep. 61:8-62:6; 95:20-96:13).

Nancy Grace herself took decisive action to keep the spotlight on the search for Trenton.  Prior to the taping, Grace met with producers and adamantly told the staff that she did not want any part of the program to focus on Melinda and Joshua's divorce. (Ex. 9, Grace Dep. 59:19-60:7, 82:5-83:15;  Ex. 21, Goldband Dep. 58:20-61:13, 73:18-75:16, CNN 194). Immediately after the meeting with Grace, producer Clark Goldband emailed the entire production team with the subject matter "URGENT FOR TAPING" and wrote:

> Please call your guests back ASAP! and instruct them
> We will not be going into any of the negative emails back and forth
> between parents, mom dying hair, or reported myspace page etc.
>
> THE FOCUS IS ON FINDING TRENTON

(Ex. 21, Goldband Dep. 73:18-75:16, CNN 194) (emphasis in original).

Finally, the broadcast itself reflects that the interview genuinely focused on finding Trenton.  Grace informed viewers of the circumstances of his disappearance and theories of his whereabouts. (Ex. 22, DVD of 9/8/06 *Nancy Grace* Broadcast; Ex. 23, Transcript of 9/8/06 *Nancy Grace* Broadcast).  At five separate times during the program, she directly implored viewers to help find Trenton, showing Trenton's picture and displaying the FBI's reward tip-line.  (*Id.*; Ex. 3, B. Eubank Dep. 364:11-365:16, 374:8-375:9, 381:10-382:9, 391:15-392:18). Joshua <u>and</u> Melinda were each asked the same simple questions, which the program routinely asks the parents of any missing child (Ex. 14, Jostad Dep. 126:5-19), about their whereabouts the day Trenton went missing, their knowledge about the police investigation, and whether they

took a polygraph.[18] (Ex. 22, DVD of Broadcast; Ex. 23, Transcript of Broadcast). Schiffman discussed these topics with Melinda the previous day (Ex. 12, Schiffman Dep. 60:13-61:5, 142:23-149:22), and they were similar to questions Melinda was asked by other media prior to the taping.   (Ex. 1, Dunagan Decl. ¶¶ 8-9, Ex. A; Ex. 7, Holliday Decl. ¶¶6-7).

Plaintiffs have simply failed to develop any evidence that Nancy Grace or the CNN staff at any time intentionally tricked Melinda Duckett[19] into participating in the broadcast. Plaintiffs therefore have failed to demonstrate a triable issue of fact, and Defendants are entitled to judgment as a matter of law.

> **B.    Melinda Duckett was asked similar questions previously, publicized her appearance on *Nancy Grace* in advance, and prepared for the interview by creating a script of talking points.**

The evidence further demonstrates no misplaced reliance by Melinda, as she knew and anticipated precisely which topics she may be asked when discussing Trenton's disappearance. She was asked similar questions by police, she had responded to other media inquiries on the same topic, and she even prepared a script of talking points to read from during the *Nancy Grace* taping.

Shortly after reporting Trenton missing, Leesburg Police detectives interviewed Melinda as part of a routine investigation of a child reported missing by his parent. (Ex. 1, Dunagan Decl. ¶¶ 4-7; Ex. 6, Giles Decl. ¶¶ 9-13). Investigators found Melinda to be surprisingly evasive and confrontational, refusing to give specific details of her whereabouts, showing deception in a voice stress analysis, and refusing to consent to a polygraph

---

[18] Melinda participated in the taping by phone.  She could hear, but could not see, Grace or and other guests during the program.  Therefore, Plaintiffs' overblown characterization of Nancy Grace's gesturing for emphasis during the interview as "fist-pounding" (Complaint ¶10) is entirely irrelevant, because Melinda could not see the host.

[19] The Court has determined that Plaintiffs' allegations of misrepresentation through attorney Kimberly Schulte are insufficient to support the Estate's emotional distress claim, as Schulte advised Melinda not to participate in the taping.  (Ex. 5, Schulte Dep. 80:22-81:7; 197:21-198:7). As the Court's decision on this aspect of the claim is now law of the case, Defendants will not address the issue at length here.

examination.  (*Id*.)  During the voice stress analysis, Melinda was asked and answered simple yes/no questions, including:

- Did you take Trenton to a safe place?
- Did you make up the story about Trenton being taken?
- Are you being truthful about Trenton?
- Did you lie during this investigation?
- Have you ensured Trenton's safety?

(Ex. 6, Giles Decl. at ¶ 11, Ex. E).  Detectives told Melinda that her answers showed deception and her story "wasn't adding up." (*Id*. ¶ 12-13). Investigators were further perplexed when she walked out of both interviews without giving the basic information regarding her whereabouts in order to help find her son. (*Id*. ¶13; Ex. 1, Dunagan Decl. ¶ 6).

While unwilling to share details with investigators, Melinda engaged the media on her own terms before the *Nancy Grace* taping, maintaining a visibly public image. In her public appearances, Melinda appeared calm and collected in reciting her story – too calm in her lawyer's view – and refused to show any emotion.  (Ex. 5, Schulte Dep. 53:4-56:13, 133:20-134:21; Ex. 1, Dunagan Decl. ¶¶ 7-9).  On the morning of August 29th, Melinda arranged an interview with a local radio program, the *Doc & Johnny Morning Show*.  (Ex. 7, Holliday Decl. ¶4-5).  Later that day, Melinda answered reporters' questions and spoke to the public at a Leesburg Police press conference.  (Ex. 1, Dunagan Decl. ¶ 8).

Melinda continued to publicize her version of events through subsequent interviews with the local print and television press. On September 5th, Leesburg Police held another press conference, which Melinda chose to not attend. (*Id*. ¶ 9; Ex. 5, Schulte Dep. 127:8-128:18). Instead, she courted the media in a nearby park, speaking about the investigation and continuing to give her story in taped interviews. (Ex. 1, Dunagan Decl. ¶¶ 8-9, Ex. A). Much like Nancy Grace, one local television reporter that day asked Melinda whether she had taken a

polygraph examination, whether she thought the police were doubting her story, and challenged Melinda as to whether she really thought someone had come through Trenton's bedroom window.  (*Id.* ¶ 9, DVD Ex. A at 8 min. 30 sec.).

Finally, on September 7th, the same morning as the HLN taping, Melinda made another unsolicited call to the *Doc & Johnny Morning Show* to publicize her upcoming appearance on *Nancy Grace*. (Ex. 7, Holliday Decl. ¶¶6-7).   During the live radio broadcast, Melinda stated that she was taking the search "national." (*Id.*)  The show's host, Doc Holliday, asked Melinda if she was going to take a polygraph examination, to which she responded, "I'm not going to get into that." (*Id.*)

Melinda continued her direct and deliberate press campaign[20] by preparing the written script for the taping of *Nancy Grace*. At 6:23 PM the evening before the taping – and even before she told Schiffman she would agree to participate in the program – Melinda drafted her talking points on her laptop computer titled "CNN Interview – September 7th 2006, From the Mother's point of view," in a file named "Nancy Graves.wps." (Ex. 19, Akin Decl. ¶¶2-3, ex.A; Ex. 20, Ramos-Mendez Decl. ¶¶ 5-6, Ex. A; Ex. 6 Giles Decl. ¶¶ 4-8, Ex. A-C). Melinda's script addressed the topics she discussed with Schiffman, including her divorce and custody issues with Joshua, her interactions with law enforcement after reporting Trenton missing, and material anticipating a question related to taking a polygraph examination. In her script, Melinda acknowledged that "everyone is a suspect in this matter, no one has been excluded…." (Ex. 6 Giles Decl. ¶ 6, ex. B). Melinda later opened her script on her laptop at 8:11 PM and again 8:20 PM the night before the taping, (Ex. 20, Ramos-Mendez Decl. ¶ 6), and a printed

---

[20] Melinda felt so in control during her interviews that at the time of the *Nancy Grace* taping, she drafted a note to a friend on her laptop: "[R]ight now I'm fixing to be on an interview with Nancy Grace from CNN and it's over the phone so I've got the phone in one ear, headset to my cell in another, and then I'm on my computer, but not hooked up to the internet.  Confusing as hell, but I'm doing fine so far." (Ex. 6, Giles Decl. ¶ 6.b, Ex. D).

copy was found by investigators at the scene of Melinda's suicide. (Ex. 6 Giles Decl. ¶ 6, Ex. B).

In anticipation that Grace might ask where she was the day or weekend she reported Trenton missing, Melinda prepared to say almost the precise words she actually said on the program, deflecting the discussion from her whereabouts earlier that day to her alibi witnesses at the time Trenton disappeared. Her script reads:

> "Summary: That night approximately around 6 we came home from a long day out *and I'm not going to go into the small details about the entire day or weekend for that matter*. Anyway I fed him dinner he went to bed, I checked on him before my friends came and he was asleep. My friends arrived, we watched one movie, got ready for another when I checked on Trent and found him missing. I searched the premise (sic), but with him unfound, my friend called the police, I went to a deputy's apartment in my complex, called family and friends and then everyone showed up . . . . "

(Ex. 6 Giles Decl. ¶ 6, Ex. B) (emphasis added). In her script, Melinda also specifically prepared to deflect questions about a polygraph:

> "Polygraph: *As far as the investigative techniques are concerned whether they be polygraphs, stress tests, physical searches or interviews: my family and I have fully cooperated with the local law enforcement and now the federal. Locally, they do not have the necessary experience and that is why the FBI was called in. I have been instructed to only speak to an individual FBI unit and anything that they release to the media or public is up to them.* They are the professionals and I do not want to impede on any of their involvement so any other questions pertaining to the technical aspect, please direct those to them."

(*Id*.) (emphasis added). Melinda also read this response nearly *verbatim* the first time that Grace inquired whether she had taken a polygraph, and continued reading until she finished her prepared statement:

> GRACE: Out to Melinda Duckett. This is Trenton's mom. Melinda, have you taken a polygraph?
>
> MELINDA DUCKETT: I've spoken to the investigators, and Joshua is on the outside loop of it, and *as far as the investigative techniques are concerned with polygraph, stress test, physical searches, interviews, et cetera, my family and I*

25

*have fully cooperated with local law enforcement and...*

GRACE: Have you taken a polygraph?

MELINDA DUCKETT: ... *the federal and everything...*

(CROSSTALK)
[GRACE:  Right.]
[MELINDA DUCKETT:  Hold on a 'sec]

MELINDA DUCKETT: And *locally, they don't have enough necessary experience, and that's why the FBI was called in to begin with. I've been instructed to only speak with them, with their unit, and anything that they release to the media or public is up to them.* Now, as far as...

GRACE: Have you taken a polygraph?

MELINDA DUCKETT: ... or anything -- like I said, I mean, *anything that I do or anything is in cooperation with them. I'm doing everything they want me to. But as far as details and everything, I mean, I'm leaving everything up to them.*

GRACE: Right. Have you taken a polygraph?

MELINDA DUCKETT: I've done everything they've asked me to.

(Ex. 22, DVD of Broadcast at 19:00 minute mark; Ex. 23, Transcript of Broadcast) (emphasis added). Clearly, far from being ambushed or surprised, Melinda had prepared a scripted answer to the simple question about a polygraph.  Additionally, during the taping and after Melinda avoided answering the question for the first time, *Nancy Grace* producers Schiffman and Jostad confirmed that Leesburg Police had offered Melinda a polygraph, and that she refused to take it.  (Ex. 14, Jostad Dep. 95:12-96:20). With this new information, Grace rephrased her question to ask whether the FBI offered her a polygraph yet Melinda again stuck to her script:

GRACE: Melinda, my producers tell me police say they offered you a polygraph and you haven't taken it yet.

MELINDA DUCKETT: Well, I'm not sure what the police are doing. I'm not working with the police. But everything with the FBI is being handled.

GRACE: Have the FBI offered you a polygraph?

MELINDA DUCKETT: I beg your pardon?

GRACE: Have the FBI offered you a polygraph?

MELINDA DUCKETT: Everything that they have done (INAUDIBLE) and asked and everything, we've cooperated with. Just like with my husband, obviously, you know, there's nothing coming up with anything.

(*Id.*)

Further, as Grace told Melinda during the broadcast, informing the audience where she was the day she reported Trenton missing was vital in aiding the public's search for son, i.e., stores that Melinda had visited could review surveillance tapes for suspicious activity, and members of the public who were in the same locations as Melinda might have information which ultimately would lead to Trenton's safe return.[21] Grace even gave Melinda an opportunity for the last word on her whereabouts. Choosing to disclose nothing, Melinda instead blamed the media, stating that "[she wasn't dealing] well with all media. It's not just there, just all media. Period." (*Id.*)

The undisputed evidence shows that Melinda completely prepared for the taping, anticipated the very topics covered, and even had scripted answers to anticipated questions. The Estate cannot meet the extremely high threshold of outrageous behavior under these facts. Defendants therefore are entitled to judgment as a matter of law.

     **C.    Defendants' knowledge of Melinda Duckett's mental state was limited to what she told them at the time she was interviewed.**

The Estate's intentional infliction of emotional distress claim is further premised upon the allegation that CNN and Nancy Grace knew that Melinda "was in a severe state of mental anguish and distress" so that Melinda's unforeseeable suicide was somehow knowable.

---

[21] Plaintiff Bethann Eubank, Melinda's mother, testified that she did not find it offensive for Nancy Grace to ask Melinda "where she had been with Trenton that day." (Ex. 3, B Eubank Dep. 393:15-18). Indeed, she testified that it was a "legitimate question" and that she only found Grace's "tonality" to be offensive. (*Id.* 400-401).

(Complaint, ¶¶ 10, 11, 13). Because "foreseeability is the guidepost of any tort claim . . . one who recklessly and outrageously inflicts emotional distress can be liable if he knows that emotional distress is certain or substantially certain to result from his act." *Williams v. City of Minneola*, 575 So. 2d 683, 692 (Fla. 5th DCA 1991).

However, in Florida, claims of outrage premised on mental deficiency or peculiar susceptibility only succeed where: (1) a defendant has "knowledge that the other is peculiarly susceptible to emotional distress by reason of some physical or mental condition or peculiarity." *Id*. at 693; *see Weinstein v. Bullick*, 827 F. Supp. 1193, 1203-05 (E.D. Pa. 1993) (granting summary judgment where defendants only knew plaintiff might be upset by broadcast, not that defendants knew in advance that plaintiff was "peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity."); and (2) the complained-of action is sufficiently "outrageous" in light of such knowledge. *See Hernandez v. Tallahassee Medical Center, Inc.*, 896 So. 2d 839 (Fla. 1st DCA 2005) (employer's direction to report to work "right away," despite knowledge that employee might be suffering from symptoms of epileptic-seizure disorder, and which resulted in accident due to seizure, "did not exceed all bounds of decency" so as to be sufficiently "outrageous").

Here, the undisputed evidence does not support the claim that Nancy Grace or CNN had any knowledge that Melinda was "peculiarly susceptible to emotional distress" or that simple questions regarding the circumstances of Trenton's disappearance could cause her to commit suicide while her child was still missing. Melinda did not tell Defendants at any point that she was suicidal or in any way mentally ill. (Ex. 14, Jostad 115:16-116:2; Ex. 12, Schiffman Dep. 123:16-125:23). The other individuals whom Defendants spoke with and knew Melinda best – including her grandmother Nancy Eubank, her husband Joshua Duckett, and her family law

28

attorney Kimberly Schulte – never voiced any concern at any time that Melinda was mentally ill, suicidal, or otherwise unfit to be asked about Trenton's disappearance.  (Ex. 12, Schiffman Dep. 63:13-64:19; 66:21-67:13; 137:17-25; Ex. 13, N. Eubank Dep. 102:18-104:5).  No witness in this case thought Melinda was suicidal at the time, including her Personal Representative and Aunt Kathleen Calvert (Ex. 4, Calvert Dep. 101:16-108:7; 268:13-16), her father (Ex. 2, W.G. Eubank Dep. 427:22-428:21), her mother (Ex. 3, B. Eubank Dep. 320:2-321:19), her divorce attorney (Ex. 5, Schulte Dep. 16:21-22:1,149:15-152:10), or her grandmother (Ex. 13, N. Eubank Dep. 39:4-42:23). Indeed, Melinda's extensive prior mental health history, identified only through discovery, was completely unknown to Defendants.[22] And finally, prior to taping, the Leesburg Police Department and the FBI discussed whether they thought Melinda was a suicide risk and concluded that she was not. (Ex. 6, Giles Decl. ¶ 16, Ex. F; Ex. 1 Dunagan Decl. ¶¶ 10-12). Had investigators thought Melinda was a suicide risk, they would have immediately arrested her for the false MySpace.com email and her related perjury.  (*Id.*)

While Melinda volunteered to CNN's producer Keren Schiffman that she had been taken into custody under Florida's Baker Act in April, 2005, and the local press had referenced the incident in one article, Melinda dismissed the incident as "one of Josh's dirty tricks," (Ex. 12, Schiffman Dep. 64:12-19), and that "she made it clear that it wasn't something to take seriously, simply a tool [Joshua] used to manipulate the custody dispute over Trenton."[23]  (*Id.* 63:16-22).  It is further undisputed that prior to taping, Schiffman discussed the Baker Act with fellow producer Ellie Jostad, and they decided that because both Melinda dismissed the

---

[22] Defendants did not know that Melinda had run away from her New York home on multiple occasions, was hospitalized in a youth mental health hospital at age16 after she cut her wrist with a knife in front of her parents, and was administered mental health counseling in both New York and Florida.  *See supra* fn. 11.

[23] To this day, Melinda's parents and grandparents continue to believe that the Baker Act confinement was a ploy by Joshua Duckett to gain custody of Trenton and did not reflect a mental illness. (Ex. 2, W.G. Eubank Dep. 427:22-428:21, 436:4-438:3; Ex. 3, B. Eubank Dep. 320:2-321:19; Ex. 4, Calvert Dep. 105:20-108:7, 268:13-16; Ex. 13, N. Eubank Dep. 39:4-42:23).

incident as nothing more than part of their custody dispute, they would not bring the information out during the taping or prepare Grace to discuss it. (Ex. 12, Schiffman Dep. 63:13-64:19, 123:16-125:23, Jostad Dep. 79:14-83:2, 97:15-98:23, 115:16-116:2, 128:15-21, 144:2-145:25).

The Estate separately argues that as Melinda was the mother of a missing child, CNN and Nancy Grace must have known that she was susceptible to heightened emotional vulnerability in the interview.  Florida courts, however, do not even take trained mental health professionals "down the path of clairvoyance" that the Estate urges here with a television broadcaster.[24]  *Garcia v. Lifemark Hospitals of Florida*, 754 So. 2d 48, 49 (Fla. 3rd DCA 1999) (quoting *Tarasoff v. Regents of Univ. of California,* 551 P.2d 334, 354 (1976)). The nature of psychiatry is such that while "the outward manifestations of infectious diseases lend themselves to accurate and reliable diagnoses [,] the internal workings of the human mind remain largely mysterious." *Id.*

> Numerous cases underscore the inability of psychiatric experts to predict, with any degree of precision, an individual's propensity to do violence to himself or others. Indeed, "[p]sychiatrists themselves would be the first to admit that however desirable an infallible crystal ball might be, it is not among the tools of their profession."

*Paddock v. Chacko*, 522 So. 2d 410, 414 (Fla. 5th DCA 1988) (internal citations omitted).

If an emergency room doctor, psychotherapist, or psychiatrist are all without the duty to prevent the unforeseeable act of their patient's suicide, the law does not impose a greater duty

---

[24] In Florida, not even a trained medical professional has a duty to prevent the unforeseeable act of a patient's suicide, and liability may only be imposed where the patient committed suicide under the doctor's care in a psychiatric hospital. *See Paddock v. Chacko*, 522 So. 2d 410 (Fla. 5th DCA 1988) (psychiatrist who saw outpatient on single occasion and prescribed appropriate medication not liable for failing to have her civilly committed to prevent suicide attempt); *Lawlor v. Orlando*, 795 So. 2d 147 (Fla. 1st DCA 2001) (psychotherapist owed no duty to outpatient who committed suicide, where patient showed no sign of suicidal tendencies, no evidence of prior suicide attempts or threats, and suicide screening a few months prior showed no risk of suicide); *Garcia v. Lifemark Hospitals of Florida*, 754 So. 2d 48 (Fla. 3rd DCA 1999) (emergency room personnel not obligated to detain victim of drug overdose and subsequent accident who chose to leave against medical advice and later killed self).

on the producers and the host of a television news program.  In fact, holding CNN and Nancy Grace to a standard that does not exist in the law would unduly restrain the press' ability to publicize many important news events and public controversies, including the disappearance of innocent children like Trenton Duckett.  In this regard as well, Plaintiffs' claim fails as a matter of law.

> **D.  Melinda Duckett was a public figure and the Estate cannot prove its claim under the "clear and convincing evidence" standard mandated by the First Amendment.**

Finally, under the facts here, the First Amendment sharply increases the degree of fault to which a plaintiff must prove their claim under state tort law. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 264-65 (1964).  In accord with *Hustler v. Falwell*, 485 U.S. 46, 52 (1988) (applying First Amendment to emotional distress claimed by public figure), because Melinda became a public figure through the media interviews she participated in,[25] the Estate must prove Defendants' intent to the requisite "actual malice" standard as defined in *New York Times v. Sullivan*.  Under this constitutional standard, the Estate must establish by "clear and convincing evidence" Defendants knew the information provided to Melinda was false or proceeded in the face of serious doubts as to its truth.  *See  Falwell*, 485 U.S. at 52.  *See also Della-Donna v. Gore Newspapers, Co.,* 489 So. 2d 72, 76 (Fla. 4th DCA 1986). The Estate has not met the constitutional standard.

---

[25] In applying the "actual malice" standard, courts must find that alleged tortious act arose out of a "matter of public concern" in which the plaintiff was a public figure. *See Della-Donna v. Gore Newspapers, Co.,* 489 So. 2d 72, 76 (Fla. 4th DCA 1986) (controversy over use of private university funds by university trustee was a matter of public concern, and plaintiff-trustee who played central role in the controversy was a public figure). Here, the Trenton Duckett missing person investigation was a matter of great public concern with federal, state, and local law enforcement encouraging a nation-wide search. Further, the Estate's allegations are "directly germane to [Melinda's] involvement in the controversy," as Melinda played an active and "sufficiently central role" by enlisting the public's help find Trenton and holding her own press conferences and interviews. *Id.* at 77 (citing *Dameron v. Washington Magazine, Inc.*, 779 F.3d 736, 741 (D.C. Cir. 1985)). Under Florida law, Melinda therefore was a public figure at the time she taped *Nancy Grace*.

## II.     THE EUBANK PLAINTIFFS' CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT II) FAILS AS A MATTER OF LAW.

The claims for intentional infliction of emotional distress brought on behalf of Melinda's adoptive parents, Bethann and William Gerald Eubank, and Melinda's minor sibling, M.E. (referred to collectively as the "Eubank Plaintiffs"), is premised upon CNN's decision to air the taped *Nancy Grace* program as planned, and by continuing to air the interview with Melinda on other occasions.  Here too, the Eubank Plaintiffs, who had not seen Melinda in four years and never met Trenton, failed to establish a factual dispute. The record contains no evidence to support the argument that CNN or Nancy Grace intentionally chose to air the program to inflict severe emotional distress. Indeed, Nancy Grace herself played no role in CNN's decision to air the program.  Thus, like the Estate, the Eubank Plaintiffs' intentional infliction of emotional distress claim fails under the very high "outrageous" standard required by Florida law.

### A.     CNN's decision to broadcast the Trenton Duckett program was not "outrageous" as a matter of law.

No Florida court has ever found that airing a taped interview with an individual after they died is so outrageous as to go "beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community."  Instead, Florida law rigidly resists causes of action by family members of deceased newsmakers who are unhappy with a relative's portrayal. *See Tyne v. Time Warner,* 336 F.3d 1286, 1292 (11th Cir. 2003) (applying Florida law, rejects as "heavily disfavored" claim by decedent's relatives for relational invasion of privacy for portrayal of decedent in motion picture); *Loft v. Fuller,* 408 So. 2d 619 (Fla. 4th DCA 1982) (portrayal of deceased airline pilot as "ghost" in novel and movie of airline crash not outrageous); *Fletcher v. Fla. Pub. Co.,* 319 So. 2d 100, 112 (Fla.1[st] DCA 1975) (insufficient

evidence for intentional infliction of emotional distress where newspaper published photograph of silhouette of plaintiff's deceased daughter on floor of bedroom after fire). *See also Cape Publications v. Bridges*, 423   So. 2d 426 (Fla. 5th DCA 1982) (woman could not sustain emotional distress claim where she was photographed on the street immediately after being released from a kidnapping clad only in a dish towel).

Indeed, with respect to familial outrage claims, Florida courts have <u>only</u> found a cause of action exists when a <u>picture of a dead body</u> is involved.[26]  *Williams v. City of Minneola*, 575 So. 2d 683, 691 (Fla. 5th DCA 1991) (display of autopsy footage and photos, "level of carelessness or callousness which might not be considered tortious in other situations can show outrageousness and recklessness when a dead body or a picture of a dead body is involved."); *Armstrong v. H & C Comm's, Inc.*, 575 So. 2d 280, 281-82 (Fla. 5th DCA 1991) (televised broadcast of a dead missing-child's decomposed skull). No Florida court has ever held that the <u>voice of a living person</u> will support a claim when broadcast after their death.  Further, the *Armstrong* and *Williams* cases are fully distinguishable as, unlike here, they involved the gruesome display of human remains. Moreover, here, the family members knew Melinda had participated in the *Nancy Grace* taping when they chose to watch the broadcast, and the family was completely aware that the taped broadcast footage existed and could be aired.

*Armstrong* concerned broadcast images of a six-year-old girl's decomposed remains. 575 So. 2d at 281. The girl, who was missing for over three years, had been recently found dead.  *Id.* The court affirmed denial of an Orlando television station's motion to dismiss the family's intentional infliction of emotional distress claim for the station's broadcast of the video

---

[26] Obviously inapplicable here are cases where a defendant mishandles, mutilates, or prevents the proper burial of the physical remains of the deceased.  *See e.g., Kirksey v. Jernigan*, 45 So. 2d 188 (Fla. 1950) (wrongful withholding and mishandling of child's body by undertaker);  *Kraeer Funeral Homes, Inc. v. Noble*, 521 So. 2d 324 (Fla. 4th DCA 1988) (funeral home mishandled corpse of decedent).

on the day of her memorial service. *Id*. Without anyone at the station ever seeing the footage, the news director dismissively overruled dissenters in the station who objected to showing the graphic images. *Id*. Aired during a live story about the memorial service, the footage included a "gruesome and macabre" close-up of the skull, immediately followed by close-up footage of animal remains originally thought to be those of the girl. *Id*. The unsuspecting Armstrong family saw the footage during the station's live broadcast, and the court held that "if the facts as alleged herein do not constitute the tort of outrage, then there is no such tort." *Id*. at 282.

Likewise, *Williams* concerned police officers' display of graphic videotape and photographs of an autopsy performed on decedent. *Williams*, 575 So. 2d at 686-87.  The autopsy videotape was unauthorized, displayed in an officer's home "in a party atmosphere where the audience joked and laughed," and the photos were shown by the Chief of Police to a custodian cleaning his office, and the Chief asked him "Do you want something to eat?" *Id*. Reversing summary judgment as to the family's intentional infliction of emotional distress claim, the court found that "one who behaves outrageously with regard to pictures of a dead body can be presumed to know that severe emotional distress will be inflicted" on the close relatives of the deceased.  *Id*. at 693.

The conduct with respect to the dead relatives in those cases is in no respects similar to CNN's decision, which undisputedly was based on the desire to continue the effort to locate Trenton Duckett by broadcasting a consensually recorded phone interview with Melinda. Moreover, it is undisputed that the Eubank Plaintiffs watched the *Nancy Grace* program on September 8, 2006 with the full knowledge that Melinda participated in the taping of the program the day before, and had committed suicide earlier that afternoon. (Ex. 2, W.G. Eubank Dep.103:10-104:1; Ex. 24, M.E. Dep. 45:9-48:25, 59:22-62:14; Ex. 3, B. Eubank Dep. 333:9-

25). Indeed, Melinda's mother, Bethann Eubank, was met at her home by a Niagara County, New York Sherriff's deputy who notified her of Melinda's death. (Ex. 3, B. Eubank Dep. 298:14-300:22). Melinda's minor sibling, M.E. testified that she watched the deputy inform her mother, and that her mother then told M.E. that Melinda had committed suicide. (Ex. 24, M.E. Dep. 47:11-48:18). Because Melinda's father, William Gerald Eubank, was still at work, Bethann Eubank called his workplace and informed him that Melinda was dead and that she had committed suicide.  (Ex. 2, W.G. Eubank Dep. 97:12-105:16).

Further, because the alleged conduct must be viewed objectively, and not subjectively, the Eubank Plaintiffs' characterizations of the broadcast are not relevant to determining whether the conduct meets the very high standard of outrage. Instead, the key to measuring outrage here is the fact that the Eubank Plaintiffs knew exactly what was going to be aired on the program, an interview with their daughter, whom they knew had committed suicide earlier that same day.[27]

No evidence whatsoever suggests that CNN decided to air the taped program with the intent to harm Melinda's family.  The evidence instead uniformly reflects that the decision to air the broadcast was based on the continuing desire to help find Trenton. Immediately after learning of Melinda's death, CNN Producer Keren Schiffman contacted Executive Producer Dean Sicoli, who, in consultation with CNN News Standards and Practices and the CNN Legal Department, decided to air the program as planned to fulfill the program's mission of helping find Trenton. (Ex. 12, Schiffman Dep. 162:15-163:13; Ex. 10, Sicoli Dep. 69:19-73:19). In order to provide viewers with the latest developments in the search for Trenton, Sicoli directed staff to update the taped program's on-screen text to inform viewers of Melinda's suicide, and

---

[27] Melinda's father even testified that he had spoken to Melinda, had concluded that she was unhappy with how the program went for her, but he still watched it after learning of her death.  (Ex. 2, W.G. Eubank Dep. 479:5-9).

the updated recording was broadcast at the scheduled time that day at 8:00 PM. (Ex. 10, Sicoli Dep. 82:24-84:22).

The Eubank Plaintiffs' allegation that CNN "failed to obtain consent for the use of the videotape" of the *Nancy Grace* program carries no legal import at all. (Complaint ¶17). This allegation presupposes a duty that does not exist.  Indeed, as in both *Williams* and *Armstrong*, CNN owed no duty to the Eubank Plaintiffs to ask for permission to air a videotape, portions of which contained a consensual interview with Melinda. *See Williams,* 575 So. 2d at 688, and *Armstrong*,  575 So. 2d at 282. Florida law simply does not grant a property right to block news coverage that includes a relative's image.

> **B.      CNN's decision to broadcast the Trenton Duckett program is protected by the First Amendment.**

In addition to a failure to meet the very high threshold required by Florida law, Plaintiffs' claim also fails as the broadcast is protected expression under the First Amendment. *See McCarson*, 5467 So. 2d at 279 (defendant privileged to deny insurance benefits when decedent failed to prove it was not entitled to Medicare benefits); *see also Gibbs v. Republic Tobacco, LP,* 119 F. Supp. 2d 1288, 1296 (M.D. Fla. 2000) (defendants tobacco product producers exercising legal right to sell tobacco products cannot be held liable for intentional infliction of emotional distress, even if they knew such conduct will cause emotional distress). As this Court already noted, "the Defendants had a business purpose protected by the First Amendment in going forward with the broadcasts after Melinda Duckett's death."  Opinion on Motion to Dismiss, Dkt. No. 50, at p.14.

It is well-settled law that news coverage of matters of public concern is protected by the First Amendment, barring actions in tort.  *See e.g. Bartnicki v. Vopper*, 532 U.S. 514, 527-28, 533-35 (2001) (First Amendment barred imposition of civil damages under wiretapping law for

publishing lawfully obtained contents of conversation relevant to matter of public concern); *Florida Star v. B.J.F.*, 491 U.S. 524, 534 (1989) (First Amendment barred imposition of civil damages on newspaper for publishing rape victim's name lawfully obtained); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) (First Amendment prohibited damages awards to public figures for intentional infliction of emotional distress absent proof of "actual malice"); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103-06 (1979) (First Amendment barred prosecution under state statute for publishing names of juvenile offenders without permission of court). CNN's coverage of the Trenton Duckett "Amber Alert" and informing the public of the circumstances of his disappearance, as emphasized in Bethann Eubank's testimony, are a matter of great public concern. (Ex. 3, B. Eubank Dep. 314:7-23) ("all it takes is one set of eyes and one set of ears somewhere to find him").  Indeed, on August 30th, only three days after Trenton was reported missing, *Nancy Grace* aired a segment highlighting Trenton, and then devoted an entire hour-long show to helping find Trenton a week later on September 8th.

Further, Melinda gave interviews to several media outlets, convened her own press conference, and became the increasing focus of the story after her suicide.  Thus, re-airing the newsworthy interview with a mother who committed suicide refusing to answer simple questions about her child's disappearance is protected expression related to discussion, commentary, and opinion regarding Trenton Duckett's still-unsolved disappearance. Plaintiff Bethann Eubank has even testified that she watched subsequent episodes of *Nancy Grace* after September 8th in order to find out what happened to Trenton, where he was, and "if there were any clues or anything."  (Ex. 3, B. Eubank Dep. 305:18-21).

Additionally, because the content of the September 8th *Nancy Grace* program is protected expression under the First Amendment as a matter of public concern, the "actual

malice" standard of *New York Times Co. v. Sullivan,* 376 U. S. 254 (1964), must be met before the Eubank Plaintiffs can recover for their claimed emotional distress. *See Falwell,* 485 U.S. at 56 (applying "actual malice" where public figure complained of intentional infliction of emotional distress).   Here, the Eubank Plaintiffs have adduced no evidence that CNN's decision to air the September 8th *Nancy Grace* program was made with "actual malice," *i.e.,* with knowledge that airing the program would cause severe emotional distress or with serious doubts as to whether or not it would cause severe emotional distress. *Id.*   Such heightened standard of knowledge is "necessary to give adequate 'breathing space' to the freedoms protected by the First Amendment." *Id.* Accordingly, Defendants are entitled to judgment as a matter of law on Count II.

### III.   NOTWITHSTANDING PLAINTIFFS' CLAIMS AS TO CNN,  BOTH CLAIMS AS TO NANCY GRACE FAIL AS A MATTER OF LAW.

While Defendants together move for summary judgment based on these undisputed facts, both counts against Defendant Nancy Grace, who is a CNN employee and does not have ultimate authority over editorial content of the program, also fail as a matter of law for three additional reasons.   First, Grace did not speak with Melinda prior to the taping of the program (Ex. 9, Grace Dep. 35:11-36:2; 56:24-57:17), and she had no knowledge of producer Keren Schiffman's conversation with Melinda's family law attorney Kimberly Schulte. (*Id.* 57:18-58:5; 94:8-23, 126:3-128:3, CNN 196). Rather than an "ambush," the undisputed evidence reflects that Grace came to the taping with suspicions about Joshua – not Melinda – because fathers are more often involved when children are taken by family members. (*Id.* 55:16-20, 58:10-59:14). Indeed, Grace was not even aware Melinda would appear by telephone until minutes before the taping. (*Id.* 35:11-36:2). During the taping, Grace asked Joshua to answer simple routine questions typically asked of the parent of any missing child, and after he

answered them, Grace posed similar questions to Melinda, who refused to answer them and instead stuck to her script. (Ex. 22, DVD of Broadcast; Ex. 23, Transcript of Broadcast). Thus, no evidence supports the position that Melinda relied on anything said by Grace, because they never spoke prior to the taping.

Second, Grace was completely unaware of Melinda's mental state. She did not know about Melinda's Baker Act confinement, nor was she aware that Melinda had dismissed it as part of her custody battle with Joshua. (Ex. 9, Grace Dep. 39:22-40:6). Moreover, standing alone, the Estate's unsupported allegation that Grace intended to inflict emotional distress by accusing Melinda, or engaged in what Plaintiffs overdramatize as "fist-pounding" (Complaint ¶10), fails to meet the very high element of outrage as a matter of law.  *See Lapar v. Potter*, 395 F.Supp.2d 1152, 1160-62 (M.D. Fla. 2005) (no outrage for perceived negative tone and "foot stomping, arm crossing, staring, and snapping" by defendant's harassment of plaintiff for known bipolar disorder condition).

Finally, Grace had no role in CNN's decision to air the taped program after learning of Melinda's suicide. (Ex. 9, Grace Dep. 134:11-21). Instead, the ultimate decision to air the program was made by *Nancy Grace* Executive Producer Dean Sicoli in consultation with CNN News Standards and Practices and the CNN Legal Department, and without any input from Grace. (*Id.*; Ex. 10, Sicoli Dep. 69:19-73:19). Therefore, because the undisputed evidence demonstrates that Grace had no involvement in CNN's decision to air the *Nancy Grace* program, the Eubank Plaintiffs cannot sustain their intentional infliction of emotional distress cause of action against her.

## CONCLUSION

WHEREFORE, Defendants respectfully request that this Court enter final summary judgment in their favor on all counts in Plaintiffs' Complaint.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 3.01(j), Defendants respectfully request approximately 60 minutes of oral argument for this Motion.

Respectfully Submitted,

**HOLLAND & KNIGHT LLP**
*Counsel for Defendants*

Judith M. Mercier #32727
200 S. Orange Avenue, Ste. 2600
Orlando, Florida  32801-3453
Telephone:  (407) 425-8500
Facsimile:  (407) 244-5288

Charles D. Tobin #0816345
Drew E. Shenkman, *Of Counsel*
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006
Telephone:  (202) 955-3000
Facsimile: (202) 955-5564

By:      /s/ Charles D. Tobin

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 7, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to the following parties of record:  Counsel for Plaintiffs, Jay Paul Deratany, Esquire and Kara Skorupa, Esquire, Deratany, Skorupa & O'Hara, P.A., Crystal Tree Centre, 1201 U.S. Highway One, Suite 315, North Palm Beach, Florida.

/s/ Charles D. Tobin

*NANCY GRAVES*

## CNN Interview- September 7th, 2006
## From the Mother's point of view

**Main Topic:**
* My son is the main topic in this search and neither the media nor any other parties involvement should stray from him. There have been so many other avenues that people have wandered onto, I feel some of lost the essence of what is going on here. This whole ordeal should focus on an innocent two year old, this toddler being my son and the most important aspect of my life.

It frustrates me to no end when naïve people with no aspect of how I feel personally are trying to judge my family and I.

**Husband:**
* The events between my husband and I are not for public illustration. Our chemistry was just not compatible and yes, we had our differences and I have filed for divorce. Now I have been waiting months for him to sign the papers. But again, the focus...
* The media has divulged onto me dying my hair, my emotional state while on camera, and so on....

**Emotions:**
Emotions: I am not a publicly emotional person and when I break down it is in the privacy of my own home. I feel that keeping my head screwed on straight and not going crazy helps me to aid in the search for my son. Sitting in one spot and bawling or gluing myself to the police stations lobby is surrendering my son to whoever has him. My love for him is too strong and defiant to fall into that pit.

**Polygraph:**
* As far as any investigative techniques are concerned whether they be polygraphs, stress tests, physical searches or interviews: my family and I have fully cooperated with the local law enforcement and now the federal. Locally, they do not have the necessary experience and that is why the FBI was called in. I have been instructed to only speak to an individual FBI unit and anything that they release to the media or public is up to them. They are the professionals and I do not want to impede on any of their involvement so any other questions pertaining to the technical aspect, please direct those to them.

**Suspects:**
* Personally I do not want to point the finger and publicly humiliate anyone. I am too emotionally involved and my assuming of events would be bias and wrong. Everyone is a suspect in this matter, no one has been excluded and since I am the mother, the FBI would personally contact me first if any solid leads came up.

**Coping with...:**
* Honestly there is no actual coping in this matter. My son is my life and with him gone the only thing I can do is exist. Now keeping myself busy with the search and helping in whatever ways I can does help with the stress and aggravation.

What does not help is when you walk in a store to buy something as simple as milk and a dozen people can't take their eyes off of you. And I'm not talking about the supportive ones that are trying to make sure your still alive, I mean the cold heartless ones that are pointing fingers instead of focusing on finding my son.

**Speak to abductor:**
* If I could speak to whoever has Trent, I would have originally begged and pleaded, telling them that I did not care about finding them, only to give my son back so he could be safe at home with me again, where he rightfully belongs. Now I am facing the cold truth that is not enough and with passing day I can literally feel life sinking. All I can say now is that you reap what you sow and somehow in the end of all this, you will get what's coming to you if you don't do what's right. He is so small and innocent, there was no reason to take him away from those who really cared for him. Please give him back to the security and warmth that he knows.

**Baker Act:**
* First of all I'm going to go through this and then I want it squashed because it takes the highlight away from my son. For two years actually Joshua and his mother had been trying to take my son away from me by using Bushnell police, Sumter County, and the Department of Children and Families. DCF came into the picture and did numerous investigations because of Joshua's false reports of child abuse and neglect on my part. My family and I jumped through all of their hoops, finally completing the case plan with flying colors. Joshua on the other hand committed perjury and was in noncompliance

MISC00127

so his custody was taken away completely.  DCF closed all cases being unfounded and if Joshua or his mother make any other false reports, they will be taken as criminal charges   That is all on that matter and now we're done with it.

Summary:

That night approximately around 6 we came home from a long day out and I'm not going to go into small details about the entire day or weekend for that matter.  Anyway I fed him dinner he went to bed, I checked on him before my friends came and he was asleep. My friends arrived, we watched one movie, got ready for another when I checked on Trent and found him missing.  I searched the premise, but with him unfound, my friend called the police, I went to a deputy's apartment in my complex, called family and friends and then everyone showed up and it was a mad house.  Investigators scrambled around, tape was put up, my family was in distress and there I was a bawling fool in the mist of it all, not helping with anything.  That is part of the reason why I am so determined to stay on track now.  I have had  a few distraught and overly emotional moments in public, but if my eyes are shut with tears, they're not open to look for him.  That is the way I see it.

MISC00128