# EXHIBIT 6

# Declaration of Leesburg Police Detective Richard Giles

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

ESTATE OF MELINDA DUCKETT, et al.
Plaintiffs,

v.                                      CASE NO.:  5:06-cv-444-WTH-GRJ

CABLE NEWS NETWORK LLLP (CNN), et al.
Defendants.

_____/

## DECLARATION OF DETECTIVE RICHARD GILES (RET.)

Pursuant to 28 U.S.C. § 1746, I declare the following under the penalty of perjury:

1.      My name is Richard Giles, I am over the age of 18 and am fully competent to make this Declaration.  The statements made herein are based upon personal knowledge and my review of the records of the Leesburg Police Department in Leesburg, Florida (the "Department").

2.      From February 1991 until my retirement in July 2008 I was in law enforcement with the Department.  From July 2005 until my retirement, I served as a detective.  Before I retired, I served as the Department's lead detective on the Trenton Duckett missing person investigation.  Also participating in the Department's investigation were agents of the Federal Bureau of Investigation ("FBI") and the Florida Department of Law Enforcement ("FDLE").

3.      On August 27, 2006, the Department began an investigation precipitated by a 911 telephone call reporting that Melinda Duckett's son had been abducted from her home in Leesburg, Florida.  Melinda reported that someone had cut a screen on Trenton's bedroom window and abducted him from the home through the window.

**Documents Recovered from Melinda Duckett's Laptop Computer**

4.    After Melinda's September 8, 2006, suicide at the home of her grandparents at 638 Rainbow Blvd., law enforcement officers secured that scene. I participated in the investigation of the scene.

5.    On September 8, 2006, the FDLE recovered a laptop computer from the vehicle belonging to Melinda Duckett, which was parked outside of her grandparents' home. Melinda Duckett is the only known user of that computer. The FDLE provided to the Department the chain of custody and report regarding Melinda's laptop, an Averatec 3200 Series Silver Laptop Computer Model: AV3250HX-01, with an internal Travelstar/Hitachi 80GB hard drive Model 1C25N080ATMR04-0, P/N 08K0635, S/N K4J23RAH. That record is attached to this Declaration as **Exhibit A.**

6.    I and other investigators obtained a document from the grandparents' home and recovered documents from the hard drive of Melinda's laptop computer demonstrating that she had prepared for her appearance on the *Nancy Grace* television program. Among these documents were:

    a.    A script of Melinda's talking points for the *Nancy Grace* program, in both hard copy (attached as **Exhibit B**) and in text fragments (attached as **Exhibit C).** In her script, Melinda had prepared responses to questions ranging from her interaction with local law enforcement and refusal to take a polygraph examination, to her child custody and marital problems, as well as her thoughts on who might be a suspect.

    b.    A letter she wrote to a friend, attached as **Exhibit D,** while she was on the

telephone awaiting the start of the taping of Nancy Grace. In the letter, she told her friend that "right now I'm fixing to be on an interview with Nancy Grace from CNN and it's over the phone so I've got the phone in one ear, headset to my cell in another, and then I'm on my computer, but not hooked up to the internet. Confusing as hell, but I'm doing fine so far."

7.      The text fragments contained in attached Exhibits C and D were recovered from the hard drive (listed by FDLE as "Exhibit MA3" on attached Exhibit D) following a search of all text fragments recovered on the hard drive using a number of search terms. That search produced 262 pages of information, in the form of text fragments like those contained in Exhibits C and D, that had been deleted from Melinda's laptop computer before law enforcement recovered the computer from her car.

8.      After FDLE completed its forensic analysis, on or about October 12, 2006, the laptop computer, its hard drive, and all reports and tests performed by FDLE were transferred to the Leesburg Police Department. I therefore am familiar with the contents, and these are the types of records detectives in the Department routinely keep and rely upon in conducting investigations like this one.

**My Interviews With Melinda Duckett**

9.      During investigations like this one, detectives routinely interview the parents for any information that may help find their missing child. I therefore interviewed Melinda Duckett two times in investigating Trenton's disappearance.

10.      During the early morning of August 28, 2006, I, along with FDLE Special Agent Denise Nevers, interviewed Melinda at the Leesburg Police Department's offices. This

3

interview was recorded. During this interview, we asked Melinda to provide details regarding her whereabouts for the two days prior to Trenton's reported abduction. Melinda refused to provide anything beyond a generalized and repetitive story.

11.     As part of any interview, it is important to test the accuracy of the information being given. During the course of the interview, Melinda was consensually administered a Voice Stress Analysis ("VSA"), an investigative tool commonly used to detect deception in witnesses during criminal investigations. The VSA examiner asked Melinda a series of Yes/No questions, including:

- Did you take Trenton to a safe place?

- Did you make up the story about Trenton being taken?

- Are you being truthful about Trenton?

- Did you lie during this investigation?

- Have you ensured Trenton's safety?

The Department's written report of the session, finding possible deception by Melinda, is attached as **Exhibit E**.

12.     FDLE Special Agent Nevers and I informed Melinda of the results shortly after she concluded the test. Melinda became defensive. We asked her whether she left Trenton somewhere other than his bedroom, and we told her we thought it would be impossible for someone to take Trenton out of the bedroom through the cut screen on the window. Melinda became more argumentative and accused us of not trying to help find her child. I then asked her to write a statement for me to summarize her story. Melinda resisted and terminated the interview by abruptly walking out of the room and leaving the station.

4

13.     Later on the morning of August 28, 2006, after Melinda returned to the station, I interviewed her with Detective Dunagan. We questioned her on inconsistencies in her story. Melinda's answers were evasive and incomplete. I informed Melinda that her story wasn't adding up, and I asked her if it was possible that she had arranged to place Trenton somewhere. Melinda acknowledged that it was a reasonable question, but then asked us to not bring it up again. After further questioning, Melinda also terminated this interview by walking out of the room and leaving the station.

**Melinda Duckett Was the Prime Suspect, and Continues to Be the Only Suspect**

14.     After interviewing Melinda, speaking with a large number of witnesses, reviewing all available documents, and discussions with investigators, I, in consensus with the other investigators, concluded that Melinda Duckett was the prime suspect in Trenton's disappearance.

15.     In addition, prior to her suicide, the Department had been prepared to charge Melinda Duckett with the crimes of Offense Against Intellectual Property and Perjury in an Official Proceeding. The charges stem from Melinda's false report that she had received a message from her husband Joshua Duckett on her MySpace.com email account, threatening to hunt her and Trenton down and kill them. Melinda reported this email to the Department, and later swore in a state court custody proceeding that Joshua sent the email. On the basis of that sworn testimony, Melinda received a temporary restraining order against Joshua. Upon further investigation, the Department found that Melinda had in fact unlawfully entered Joshua's MySpace.com account and sent the fictitious email to herself, giving the appearance that it was generated by Joshua. The Department did not arrest Melinda on these charges,

however, as we believed the best option for finding Trenton was to not take her into custody.

16. The FBI's Behavioral Analysis Unit, which developed a profile of the person who took Trenton, similarly concluded in the December 15, 2006 report that it provided to the Department (attached hereto as **Exhibit F**) that "Melinda Duckett falsely alleged that her child was abducted in an effort to cover up a homicide." The Department received this document from the FBI, our trusted partner in the Trenton Duckett investigation, which contained factual findings resulting from the investigation.

17. When I retired from the Department in July 2008, Melinda remained the prime suspect in the disappearance of Trenton Duckett.

**No Discussions with CNN and Nancy Grace Prior to Melinda Duckett's Suicide**

18. From the time Trenton was reported missing on August 27, 2006, to the time Melinda Duckett committed suicide on September 8, 2006, I did not speak or have any communication with anyone from Cable News Network or the *Nancy Grace* television program, and I provided no input at all in the *Nancy Grace* program in which Melinda participated.

**No Interference with Law Enforcement Investigation**

19. At no time did CNN, Nancy Grace, or any other media interfere with the Department's investigation and efforts to locate Trenton Duckett. Instead, the Department welcomed media coverage to publicize the search for Trenton.

FURTHER DECLARANT SAYETH NAUGHT

I declare under penalty of perjury that the foregoing is true and correct on this

_____ day of March , 2010.

Richard Giles

# EXHIBIT A
# to Giles Decl.

**FLORIDA DEPARTMENT OF LAW ENFORCEMENT**
**INVESTIGATIVE REPORT**

This report was written in reference to investigative activities related to the kidnapping of Trenton Duckett from his residence in the City of Leesburg.

On September 8, 2006, FDLE Special Agent (SA) Molly Akin performed computer forensic imaging and analysis on two laptop computers at the request of Special Agent Supervisor (SAS) John King.  United States Secret Service (USSS) Special Agents Ramin Sawal, Edward Hughes, and Thomas Campbell of the Orlando Field Office assisted SA Akin with forensic imaging and analysis of these computers.  These computers were forensically analyzed to determine the location of Trenton Duckett, who has been missing from Leesburg, Florida, since August 27, 2006.  These computers were searched, due to exigent circumstances which exist in this case.

SA Akin received an Averatec 3200 Series laptop, silver in color, from FDLE SA Tom Davis on September 8, 2006, at approximately 1845 hours.  SA Davis obtained this laptop from Melinda Duckett's vehicle.  The details obtained from the computer and hard drive are as follows:

Averatec 3200 Series
Silver Laptop
Model: AV3250HX-01

HDD: Travelstar/Hitachi
Capacity: 80 GB
Model: IC25N080ATMR04-0
P/N: 08K0635
S/N: K4J23RAH
Comments: No Jumpers


On September 8, 2006, USSS SA Hughes created a forensic image of this computer using a write blocker and the forensic software, Encase. USSS SA Sawal utilized the forensic software, Forensic Toolkit (FTK) to analyze the contents of the image. Relevant documents retrieved from this computer are maintained in the related items section of this case file.

On September 8, 2006, at approximately 2330 hours, Special Agent (SA) Akin received a black Compaq Presario computer from FDLE SA Denise Nevers. This computer was seized pursuant to a search warrant executed at Melinda Duckett's residence.  The specifications for this

| Case Number:OR-20-0062 | Serial #:13 |
|---|---|
| Author:Akin, Mary (Molly) Emily | Office:Orlando |
| Activity Start Date:09/08/2006 | Activity End Date:09/08/2006 |
| Approved By:King, John L. | |
| Description:Two Laptop Computers: Digital Evidence Imaging & Analysis | |



*THIS REPORT IS INTENDED ONLY FOR THE USE OF THE AGENCY TO WHICH IT WAS DISSEMINATED AND MAY CONTAIN INFORMATION THAT IS EITHER PRIVILEGED OR CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. ITS CONTENTS ARE NOT TO BE DISTRIBUTED OUTSIDE YOUR AGENCY.*



NPP-3747

| Case Number: | OR-20-0062 |
|---|---|
| IR Number: | 13 |

computer were recorded as follows:

Compaq Presario
Black Laptop
Model: 1456VQLIN

HDD: Fujitsu
Model: MHH2064AT
Capacity: 6 GB
S/N: 01052793
Jumper: Cable Select

SA Hughes used Encase to create a forensic image of this hard drive.  Because there was little data on the hard drive, it was not forensically analyzed.

The Compaq Presario and the hard drive retrieved from the Averatec 3200 laptop shall be sent to the FDLE/Tampa Crime Laboratory for a complete forensic examination.  SA Akin entered these items into evidence on September 12, 2006.  The exhibits were labeled as follows:

MA1:    Averatec Laptop Computers
MA2:    Compaq Presario
MA3:    Hitachi/Travelstar Harddrive (Hard Drive from Exhibit MA1)

**Note: This case was submitted under the Leesburg Police Department's case number, #06083735.  Therefore, the evidence will not appear in the AIMS systems under the FDLE Case Number OR-20-0052. The lab case number associated with this evidence is: 20060309114.**

The documents retrieved from the Averatec Laptop and the evidence submission form are maintained in a related items section within this case file.

NPP-3748



| Florida Department of<br>Law Enforcement<br><br>Gerald M. Bailey<br>*Commissioner* | **Tampa Bay Regional Operations Center** | 4211 North Lois Avenue<br>Tampa, Florida 33614<br>(800) 226-1140<br>www.fdle.state.fl.us |

October 12, 2006

| TO: | Chief William J. Chrisman<br>Leesburg Police Department<br>115 East Magnolia<br>Leesburg, FL 34748 | **FDLE NUMBER:**<br>**SUBMISSION:**<br>**AGENCY NUMBER:** | 20060309114<br>004<br>06083735 |
| ATTN: | EVID CUSTODIAN | SUBPOENAS PERTAINING TO THIS CASE<br>SHOULD REFER TO THE FDLE NUMBER. | |
| **VICTIM(S):**<br>**OFFENSE(S):** | TRENTON, DUCKETT<br>Kidnapping<br>Lake County<br>08/27/2006 | Barbara Ramos-Mendez<br>Crime Laboratory Analyst<br>Digital Evidence Section | |

## REFERENCE :

This report has reference to item(s) submitted to FDLE on September 12, 2006 by Molly Akin referenced to a missing child. This report cross references case number 20060511306 from the Town of Lady Lake Police Department in reference to a death investigation case.

## EXHIBIT(S) :

| Container | Exhibit | Description |
| --- | --- | --- |
| 02.000.000.00 | Exhibit MA2 | One (1) Compaq Presario 1830 model laptop computer with serial number 1V9BCTV520E0 with one (1)Fujitsu MHH2064AT model hard drive with serial number 01052793. |
| 03.000.000.00 | Exhibit MA3 | One (1) Hitachi Travelstar model hard drive with serial number K4J23RAH. |

## RESULT (S):

Exhibit MA2 was analyzed for the presence of active and deleted data of potential evidentiary value. All data of potential evidentiary value was recorded on the DVD-R under the directory titled "\20060309114 SUB4\Exh-MA2\Active Files". A search for data in the unallocated space (where deleted data of potential value may be found) was performed and the data recovered was recorded on the DVD-R under the directory titled "\20060309114 SUB4\Exh-MA2\Unallocated Data Files". A keyword search was performed. No keywords of value were found.

Exhibit MA3 was analyzed for the presence of active and deleted data of potential evidentiary value. All data of potential evidentiary value was recorded on the DVD-R under the directory titled "\20060309114 SUB4\Exh-MA3\Active Files". A search for data in the unallocated space was performed and the data recovered was recorded on the DVD-R under the directory titled "\20060309114 SUB4\Exh-MA3\Unallocated Data Files". A keyword search was performed. A listing of the keywords and frequency of occurrence was saved to the directory referenced above as "Keyword Search Report for Exh-MA3.rtf." In addition, text fragments of potential evidentiary value were saved to the file titled "Text Fragments from Exh-MA3.rtf" in this directory.

NPP-3229

Chief William J. Chrisman
PAGE 2 of 2
FDLE NUMBER : 20060309114 004

## REMARK(S) :

A complete listing of all active and deleted files recovered during this analysis was saved in the "Active Files" directory under the corresponding exhibit number.

All data files and reports generated from the exhibits in this case were recorded on two (2) DVD-Rs in container number 01.002.000.00. In addition, a forensic backup was saved on seven (7) DVD-Rs in container 01.001.000.00. Please be advised that all data of potential evidentiary value is still present on the media that you submitted for analysis. The DVD-Rs mentioned in this report have been returned with your evidence. Additionally, analytical case file notes for this case are available upon request.

NPP-3230

# Encase report Exh-MA3

**Device**
| | |
|---|---|
| Name: | Exh-MA3 |
| Actual Date: | 09/14/06 12:51:12PM |
| Target Date: | 09/14/06 12:52:54PM |
| File Path: | F:\20060309114 S4\Exh-MA3.E01 |
| Case Number: | 20060309114 |
| Evidence Number: | Exh-MA3 |
| Examiner Name: | Barbara Mendez |
| Notes: | Hitachi HDD s/n K4J23RAH |
| Drive Type: | Fixed |
| File Integrity: | Completely Verified, 0 Errors |
| Acquisition Hash: | ade27b8883101ace5ed0c14d38a4b168 |
| Verify Hash: | ade27b8883101ace5ed0c14d38a4b168 |
| EnCase Version: | 3.22g |
| System Version: | Windows 2000 |
| Is Physical: | • |
| Raid Stripe Size: | 0 |
| Error Granularity: | 0 |
| Read Errors: | 0 |
| CRC Errors: | 0 |
| Compression: | None |
| Total Size: | 80,026,361,856 bytes (74.5GB) |
| Total Sectors: | 156,301,488 |

**Partitions**
| Code | Type | Start Sector | Total Sectors | Size |
|---|---|---|---|---|
| 07 | NTFS | 0 | 156,296,385 | 74.5GB |

**Volume**
| | | | |
|---|---|---|---|
| File System: | NTFS | Drive Type: | Fixed |
| Sectors per cluster: | 8 | Bytes per sector: | 512 |
| Total Sectors: | 156,296,322 | Total Capacity: | 80,023,715,840 bytes (74.5GB) |
| Total Clusters: | 19,537,040 | Unallocated: | 70,452,310,016 bytes (65.6GB) |
| Free Clusters: | 17,200,271 | Allocated: | 9,571,405,824 bytes (8.9GB) |
| Volume Name: | | Volume Offset: | 63 |
| Driver Information: | NTFS 3.1 Chkdsk 0 | | |



```
└─C
  ├─$Extend
  ├─AOL Instant Messenger
  ├─Config.Msi
  ├─Documents and Settings
  │  ├─All Users
  │  │  ├─Application Data
  │  │  │  ├─Adobe
  │  │  │  │  └─Acrobat
  │  │  │  │     └─6.0
  │  │  │  │        ├─Replicate
  │  │  │  │        └─Security
  │  │  │  ├─AOL
  │  │  │  │  ├─AOL Spyware Protection
  │  │  │  │  ├─AOLDiag
  │  │  │  │  └─AOL
  │  │  │  │     ├─ACSD
  │  │  │  │     │  └─Win32
  │  │  │  │     │     ├─3.2.9.1
  │  │  │  │     │     └─4.1.35.3
  │  │  │  │     ├─ACSDialer
  │  │  │  │     │  └─Win32
  │  │  │  │     │     ├─3.2.9.1
```

# EXHIBIT B
# to Giles Decl.

*NANCY GRAVES*

## CNN Interview- September 7th, 2006
### From the Mother's point of view

**Main Topic:**
* My son is the main topic in this search and neither the media nor any other parties involvement should stray from him. There have been so many other avenues that people have wandered onto, I feel some of lost the essence of what is going on here. This whole ordeal should focus on an innocent two year old, that toddler being my son and the most important aspect of my life.

It frustrates me to no end when naïve people with no aspect of how I feel personally are trying to judge my family and I.

**Husband:**
* The events between my husband and I are not for public illustration. Our chemistry was just not compatible and yes, we had our differences and I have filed for divorce. Now I have been waiting months for him to sign the papers. But again, the focus...
* The media has divulged onto me dying my hair, my emotional state while on camera, and so on....

**Emotions:**
Emotions: I am not a publicly emotional person and when I break down it is in the privacy of my own home. I feel that keeping my head screwed on straight and not going crazy helps me to aid in the search for my son. Sitting in one spot and bawling or giving myself to the police stations lobby is surrendering my son to whoever has him. My love for him is too strong and defiant to fall into that pit.

**Polygraph:**
* As far as any investigative techniques are concerned whether they be polygraphs, stress tests, physical searches or interviews: my family and I have fully cooperated with the local law enforcement and now the federal. Locally, they do not have the necessary experience and that is why the FBI was called in. I have been instructed to only speak to an individual FBI unit and anything that they release to the media or public is up to them. They are the professionals and I do not want to impede on any of their involvement so any other questions pertaining to the technical aspect, please direct those to them.

**Suspects:**
* Personally I do not want to point the finger and publicly humiliate anyone. I am too emotionally involved and my assuming of events would be bias and wrong. Everyone is a suspect in this matter, no one has been excluded and since I am the mother, the FBI would personally contact me first if any solid leads came up.

**Coping with...:**
* Honestly there is no actual coping in this matter. My son is my life and with him gone the only thing I can do is exist. Now keeping myself busy with the search and helping in whatever ways I can does help with the stress and aggravation.

What does not help is when you walk in a store to buy something as simple as milk and a dozen people can't take their eyes off of you. And I'm not talking about the supportive ones that are trying to make sure your still alive, I mean the cold heartless ones that are pointing fingers instead of focusing on finding my son.

**Speak to abductor:**
* If I could speak to whoever has Trent, I would have originally begged and pleaded, telling them that I did not care about finding them, only to give my son back so he could be safe at home with me again, where he rightfully belongs. Now I am facing the cold truth that is not enough and with passing day I can literally feel life sinking. All I can say now is that you reap what you sow and somehow in the end of all this, you will get what's coming to you if you don't do what's right. He is so small and innocent, there was no reason to take him away from those who really cared for him. Please give him back to the security and warmth that he knows.

**Baker Act:**
* First of all I'm going to go through this and then I want it squashed because it takes the highlight away from my son. For two years actually Joshua and his mother had been trying to take my son away from me by using Bushnell police, Sumter County, and the Department of Children and Families. DCF came into the picture and did numerous investigations because of Joshua's false reports of child abuse and neglect on my part. My family and I jumped through all of their hoops, finally completing the case plan with flying colors. Joshua on the other hand committed perjury and was in noncompliance

so his custody was taken away completely.  DCF closed all cases being unfounded and if Joshua or his mother make any other false reports, they will be taken as criminal charges  That is all on that matter and now we're done with it.

Summary:
That night approximately around 6 we came home from a long day out and I'm not going to go into small details about the entire day or weekend for that matter.  Anyway I fed him dinner he went to bed, I checked on him before my friends came and he was asleep, My friends arrived, we watched one movie, got ready for another when I checked on Trent and found him missing.  I searched the premise, but with him unfound, my friend called the police, I went to a deputy's apartment in my complex, called family and friends and then everyone showed up and it was a mad house.  Investigators scrambled around, tape was put up, my family was in distress and there I was a bawling fool in the mist of it all, not helping with anything.  That is part of the reason why I am so determined to stay on track now.  I have had  a few distraught and overly emotional moments in public, but if my eyes are shut with tears, they're not open to look for him.  That is the way I see it.

MISC00128

# EXHIBIT C
# to Giles Decl.

68) Exh-MA3\C\Documents and Settings\FOX\Local Settings\Temp\~Qil3782.tmp

o that pitfall..

As affar as any investiagative technigques are c
oncerned: I    Ifmy family and I    Ihav fue fully co
operated iwth   withtthe lockaal law enforcemnetn
tnt now the federal.    Locally, they do not have t
he ezxnecessary expericneence and that is why the
FBI was called in.    I    Ihave been instructed  whe
ther they be polygraphs , stress teeststs, physia
cal searchers or internvieswsto only speak to the
an individual FBI unit and anything that they rel
ease to the media I    Iconla or puclblic is up to
them. they  .   Theyare the professionals and I   I
do not want to impege ode on any of their involve
ment so any quesother quesitons   questionspertain
ing to the technical aspect, please direct those
tho them. and

Personaly ly I    Ido not want to point the finget
r r and publicaly   publiclyhumiliate anyone .   I
Ido noam too emotionally involved and my assuming
of thingsevents would be bias.    and wrong.    AEve
ryoenne is a susupatopecpoecect in this mtatter,
no one has been exlcclcluded ndand since I    Iam n
tthe motehr   mother, the FBI would perosnsonally
contact me first if any solid leads came up.

To copeHonestly there siis no actuall co coping
in this matter. My son is my life and with him go
ne the one lly thing iI    Ican do is esxist.    Now
keeping myself busy iwth  withthe search and heli
lping in mwhatwhatever ways I    Ican does help wit
h the stress and agrgravateion.

What  What does not help is when you wantlk in a
store to buy somehting  somethingas simple as mil
dk and a dozen people can't take their eyes off
of you.   Those are the onees thatAnd I    Imn not t
alking about hte   thesuprotortive ones that are
trying to make sure your still alive, I    Imean th
e cold heartless ones that are pointing fingers i
nsetead of fusoxcusing on finding my son.

If I    IcouldMy son is the main topic in this sea
rch and the medianeither the nemedia nor any othe
r vparties involvement should stray from him.    Th
ere have been so many other avenues that people h
ave wandered on toto, thinsgs  weI    Ifeel some of
lost the esesence of tw    Œ Ä  â  î  Š͡  n͡š  B‐  ´6 Æ6 Ê6 ô6
ô6  7  7 ͞7 ‘7 ͡7 ͡7 Û7 R8 ôæôæôæôæ Ú͡ôÚ͡ô Ú͡ô Ú͡æ È² æ²

69) Exh-MA3\C\Documents and Settings\FOX\Local Settings\Temp\~Qil3782.tmp

"PS    "
"PS    "
"    "PS    "
"    "   hat is going on here.   This owhole ordeal fo
cs should foxuscus on an innocent two tyear old,



that tollddler being my son nadand mthe most impo
rtnatant aspect of my life.

It furiatedss mefrustrates me to enno end when n
aive naïvepeople with not aspect of1   V  X  Š  Œ  0
8  <  >  @  B     "  $  &  ¢  |   "  ²  ´   ¶  â  ä  ä  æ  è  Œ  B-
D-  F-  H-  J-  L-  N-  P-  R-  T-  Ê6  Ê6  ö6   7  '7  ¬7  Φ7  Φ7  Ú7  Ú7
8  æ Ì Ä Ä æ æ Ì Ä Ä Ä æ Ì Ä Ä Ä æ

70) Exh-MA3\C\Documents and Settings\FOX\Local Settings\Temp\~Qil3782.tmp


"     "      " füÿ                    "
"ø|  "Ÿ  how  I  Ifeel personally are tryingt to jud
ege my family an ddI I. I

The evetns nts betewewen my husgband and I Iare
not for public illustrateion.  Yes, we had our di
fferences and I Ihav e filed for divorce.  We ar
e currently I Ihave been waiting months for him
to sighn the papers, but thats. ande.  Now IWOur
comemhemisty ry was justjust not omcompatable and
ycompatible  But agianain, the foxcus... &
the
]


Teh  Themedia has deivulged on to me dying my ha
ir, my emotional state while on camera, and so on
... & .

HiaEmotion: s: I  Iam not a publically emtotiona
l person aand when I  Ibreak down it is in the pr
viivacy of my own home.publicly I  Ifeel that ke
eping my head screwed on dsstraidght nd nand not
going crazy ehhelps me to aid int ho the seaccrch
for meyy ons. son.  ESitting itting in on ee spo
t and crybawling or clglusiing myself to the pole
ice stationns lobby is surrendering my son to wh
oever has him and .  I  Iam too strong willed and
My love nad for him is too strong and diefiant to
fall in t speak the o whoever has Trent, I  Iwoul
d have origainlinally told them that Idi  Idid  n
not care about finding them, only to give my sone
back so he could be safe at home with me again.
nNow I  Iams facing the cold truthd t hat t that
is not enough and with each day passing day I  Is
ink farther and frarther an away from reality.  I
f the individiuals that have my child do not give
my son back to where he rightfully belongs before
imimmediately then All I  Ican say is that you we
ep whareep what yap what you soe and inw and some
hwoow in the end of this, you will get what s com
ing to you if you don t do what s right. begged a
nd pleaded,lelling, right where  where he rightfu
lly belongs.can literally fellel life sinking now
allall  He is only sop small and innocetnnt...
& I  Il and innocietnent , there was no reason to
take him aways from those hose who really cared f
roor him.  Give him back to the securtiy  securit
yand warm Pleease gith that he knows.
With the bakFor two eyaryears actually Josh ua a
nd his mother had beenFirst of all I  Im going to
go through this and then I  Iwant tiist squashed
becaue se it takes the thhgilighlight away from m
y son.   btrying to take mcy y son away from me b
y usuing ing Bushnell plikolice, LSumter County,

and the the Dpepartment of Chirldldren and fFamil
ies. DCF came into the picterue andure and didn
numerous investigations because of Joshua s fals
ree reperoorts of child abuse and nedlglect on my
part. My family and I Ijumped through all of th
eir hoopes s , finally completel=ing the case pla
n with flying colors . Joshua on the other hand
committed purgery and erguyry perjuryand was in
cnoncompliance so his custody wsayas taken aways
comy completely. Tathhat is where DCF cloessed a
ll cases being unfounded and if Joshua andor his
motehr mothermake any other false reprostorstzts
, they will be taken as criminal charges. That i
s all on that matter and now we er we redone wit
h it.


That night approximately around 6 we came onhojm
e homefrom a long day out and I Im not going to
getoo into small detials ails about the entire da
y or weekend for htatthat meatatter. Anyway I I
dfed him ndinner he wneent to bed, iI I chekcke
don d on him fbeofre beforem before my friends
cam e and hwe was asleep. wMy friends arrived an
, we atwatched one movie, got ready for another w
ihhen we I Ichecked on Trento and found him mis
sing. I Isearched the premisisse cse premise ,m
m but with him nunfound, my frineend called the p
olice, iI Iwent to a detputy s apparetment in my
complex, called family and friends na dtheand the
n everyoen everyoneshowed up and it was a mad ho
use. Investigaotors scrabmmbled around, tape was
put up, my family wans in sdistres distresssnand
there i I Iwas a bawling fool in the mist of it
all, not lhelpin helpingwith anything is . That
is part of the reasyono reasonnwhy I Iam so det
ermined to stayon on track hownow.l I Ihave h
ad a few deistraught and overly emotional moment
s in upublic, ubt but they have not helpied me ke
ep my eyes if my eyes are suhut with ytears, they
re not open to look for him. That is the way iI
Isee it.Summary:Huhsband:

Mein]aiun n Topciic:
Emotions:PolygraphuL:
Suspect:s:Coping with iwthwith... &:Sopeak to ab
ducktor:
Bakerer Act:

Nanyc CNN Ineterview

- September 7th, 2006
from Fromthe Mother s point of view          Øi

72) Exh-MA3\C\Documents and Settings\FOX\My Documents\News on Trent\Nancy
Graves.wps


e finger and publicly humiliCNN Interview- Septe
mber 7th, 2006

From the Mother s point of view

Main Topic:

My son is the main topic in this search and neither the media nor any other parties involvement should stray from him. There have been so many other avenues that people have wandered onto, I feel some of lost the essence of what is going on here. This whole ordeal should focus on an innocent two year old, that toddler being my son and the most important aspect of my life.

It frustrates me to no end when naive people with no aspect of how I feel personally are trying to judge my family and I.

Husband:

The events between my husband and I are not for public illustration. Our chemistry was just not compatible and yes, we had our differences and I have filed for divorce. Now I have been waiting months for him to sign the papers. But again, the focus&

The media has divulged onto me dying my hair, my emotional state while on camera, and so on&.

Emotions:

Emotions: I am not a publicly emotional person and when I break down it is in the privacy of my own home. I feel that keeping my head screwed on straight and not going crazy helps me to aid in the search for my son. Sitting in one spot and bawling or gluing myself to the police stations lobby is surrendering my son to whoever has him. My love for him is too strong and defiant to fall into that pit.

Polygraph:

As far as any investigative techniques are concerned whether they be polygraphs, stress tests, physical searches or interviews: my family and I have fully cooperated with the local law enforcement and now the federal. Locally, they do not have the necessary experience and that is why the FBI was called in. I have been instructed to only speak to an individual FBI unit and anything that they release to the media or public is uI m going to go through this and then I want it squashed because it takes the highlight away from my son. For two years actually Joshua and his mother had been trying to take my son away from me by using Bushnell police, Sumter County, and the Department of Children and Families. DCF came into the picture and did numerous investigations because of Joshua s false reports of child abuse and neglect on my part. My family and I jumped through all of their hoops, finally completing the case plan with flying colors. Joshua on the other hand committed perjury and was in noncompliance so his custody was taken away completely. DCF closed all cases being unfounded and if Joshua or his mother make any other false reports, they will be taken as criminal charges. That is all on that matter and now we re done with it.

Summary:

That night approximately around 6 we came home from a long day out and I m not going to go into small details about the entire day or weekend for that matter. Anyway I fed him dinner he went to bed, I checked on him before my friends came and he was asleep. My friends arrived, we watched one movie, got ready for another when I checked on Trent and found him missing. I searched the premise, but with him unfound, my friend called the police, I went to a deputy s apartment in my compl

ex, called family and friends and then everyone s
howed up and it was a mad house. Investigators s
crambled around, tape was put up, my family was i
n distress and there I was a bawling fool in the
mist of it all, not helping with anything. That
is part of the reason why I am so determined to s
tay on track now. I have had a few distraught a
nd overly emotional moments in public, but if my
eyes are shut with tears, they re not open to loo
k for him. That is the way I see it. ⌐


nFirst of all I  Im going to go through this and
then I  Iwant tiist squashed becaue se it takes t
he thhgilighlight away from my son.      btrying to
take mcy y son away from me by usuing ing Bushnel
l plikolice, LSumter County, and the the Dpepartm
F ↑ ž ′ ↑ ¨ ′ N b Œ ¢ l €þ  þ ˆ ® Ð æ l$ n$ €$ ,
 , ø ø õ Ú Ò Ò Ù Ú Ò Ò Ò Ú Ò Ú Ò Ú Ò Ò Ú Ò Ù Ò Ò Ò ª ª

# EXHIBIT D
# to Giles Decl.

189) Exh-MA3\C\Documents and Settings\FOX\My Documents\Personal\letters\stev1.wps

September 7th, 2006

Hey, I thought that this would be the absolute best way to contact you and to see how things were going. Sorry I m not handwriting this but honestly, right now I m fixing to be on an interview with Nancy Grace from CNN and it s over the phone so I ve got the phone in one ear, headset to my cell in another, and then I m on my computer, but not hooked up to the internet. Confusing as hell, but I m doing fine so far. Like I said when I had talked to you on the computer the other day, I got your pictures and letter in the mail. I appreciate it.

Lately with the way things have been going and all, I d be surprised if I made it over the next few months at all. Life has been turned upside down and inside out literally and I have no place to call home. I want to move out of the place I m in now, do you know anyone that owns apartments or houses for rent, cheap? It s not an immediate thing to move into one, but to move out of the one I m in now. I love the landlord and what not, but staying there is just too much for me to deal with and I m alone which doesn t help at all. I don t even know if they ll hold me to the end of my lease at Windemere Villas, where I m at now, because that s a lot of money that they d be letting go of. The question I suppose is, How nice a re the owners of my apartment complex?

The other thing I m looking into is whether or not I want to stay in the area or not. I know once Trenton gets home nice and safe I don t want to stay in Lake County at all and I damn sure am not going to be caught dead in Sumter County where dickhead and his backwards family lives. Any suggestions? I went up to Marion the other day to distress with a little drive and all and I liked the area, but I was thinking ab L d    ÿÿÿÿ
wkswp



# EXHIBIT E
# to Giles Decl.

Gary L. Barrett, Jr, Detective Sergeant
Leesburg Police Department
Truth Verification Examiner

115 East Magnolia Street
Leesburg, Florida, 34748

(352)728-9862

## CONFIDENTIAL TRUTH VERIFICATION REPORT

August 28th, 2006

### ARRANGEMENTS

On this date, the subject, Melinda M. Duckett, SSN: 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, having a date of birth of August 14th, 1985, was interviewed and submitted to a detection of deception examination. Standardized Voice Stress Analysis techniques with a self calibrating Digital Voice Stress Analyzer was utilized. A Dell Desktop Computer, serial number CN-0Y0919-70821-36M3GVC was used.

### EXAMINER'S CREDENTIALS

This examiner has practiced voice stress analysis and detection of deception since April 11th, 2003. The Baker Group, E. Gary Baker, Ph.D. awarded the title of Law Enforcement Examiner by examination. The examiner is a sworn law enforcement officer of the Leesburg Police Department and has been employed Since November, 1992. The examiner has been assigned to the Criminal Investigations Division since June 1996.

### PURPOSE

The subject was interviewed and examined for the purpose of determining their knowledge and/or possible involvement in the disappearance of Trenton J. Duckett, white male, 2 years of age, the subject's son.

### CASE INFORMATION

This was an on-going investigation, being conducted by members of the Leesburg Police Department and members of the Florida Department of Law Enforcement, relative to the child being reported missing and possibly abducted from his residence on August 27th, 2006, between the hours of 1900 and 2100 hrs.



EXHIBIT
E

NPP-2250

## PROCEDURE

International Society of Stress Analysts standardized truth verification procedures were exercised throughout the examination. The subject signed a release and acknowledged that the examination was taken freely and that he was in good health. Questions were reviewed with the subject to protect against outside issues and to insure that only the issues in question were relevant to the examination.

There were four test administered, consisting of relevant, irrelevant, control and outside issue questions regarding the subject and the issues in question.

Test number one (1): Irrelevant/Relevant Primary Test

| | |
|---|---|
| Is your first name Melinda? | YES |
| Do you live in Leesburg, Florida? | YES |
| Are you a citizen of the United States? | YES |
| Do you know who broke into your apartment? | NO |
| Is today Monday? | YES |
| Did you allow anyone other than Chris and David into your apartment? | NO |
| Is your last name Duckett? | YES |
| Is this the month of August? | YES |

Test number two (2): Irrelevant/Relevant Primary Test

| | |
|---|---|
| Is your first name Sarah? | NO |
| Do you live in Orlando, Florida? | NO |
| Are you a citizen of the United States? | YES |
| Do you know who took Trenton from your apartment? | NO |
| Is today Saturday? | NO |
| Did you take Trenton to a safe place? | NO |
| Is your last name Jefferson? | NO |
| Is this the month of December? | NO |

Test number three (3): Irrelevant/Relevant Primary Test

| | |
|---|---|
| Is your first name Melinda? | YES |
| Do you live in Leesburg, Florida? | YES |
| Are you a citizen of the United States? | YES |
| Do you know who abducted Trenton? | NO |
| Is today Monday? | YES |
| Did you make up the story about Trenton being taken? | NO |
| Is your last name Duckett? | YES |
| Is this the month of August? | YES |

Test number four (4): Irrelevant/Relevant Primary Test

| | |
|---|---|
| Is your first name Melinda? | YES |
| Do you live in Leesburg, Florida? | YES |
| Are you a citizen of the United States? | YES |
| Are you being truthful about Trenton? | YES |
| Is today Monday? | YES |
| Did you lie during this investigation? | NO |
| Is your last name Duckett? | YES |
| Is this the month of August? | YES |

Test number five (5): Irrelevant/Relevant Primary Test

| | |
|---|---|
| Is your first name Melinda? | YES |
| Do you live in Leesburg, Florida? | YES |
| Are you a citizen of the United States? | YES |
| Is Trenton in Orlando? | NO |
| Is today Monday? | YES |
| Have you ensured Trenton's safety? | NO |
| Is your last name Duckett? | YES |
| Is this the month of August? | YES |

**CONCLUSION**

Based upon the case details provided by the subject, upon standardized chart reading criteria and the stress present in the answers of the subject, to the

relevant questions, it is the professional opinion of this examiner that there is deception indicated concerning the relevant questions regarding the disappearance of Trenton J. Duckett, 2 years of age.

Gary L. Barrett, Jr., Delta 3
Detective Sergeant
Leesburg Police Department
Criminal Investigations Division

NPP-2253

File Name_____          File No. _____

## T. V. INTERVIEW DATA SHEET

SUBJECT: L, Mi, F. 2 HOUER, MELISSA MARIE DATE: 8/28/06
SSAN 109-74 3358      DOB 8-14-85    M/ RACE Asian
ADDRESS 1416 W Green 78, Leesburg FL 34748  Ph (352)551-7550
ID:     HEIGHT 4 ft 10 in, 5100 lbs BLL HAIR BLO EYES_____
DRIVER'S LIC NO./ID _____ STATE FL EXPIRES_____

### Background Information
Education, High School 1, 2, 3, 4, Grad. 2004 College L/S GSchool_____
Military,(A) N, AF, M, CG Yrs total _____ Disch. type Honorable Date_____
Specialized training, 92 Y Supply Specialist MP Detail Orlando
I. Q. Score if known  Unknown_____
General physical condition? _Good ✓Fair _Poor _____
Hospitalized past two years? Yes - Child Birth / Eye Surgery_____
Trouble with nerves? No_____
Any prescribed medication now? BC Pill_____
Ever under care of Psychiatrist or Psychologist? No_____
Ever a patient in a mental hospital? No_____
Any heart trouble or high blood pressure? High Blood Pressure_____
Any pills or medicine taken in past 8 hours? Yes, Caffeine Pills_____
Number of hours of sleep last night? 8 Soundly off n on_____
Ever taken a lie detector test before? No_____
Ever been arrested, convicted, or taken to jail? No_____

_____
Marital Status Married / Separated  No. Children & Ages 1____,____,____,____
                                                            (2)

EXAMINER'S OBSERVATION
- Basic current health: Alert, Well appearing, no apparent distress. Y/ N
- Mental Status: Alert and oriented to person, place and time. Y/ N
- Mental Status: Memory, speech and thought intact. Y/ N
- Mental Status: Affect and mood are appropriate. Y/ N
- Mental Ability: Dull  Low  Average  Above Average  Superior

Occupation: STUDENT _____ Employer AVON NOTARY _____
Length of Employment _____.From___To Present.
Prior Employers, (if necessary)_____
From___To___  _____
From___To___  _____
✓Procedure and instrumentation explained? 540 m _Polygraph ✓Voice
✓Release signed? _____m.


### Client Information Journal

Client Co. or Agency_____
Address_____Phone_____
Client representative _____Title_____
Case Details provided by:_____Title_____
Purpose of examination:_____

IS EPA REQUIRED TO BE FOLLOWED REGARDING THIS EXAMINATION?
Y/ N   IF SO, then:

EPA documents reviewed/ attached?___ Request date_____Time_____48hrs
EPA read to employee _, Reason for suspicion explained? _ Copy to emp, _
EPA documents signed?  Act_____Release_____
### Time Log
Appointment_____m. Arrived _____m. Pre-test Start _____m. Exam end __m.
Subject left exam room_____m. Client verbally advised of opinion at _____m.
Report mailed ___/___/___

Examination location_____
Observer' name_____Title _____
SIGNED:_____Examiner, License No._____

### Financial Information

FEE:_____( )Cash    ( ) Invoice date _____

## TRUTH VERIFICATION EXAMINATION
### AUTHORIZATION AND RELEASE

I, MELINDA M. DUCKETT , SSAN 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 DOB 8-14-85

do hereby request voluntarily, without duress, coercion, threats, promise of reward or immunity, agree to submit to an interview, and to be examined by the VOICE STRESS ANALYZER, a detection of deception technique, regarding the truthfulness of my statements concerning: THE DISAPPEARANCE OF TRENTON DUCKETT 2 YEARS OF AGE.

I understand that this interview and examination is being requested by myself and by: DET. SGT. GARY BARRETT + SR. DET. GILES.

I do hereby declare that I am, to the best of my knowledge, in good health, and not undergoing treatment for any illness, mental or emotional disease. I have had the nature and procedure of this examination explained to me, and I have also been advised that I have an absolute right to refuse to submit to an examination. I have been told that I can stop talking and end the interview and examination at any time, without prejudice.

I hereby authorize the examiner to tape record my statements, to place the necessary apparatus on my person, and to use any electronic hearing or recording devices operated contemporaneously with this examination.

I do release, absolve, and forever hold harmless, the Examiner, Monitor,  and Witness shown below, the Examiner's clients, agents, agency, firm, interviewers, employees, and anyone acting on their behalf, from any liability flowing from any matter, act, or thing arising out of the aforementioned interview and examination, including, but not limited to the results or opinions therefrom.

I further hereby agree and authorize the disclosure, both orally and in writing the results and opinions of the interview, and examination, including but not limited to any conversation, comments, admissions or statements made by me during the interview and examination to: SR. DET. GILES, FDLE, STATE ATTORNEY'S OFFICE

Having been made clearly aware that statements I may make will be used, that I have an absolute right to refuse to submit to an examination, and that I may discontinue the interview and examination at any time, I am willing to submit to an interview and truth verification examination freely without promise of reward, without force, threat, or duress being exerted on me.  I have carefully read this Authorization and Release and agree fully to the conditions herein.

SIGNED: M Duckett Examinee.  WITNESS:_____

DATE: 8-28-06 TIME 5.45 m.

EXAMINER Det. Sgt. G.P. Barrett Lic. No. 180 LOCATION LPD CID.

MONITOR _____

IRRELEVANT / RELEVANT PRIMARY TEST

TEST NO. __1__

SUBJECT _M. Duckett_   -DATE 8/28/06   TIME 0546

QUESTION                                                          ANSWER

1. Is your first name _MELINDA_ ?                                 +
2. Do you live in _LEESBURG, FL_ ?                               +
3. Are you a citizen of the United States?                        +
4. Do you know who _BROKE INTO YOUR APT._ ?                       O
5. Is today _MONDAY_ ?                                            +
6. Did you _ANYONE OTHER THAN CHRIS & DAVID INTO YOUR_            O
7. Is your last name _DUCKETT_ ?                 APT.            +
8. Is this the month of _AUGUST._ ?                              +


ANALYSIS:      DI        NDI        NO

Confidential
Forensic Voice Analysis

| | | | | |
|---|---|---|---|---|
| Examiner: | Det Sgt Gary Barrett | Subject: | Melinda Duckett | 8/28/2006 |
| Date: | 8/28/2006  12:00:00AM | Test: | GQT | |
| Location: | LPD CID | Charge: | None | |
| Case#: | 06083735 | Case: | Felony | Recording#:  1 |



| Selection#: | 1 | Time Begin: | 6.927 |
|---|---|---|---|
| | | End: | 7.766 |
| | | Total | 0.839 |

| Selection#: | 2 | Time Begin: | 10.915 |
|---|---|---|---|
| | | End: | 11.859 |
| | | Total | 0.944 |

| Selection#: | 3 | Time Begin: | 15.532 |
|---|---|---|---|
| | | End: | 16.687 |
| | | Total | 1.155 |

| Selection#: | 4 | Time Begin: | 20.045 |
|---|---|---|---|
| | | End: | 21.199 |
| | | Total | 1.154 |

| Selection#: | 5 | Time Begin: | 26.342 |
|---|---|---|---|
| | | End: | 27.181 |
| | | Total | 0.839 |

| Selection#: | 6 | Time Begin: | 53.103 |
|---|---|---|---|
| | | End: | 53.943 |
| | | Total | 0.84 |

| Selection#: | 7 | Time Begin: | 57.196 |
|---|---|---|---|
| | | End: | 58.246 |
| | | Total | 1.05 |

| Selection#: | 8 | Time Begin: | 60.87 |
|---|---|---|---|
| | | End: | 61.919 |
| | | Total | 1.049 |

1

NPP-2258

## IRRELEVANT / RELEVANT PRIMARY TEST

### TEST NO. 2

SUBJECT W. Dauced -DATE 8/28/06 TIME 0547

| QUESTION | ANSWER |
|---|---|
| 1. Is your first name SARAH ? | O |
| 2. Do you live in ORLANDO, FL ? | O |
| 3. Are you a citizen of the United States? | + |
| 4. Do you know who TOBIL TRENTON From RIE APT. ? | O |
| 5. Is today SATURDAY ? | O |
| 6. Did you TAKE So TRENTON TO A SAFE PLACE ? | O |
| 7. Is your last name JEFFERSON ? | O |
| 8. Is this the month of DECEMBER ? | O |

ANALYSIS:   DI     NDI     NO

Confidential                                                          Forensic Voice Analysis

| | | | | |
|---|---|---|---|---|
| Examiner: | Det Sgt Gary Barrett | Subject: | Melinda Duckett | 8/28/2006 |
| Date: | 8/28/2006 12:00:00AM | Test: | GQT | |
| Location: | LPD CID | Charge: | None | |
| Case#: | 06083735 | Case: | Felony | Recording#:    2 |



| | | | |
|---|---|---|---|
| Selection#: | 1 | Time Begin: | 7.808 |
| | | End: | 8.753 |
| | | Total | 0.945 |

| | | | |
|---|---|---|---|
| Selection#: | 2 | Time Begin: | 11.082 |
| | | End: | 12.09 |
| | | Total | 1.008 |

| | | | |
|---|---|---|---|
| Selection#: | 3 | Time Begin: | 15.742 |
| | | End: | 16.435 |
| | | Total | 0.693 |

| | | | |
|---|---|---|---|
| Selection#: | 4 | Time Begin: | 20.024 |
| | | End: | 20.78 |
| | | Total | 0.756 |

| | | | |
|---|---|---|---|
| Selection#: | 5 | Time Begin: | 24.747 |
| | | End: | 25.691 |
| | | Total | 0.944 |

| | | | |
|---|---|---|---|
| Selection#: | 6 | Time Begin: | 29.91 |
| | | End: | 30.792 |
| | | Total | 0.882 |

| | | | |
|---|---|---|---|
| Selection#: | 7 | Time Begin: | 33.877 |
| | | End: | 34.696 |
| | | Total | 0.819 |

| | | | |
|---|---|---|---|
| Selection#: | 8 | Time Begin: | 36.774 |
| | | End: | 37.655 |
| | | Total | 0.881 |

1

NPP-2260

## IRRELEVANT / RELEVANT PRIMARY TEST

### TEST NO. 3

SUBJECT _W. Duckett_          -DATE _8/28/06_ TIME _0548_

QUESTION                                                      ANSWER

1. Is your first name _Melinda_ ?
2. Do you live in _Leesburg, FL_ ?
3. Are you a citizen of the United States?
4. Do you know who _ABDUCTED TRENTON_ ?
5. Is today _MONDAY_ ?
6. Did you _MAKE UP THE STORY OF TRENTON BEING_ ? _TAKEN_
7. Is your last name _Duckett_ ?
8. Is this the month of _AUGUST_ ?


ANALYSIS:      DI      NDI      NO

Confidential                                                          Forensic Voice Analysis

| | | | | |
|---|---|---|---|---|
| Examiner: | Det Sgt Gary Barrett | Subject: | Melinda Duckett | 8/28/2006 |
| Date: | 8/28/2006  12:00:00AM | Test: | GQT | |
| Location: | LPD CID | Charge: | None | |
| Case#: | 06083735 | Case: | Felony | Recording#:    3 |



| | | | |
|---|---|---|---|
| Selection#: | 1 | Time Begin: | 9.04 |
| | | End: | 9.985 |
| | | Total | 0.945 |

| | | | |
|---|---|---|---|
| Selection#: | 2 | Time Begin: | 12.211 |
| | | End: | 13.021 |
| | | Total | 0.81 |



| | | | |
|---|---|---|---|
| Selection#: | 3 | Time Begin: | 16.394 |
| | | End: | 17.406 |
| | | Total | 1.012 |

| | | | |
|---|---|---|---|
| Selection#: | 4 | Time Begin: | 20.645 |
| | | End: | 21.657 |
| | | Total | 1.012 |



| | | | |
|---|---|---|---|
| Selection#: | 5 | Time Begin: | 25.097 |
| | | End: | 26.042 |
| | | Total | 0.945 |

| | | | |
|---|---|---|---|
| Selection#: | 6 | Time Begin: | 33.126 |
| | | End: | 34.003 |
| | | Total | 0.877 |



| | | | |
|---|---|---|---|
| Selection#: | 7 | Time Begin: | 36.904 |
| | | End: | 37.579 |
| | | Total | 0.675 |

| | | | |
|---|---|---|---|
| Selection#: | 8 | Time Begin: | 39.873 |
| | | End: | 40.682 |
| | | Total | 0.809 |

1

NPP-2262

## IRRELEVANT / RELEVANT PRIMARY TEST

### TEST NO. 4

SUBJECT M. Duckett          -DATE 8/28/06  TIME 0550

**QUESTION**                                                    **ANSWER**

1. Is your first name  MELINDA                  ?          +
2. Do you live in  LEESBURG, FL,                ?          +
3. Are you a citizen of the United States?                 +
4. ~~Do you know who~~ ARE YOU BEING TRUTHFUL ABOUT ? MENTON  +
5. Is today  MONDAY                             ?          +
6. Did you  KILL DURING THIS INVESTIGATION      ?          0
7. Is your last name  DUCKETT                   ?          +
8. Is this the month of  AUGUST.                ?          +


**ANALYSIS:**     DI     NDI        NO

NPP-2263

**Confidential**

Forensic Voice Analysis

| | | | | |
|---|---|---|---|---|
| Examiner: | Det Sgt Gary Barrett | Subject: | Melinda Duckett | 8/28/2006 |
| Date: | 8/28/2006 12:00:00AM | Test: | GQT | |
| Location: | LPD CID | Charge: | None | |
| Case#: | 06083735 | Case: | Felony | Recording#:    4 |



| Selection#: | 1 | Time Begin: | 4.438 |
|---|---|---|---|
| | | End: | 5.037 |
| | | Total | 0.599 |

| Selection#: | 2 | Time Begin: | 8.336 |
|---|---|---|---|
| | | End: | 8.936 |
| | | Total | 0.6 |

| Selection#: | 3 | Time Begin: | 11.814 |
|---|---|---|---|
| | | End: | 12.714 |
| | | Total | 0.9 |

| Selection#: | 4 | Time Begin: | 15.892 |
|---|---|---|---|
| | | End: | 16.552 |
| | | Total | 0.66 |

| Selection#: | 5 | Time Begin: | 19.49 |
|---|---|---|---|
| | | End: | 20.27 |
| | | Total | 0.78 |

| Selection#: | 6 | Time Begin: | 23.808 |
|---|---|---|---|
| | | End: | 24.648 |
| | | Total | 0.84 |

| Selection#: | 7 | Time Begin: | 27.466 |
|---|---|---|---|
| | | End: | 28.186 |
| | | Total | 0.72 |

| Selection#: | 8 | Time Begin: | 35.202 |
|---|---|---|---|
| | | End: | 35.802 |
| | | Total | 0.6 |

1

NPP-2264

## IRRELEVANT / RELEVANT PRIMARY TEST

### TEST NO. _5_

SUBJECT _N. Duckett_    -DATE _8/28/04_ TIME _0612_

| QUESTION | ANSWER |
|---|---|
| 1. **Is your first name** _MELISSA_ ? | + |
| 2. **Do you live in** _LEESBURG, FL_ ? | + |
| 3. **Are you a citizen of the United States?** | + |
| 4. ~~Do you know who~~ _Jo ∂∂∂∂∂ Js TRENTON IN ORLANDO_ ◯ | ◯ |
| 5. **Is today** _MONDAY_ ? | + |
| 6. ~~Did you~~ _HAVE YOU ENSURED TRENT'S SAFETY_ ? | ◯ |
| 7. **Is your last name** _DUCKETT_ ? | + |
| 8. **Is this the month of** _AUGUST_ ? | + |

**ANALYSIS:**    DI    NDI    NO

NPP-2265

Confidential                                                                                    Forensic Voice Analysis

| | | | | | |
|---|---|---|---|---|---|
| Examiner: | Det Sgt Gary Barrett | Subject: | Melinda Duckett | | 8/28/2006 |
| Date: | 8/28/2006  12:00:00AM | Test: | GQT | | |
| Location: | LPD CID | Charge: | None | | |
| Case#: | 06083735 | Case: | Felony | Recording#: | 5 |



| Selection#: | 1 | Time Begin: | 5.037 |
|---|---|---|---|
| | | End: | 5.637 |
| | | Total | 0.6 |



| Selection#: | 2 | Time Begin: | 8.096 |
|---|---|---|---|
| | | End: | 8.636 |
| | | Total | 0.54 |



| Selection#: | 3 | Time Begin: | 11.754 |
|---|---|---|---|
| | | End: | 12.534 |
| | | Total | 0.78 |



| Selection#: | 4 | Time Begin: | 19.61 |
|---|---|---|---|
| | | End: | 20.63 |
| | | Total | 1.02 |



| Selection#: | 5 | Time Begin: | 23.388 |
|---|---|---|---|
| | | End: | 24.288 |
| | | Total | 0.9 |



| Selection#: | 6 | Time Begin: | 29.085 |
|---|---|---|---|
| | | End: | 29.865 |
| | | Total | 0.78 |



| Selection#: | 7 | Time Begin: | 33.103 |
|---|---|---|---|
| | | End: | 33.763 |
| | | Total | 0.66 |



| Selection#: | 8 | Time Begin: | 35.982 |
|---|---|---|---|
| | | End: | 36.642 |
| | | Total | 0.66 |

NPP-2266

# EXHIBIT F
# to Giles Decl.

(Rev. 01-31-2003)

## FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                          **Date:** 12/22/2006

**To:** Jacksonville              **Attn:** Squad 9 - Ocala, RA
                                           SA Jeffrey S. Bolin

     Criminal Investigative    **Attn:** CACU
                                           UC Alan Nanavaty

     Tampa                      **Attn:** Ft. Myers RA
                                           SA John Kuchta

     Knoxville                  **Attn:** SSA Mike McLean
     Columbia                   **Attn:** SSA Phil Coughlin

**From:** CIRG
     NCAVC/BAU-3
     **Contact:** SSA Kathleen E. Canning  (703) 632-4264

**Approved By:** Hess John
     Kosky Robert H Jr

**Drafted By:** Canning Kathleen E

**Case ID #:**   7C-JK-50172;73 (Pending)

**Title:**   UNSUB;
     TRENTON DUCKETT - VICTIM
     CHILD ABDUCTION - NO RANSOM

**Synopsis:**  To document BAU's assistance and analysis with regard to captioned matter.

**Enclosure(s):**  Copies of General Assessment Questionnaires (GAQs) completed by Josh Duckett, Carla Massero, and Ruth Harvey Gilligan

**Details:** On 8/29/06, SSAs Kathleen E. Canning and James O. Beasley, II, Critical Incident Response Group, National Center for the Analysis of Violent Crime (NCAVC), Behavioral Analysis Unit (BAU-3), deployed to Leesburg, Forida (FL) to assist members of the Child Abduction Rapid Deployment (CARD)Team who had responded to the alleged child kidnaping investigation concerning Trenton Duckett (age 2).  The purpose of the BAU's assistance was to conduct a comprehensive behavioral assessment of Trenton's mother, Melinda Duckett, focusing specifically on her personality and behavior, as well as to evaluate the interpersonal dynamics associated with the extended circle of family and acquaintances and their possible relationship to the victim's disappearance.





EXHIBIT
F

(Rev. 01-31-2003)

## FEDERAL BUREAU OF INVESTIGATION

The following case analysis was conducted by SSAs Kathleen Canning, James Beasley, and Craig Ackley, in consultation with other members of the NCAVC:

**CASE SUMMARY**

Melinda Duckett told investigators that her biological son, Trenton Duckett, had been abducted from their apartment at 1416 West Griffin Rd, Apartment 48, Leesburg, Florida on the evening of Sunday, 8/27/06. She put Trenton to bed at approximately 6:45 p.m. that evening, prior to the arrival of two male friends whom she had invited earlier that day to watch movies. At approximately 9:00 p.m., during a break between movies, she went into Trenton's room to check on him and noticed he was not in his bedroom. Melinda discovered that the screen of Trenton's window had been cut. The only other disturbance to the room was a small picture frame, containing a picture of her and Trenton, which was found on the floor underneath the window. Upon discovering Trenton missing, Melinda went into the living room and alerted her two friends that Trenton had been abducted. She told one of her friends to make the call to 911 while she searched outside for her son.

The Leesburg Police arrived shortly after the 911 call and searched the inside of Melinda's apartment and the immediate area outside. A command post was established at the Leesburg Police Station to begin the investigation of Trenton's disappearance. Melinda Duckett committed suicide by shooting herself with a shotgun inside her grandparents' home on 9/8/06, the morning after she appeared on a nationally televised Nancy Grace program about her son's disappearance. To date, Trenton Duckett has not been recovered.

**VICTIMOLOGY**

Typically, two-year-olds are considered at low risk to become victims of abduction, largely because they are not making lifestyle choices that put them at risk and they are usually closely supervised. Accordingly, the risks for a victim of this age are largely driven by the custodial parent's lifestyle.

Trenton Duckett, white male (mixed Korean/Caucasian), date of birth 8/10/04, was the only biological child of Melinda and Joshua Duckett. According to a child custody evaluator, Trenton was a typical, healthy 2-year-old child who was on target developmentally. At the time of his reported disappearance, he was living with his mother at 1416 Griffin Rd., Apt. 48, in

To: Jacksonville  From: CIRG
Re: 7C-JK-50172, 12/15/2006

Leesburg, FL. Joshua shared custody of Trenton with Melinda.  His
maternal great-grandparents, Bill and Nancy Eubank of Lady Lake,
FL often babysat for Trenton while his mother worked or attended
school.  Outside of Melinda, Bill and Nancy Eubank were the last
people to see Trenton alive.  Melinda and Trenton left the
Eubank's home on Saturday, 8/26/06, at approximately 5:00 p.m.
after spending the day visiting.  According to the Eubanks,
Trenton appeared in good health the day before he was reported
missing.

Melinda Duckett (nee Eubank) was born in Korea and
adopted by Beth and William Eubank of Rockport, NY.  She lived
with the Eubanks until 2002, when her adoptive parents signed
over guardianship to the paternal adoptive grandparents, Bill and
Nancy Eubank when, according to the Eubanks, Melinda became too
difficult to control. Melinda and Joshua Duckett met in January
of 2003, when they were both seventeen years old. Melinda
graduated from high school and became pregnant.  Trenton was born
on 8/10/2004.  Trenton was placed with his father in accordance
with a Florida Department of Children and Families (DCF) Shelter
order in on 4/30/05, due to allegations of irrational and
dangerous behavior exhibited by Melinda. Trenton lived with
Joshua until 6/11/05, when Joshua, in defiance of the DCF Shelter
order, reunited with Melinda. Josh and Melinda were married in
July of 2005, and were immediately placed into marital
counseling.

After a history of marital discord, and mutual
allegations of misconduct, they separated on 12/25/05 and were
allowed shared custody of Trenton.  These arrangements remained
in effect until July of 2006, when Melinda alleged that Josh had
sent her an email threatening to harm her and Trenton.  On the
basis of this email threat, Melinda sought and received a court
ordered injunction preventing Josh from seeing Trenton until an
investigation of the email was conducted.  The police later
discovered that Melinda had emailed the threat to herself.

**<u>Previous Allegations of Abusive/Assaultive Behavior By Melinda
Against Trenton, Herself, and Others</u>:**

1. In early 2002, while living in New York with her

3

To: Jacksonville  From:  CIRG
Re:  7C-JK-50172, 12/15/2006

adoptive parents, William and Bethann Eubank, Melinda threatened
to cut her adoptive mother with a knife.  During this time period
Melinda received psychological counseling for the attack, as well
as self-mutilating behavior.  After a series of other incidents
involving harm to herself and threats to harm family members, the
decision was made to transfer guardianship of Melinda to Nancy
and Billy Eubank of Florida.

        2.  On 10/31/04, the Okeechobee Sheriff's Office
responded to an incident at a BMX Motocross race involving
Melinda and her mother-in-law, Carla Massero.  Massero reported
that Melinda attacked Massero while she attempted to bathe
Trenton.  Massero reported that Melinda slapped her, pulled her
hair, and bit her on the arm.

        3.  On 11/2/04, Melinda was evaluated by Dr. Catherine
L. Waltz upon the request of her family after the incident at the
BMX Motocross race.  Melinda reported that she sometimes cuts
herself, and that she had continued this behavior after Trenton
was born.  This self-mutilating behavior was also corroborated by
Josh as well as the child custody evaluator.

        4.  According to records, on 4/6/05, Joshua Duckett
contacted the DCF hotline alleging that Melinda Duckett had
threatened to harm Trenton that night.  He further stated that
Melinda Eubank said that Trenton "will be gone" if Joshua Duckett
would not go to her house and talk with her.  When Joshua asked
what she meant by this remark, she told him, "If you don't get it
by now, you'll read it in the paper and everyone will be sad."

        5.  According to DCF records, on 4/29/05, the Police
Chief for the City of Bushnell, Florida reported that she
overheard a telephone conversation between Melinda and Joshua
Duckett, wherein Melinda said that she was going to "end it"
because she "couldn't take it anymore."  During this
conversation, Melinda threatened the safety of Trenton, accused
Josh of being with other women and stated, "You will be sorry."
Melinda then counted down from three to zero, and at the count of
zero, Trenton was heard screaming on the other end of the line.

        Josh made a recording of this telephone call, which was
heard by several different individuals, including Melinda's child
custody evaluator. (The tape was turned over to the DCF, however

4

To: Jacksonville  From: CIRG
Re: 7C-JK-50172, 12/15/2006

investigators were unable to locate it at the time of this
report.)  At the time, Melinda and Joshua were separated and
engaging in a custody battle. This incident resulted in Melinda's
arrest for domestic violence.  She was "Baker Acted" on 4/30/05,
causing the temporary removal of Trenton from her custody, and
the referral of Melinda for a mental health evaluation.

     6.  According to DCF records, on 10/30/05, Melinda
scratched Joshua with her hands during an argument while driving.
Joshua sustained scratch marks to his left arm.  During the
argument, Melinda threatened to kill Trenton by breaking his neck
and held a pocket knife against his leg.  Joshua got out of the
vehicle and Melinda drove away.  She then called Joshua on her
cell phone and threatened to harm Trenton. Trenton was later
evaluated and found to have no physical marks indicative of an
assault.  Melinda denied the incident, although she and Josh
admitted to having an altercation in the vehicle in Trenton's
presence.

     7.  On 12/27/05, DCF was notified that Josh had made a
report to the police, alleging that Melinda told Josh she would
hurt Trenton "and make him cry" if Josh did not do what she
wanted him to do (return her keys). Melinda and Josh were
separated at the time.

<u>NCAVC Research and Anecdotal Experience of Cases Involving the
Disappearances of Two-Year-Old Children</u>:

     The two most common outcomes when *two-year-old* children
disappear are the following:

     1. <u>Lost/Accident</u>:  This may include incidents in which
the toddler becomes separated from the caregiver.  Most often the
child survives the experience and is found and returned unharmed
or with minor injuries; however, there are accounts of toddlers
who have wandered into some type of natural hazard, resulting in
the child's accidental death. In the case of Trenton Duckett, his
mother claims to have put him in his bed at 6:45 p.m. on 8/27/06,
and was watching movies in an adjacent room with two individuals
when she discovered Trenton missing from his bedroom. Therefore,
given the facts and circumstances of this case, this scenario is
eliminated as a possible outcome.

5

To: Jacksonville  From: CIRG
Re: 7C-JK-50172, 12/15/2006

     2. <u>Domestic-Related Incident</u>:  This may include abduction and/or homicide.  Typically, toddlers are the victims of an emotion-based event, i.e., anger or revenge.  Since their exposure is limited to family or close associates of the family, the greatest risk to their health and safety is likely to come from that same small universe of people.  The vast majority of child abductions/homicides of toddlers are committed by family members, followed by acquaintances, and the primary motivation is again, emotion-based.  For those incidents that end in the child's homicide, body disposal plans are usually not developed prior to the homicide, and offenders tend to dispose of the victims close to home in familiar areas. *(Child Abduction: Aged-Based Analysis of Offender, Victim, and Offense Characteristics in 550 Cases of Alleged Child Disappearance. Boudreau, Lord, Dutra, 1998).*

     One type of domestic-related incident are false allegations of child abduction. The NCAVC is presently involved in a research project studying these crimes, wherein a parent or caregiver claims a child has been abducted or has "gone missing" in an attempt to cover up a homicide. The research has shown that there are two primary categories of victims in false allegation of child abduction cases: 1) children who have had a history of being physically abused, and 2) children who are "unwanted". Typically those that have been a victim of chronic child abuse die as a result of a fatal child abuse incident.  Children who are "unwanted" are usually killed because the offender views them as a liability, or as an obstacle to a relationship with the offender's partner.  The following are some relevant findings from this study of false allegation 45 cases:

    1. The biological mother was most often the offender.

    2. In more than 1/3 of the cases, the victim had been a target of previous physical abuse.

    3. In more than ½ of cases, there had been a period of separation between the victim and the offender.

    4. There had been a change in the victim's family within six months of the offense in more than half of the cases.

6

NPP-3754

To:   Jacksonville   From:   CIRG
Re:   7C-JK-50172, 12/15/2006

    5. Domestic problems around the time of the offense
      were noted in over 90% of the cases.

    6. The vast majority of the victims would not have be
      been located if not for the offender's disclosure to
      police.

Two-year-old children present unique behavioral challenges that sometimes overwhelm young and/or inexperienced parents or care givers. "The terrible twos" often come with temper tantrums and other behaviors that require a great deal of patience and parental self-control. Potty training is an activity that is associated with any two-year-old child's natural development. Unfortunately, depending on the level of maturity of the child, the training process can be prolonged. Potty-training accidents can be frustrating and vexing, particularly for a parent prone to angry outbursts. During an interview with Melinda Duckett, SSA Canning, asked Melinda the status of Trenton's potty training. Melinda responded, "We tried it, but it went very badly."

Stranger abductions of two-year-olds are extremely rare. When they do occur, it is often in the context of a car jacking. On the rare events when children are abducted from their residence, they are most often abducted by male offenders with a sexual motivation, and the victims are usually pre-teen or teenaged females.

**Case Analysis**

<u>Analysis of Melinda's Free Narrative</u>:

Within days following her son's disappearance, Melinda was asked to provide a written narrative, explaining her whereabouts on Sunday, 8/27/06. Investigators had hoped, with Melinda's cooperation, to develop a time-line of her and Trenton's activities in an effort to develop potential leads.

In the four-page handwritten document, Melinda recounted that she and Trenton slept in her bedroom on Saturday night. On Sunday, they went through their "normal routine" and drove to Melinda's grandparents' home in Lady Lake. Melinda wrote that she had forgotten it was Sunday, and didn't realize

7

NPP-3755

To: Jacksonville   From: CIRG
Re: 7C-JK-50172, 12/15/2006

what day of the week it was until she arrived at her
grandparents' home and noticed their car was not in the driveway.
Melinda recounted that she and Trenton went to the Suntrust Bank
in Leesburg and then to the Altamonte Mall.  After spending time
window shopping, Melinda left the mall and became lost in
Orlando.  She ended up in the "TD Waterhouse" area before finding
her way back home.  Upon arriving at her complex, Melinda stated
that she parked in a different area so as to avoid a
"confrontational neighbor."  ·  She recounted that she carried
Trenton into the apartment through the front door and fed him
leftover Chinese food before tucking him into bed 6:45 p.m.  She
stated that she checked on him once and "verified his breathing."

        Melinda further wrote she had previously made plans to
have friends over to watch movies.  Chris Pierce and Danny Bass
arrived sometime around 7:00 p.m., and the three of them watched
the first movie.  Melinda recounted that after watching the first
movie, she went to check on Trenton discovered that he was not in
his room.  After checking the closet and interior of the house,
she had Danny Bass call the police while she dialed her
grandparents.  (It was later determined through an analysis of
phone records, that during this time, Melinda called an
acquaintance who was a police officer to report Trenton's
disappearance.  This police officer advised Melinda to call 911.)
Melinda then left her residence and walked to a local deputy's
apartment to see if he had seen Trenton.  When she arrived back
at her apartment, Danny Bass handed her the telephone to speak
with the dispatcher, and the police arrived a short time later.

        In her statement, Melinda told investigators that upon
returning to her apartment Sunday at approximately 6:00 p.m., she
parked in a different area of the apartment complex, rather than
in front of her apartment, in order to avoid a "confrontational
neighbor." She specifically stated that she carried Trenton
through the front door.  A neighbor, however, was interviewed as
part of the initial canvass; that neighbor reported having seen
Melinda towards the rear of her apartment without Trenton earlier
Sunday afternoon.  Chris Pierce stated that when he arrived to
watch movies at about 7:00 p.m., Melinda asked him to move her
vehicle from a rear parking lot and park it in the lot in front
of her apartment.

        An analysis of the hand-written statement revealed

8

NPP-3756

To: Jacksonville  From: CIRG
Re: 7C-JK-50172, 12/15/2006

ambiguity with respect to the times of her travel, as well as the
locations reportedly visited by her and Trenton on Sunday.  Also
of note was a significant lack of detail and emotion regarding
Trenton's activities during this period of time.  When
investigators asked Melinda to accompany them in order to retrace
her travels on Sunday, Melinda refused.  Investigators reviewed
videotape from the Altamonte Mall in an effort to assist with the
development of a time-line; however, Melinda and Trenton were not
seen on the tapes.  When asked to take a polygraph examination
with regard to Trenton's disappearance, Melinda declined.

<u>Analysis of Crime Scene</u>:

        The NCAVC defines "staging" as "the purposeful
alteration of a crime scene by an offender to redirect the
investigation."  The following analysis of the crime scene
indicates elements of staging, perpetrated by Melinda Duckett:

        Melinda reported that her son was abducted from his
bedroom on the evening of 8/27/06.  Trenton's bedroom window
faces the front of the apartment.  If one were facing the front
door, Trenton's bedroom window is approximately five feet to the
right of the unit's front door.  The bedroom is located next the
kitchen area, which abuts the family room (where Melinda claimed
to have been watching movies with her friends).  The approximate
distance between the family room and Trenton's room is less than
20 feet.

        Melinda claimed that when she discovered her son
missing from his bedroom at about 9:00 p.m., she saw that a
picture frame had fallen on the floor and a cut had been made in
the window screen.  The cut was not large enough for an adult to
squeeze through, which would infer that the offender managed to
pull Trenton outside through the screen.  The distance from the
cut in the screen to the top of Trenton's mattress is
approximately three feet.  In order to have successfully
accomplished the abduction, the offender would have to have
coaxed Trenton into standing next to the window with his arms
extended, or convinced him to stand on his bed so that he could
be close enough to the cut in the screen to be pulled through.
(Melinda commented in a posting to her Myspace account the
following day that Trenton "was kidnapped last night from our
home.  Someone broke into his room and grabbed him throught (sic)

9

To: Jacksonville  From: CIRG
Re: 7C-JK-50172, 12/15/2006

window.")

Given the relatively early hour, it would have been extremely unlikely for someone to have abducted Trenton through his bedroom window, and to have escaped without being detected by a neighbor.  Further, someone unfamiliar with the apartment's layout would not have known that the front bedroom of the apartment belonged to Trenton, or that Trenton was alone in his bedroom at that time.   Chances are a stranger would have made some audible noise, either by gaining entry, or by convincing a two-year-old child to accompany him/her through the cut screen in his bedroom window.  This scenario also assumes that Trenton would have quietly acquiesced to leaving the safety of his home for the arms of a stranger.

Analysis of the crime scene photos, taken in context with the writers' collective knowledge and experience in child abduction matters, suggests that Melinda staged the break-in to cover up the homicide of Trenton.  Witness statements and an analysis of her My Space account indicate that Melinda was home during the afternoon of 8/27/06, prior to the arrival of her two male friends.  Her friends told police that they did not see, nor hear Trenton that evening, nor did they enter his bedroom until Melinda checked on her son and told them that he was missing.

**Post Offense Behavior**

* _Apartment Cleaning_: Parents of abducted children exhibit a wide range of behavior, and the NCAVC cautions investigators not to draw conclusions about a parent or care giver's possible involvement in their child's disappearance based on emotional responses alone.  Different people deal with crises differently; some remain stoic and in control, while others become hysterical and fall apart. In most cases, despite the emotional drain, parents of abducted children take great care in preserving the memories of their missing children. Missing children's bedrooms are often enshrined and their possessions are lovingly preserved. The parents of missing children rarely change telephone numbers or move residences, especially in the days following their disappearance, in the hope that their child will someday return home.

In the case of Melinda Duckett, her emotional response

10

To: Jacksonville  From: CIRG
Re: 7C-JK-50172, 12/15/2006

and behavior during the immediate time period following her son's
alleged disappearance were so atypical that they deserve
consideration in the analysis of this incident.  Within hours
following the disappearance of her son, Melinda conducted a
thorough cleaning of her apartment.  Investigators became aware
that Melinda was removing items from the apartment and
subsequently collected them from the complex's dumpster.  Some of
Trenton's items included clothing, toys, and dishes.  Of
particular note were items that usually evoke a sentimental
response in a typical distressed parent of an abducted child.
Trenton's sonogram picture, greeting cards congratulating Melinda
on the birth of Trenton, as well photographs of Trenton and
Melinda were found among the garbage.  When investigators
questioned Melinda about the things she was throwing away, she
told them that the items were old or dirty, and that she was
preparing to move out of her apartment.

### Further Evidence of Melinda's Manipulative Behavior:

        Melinda invited three friends (one did not show up)
over to watch movies on Sunday 8/27/06 so that there would be
witnesses when she discovered Trenton missing from his room, and
to manipulate these people into contacting the police to make the
kidnaping report.  This attempt to "distance" oneself from the
crime through manipulation of others is also evidenced in another
false allegation by Melinda which occurred on 7/5/06, when
Melinda notified her family care manager and her attorney that
Josh had sent her a threatening email.  Police later found that
Melinda had sent the threatening email to herself.

        In July of 2006, Melinda met an individual at a local
pawn shop from which she purchased a shotgun.  This individual
told police that Melinda, after engaging in a brief sexual
encounter, asked him to give her money so that she could have her
husband killed.  (This information was corroborated by police
when they discovered the person whom she requested to kill her
husband.)  Melinda told him that Josh had beaten her and was
threatening to harm her and Trenton.

        In each of these scenarios, Melinda manipulated other
to "do her bidding."  Furthermore, she engaged in "impression
management", painting herself as a loving mother and vulnerable
victim.  This significant feature of Melinda's personality will

11

To:  Jacksonville  From:  CIRG
Re:  7C-JK-50172, 12/15/2006

be discussed in further detail below.

## Personality Assessment of Melinda Duckett:

- In providing an assessment regarding Duckett, it is
  important to analyze certain aspects of her personality in
  order to more fully comprehend her motivations for behaviors
  that she exhibited during this investigation, to include
  what the BAU believes to be the false allegation of her
  son's abduction, and her subsequent suicide.  These
  behaviors were demonstrated on multiple fronts, including
  several interviews with various law enforcement
  investigators; information gleaned from General Assessment
  Questionnaires (GAQs), further described elsewhere; and her
  responses to questions posed to her during her interview on
  an episode of the Nancy Grace program, as well other news
  media interviews with her on prior occasions.

- The GAQ was developed by the BAU to obtain, from multiple
  sources, background information on suspects in criminal
  investigations.  One component of the GAQ is a series of
  adjective terms that the respondents are encouraged to
  apply, as they deem appropriate, to the individual in
  question.  These terms are based on the NEO-PR Personality
  Assessment Instrument, which captures information about
  individuals based on five facets of personality.  These
  facets are neuroticism, extraversion, openness,
  conscientiousness, and agreeableness.

- Three individuals associated with Duckett completed separate
  GAQs which were evaluated by BAU personnel and outside
  consultants.  Viewed collectively, the adjective ratings of
  the respondents indicated the following:

  o Duckett had a low tolerance for frustration, was
    insecure, had low self-esteem, and was easily provoked.
    She appeared to be able to handle herself fairly well
    in crisis situations, but became emotionally unstable
    when she perceived the actions of others to be attacks
    against her self-image.  This stress would be
    manifested in the externalization of blame toward
    others.

12

To: Jacksonville  From: CIRG
Re: 7C-JK-50172, 12/15/2006

- o Duckett had a low level of warmth and trust, and
  therefore had great difficulty in developing
  attachments to others, viewing them as objects to be
  manipulated.  She was forceful and bold in social
  situations, with little hesitation to speak her mind.
  She was energetic and had a fast-paced lifestyle.  She
  was generally unemotional and pessimistic.  Stimulation
  and thrills had great appeal to her, and she was prone
  to engage in excitement-seeking behavior.

- o Duckett exhibited a high level of superiority and
  entitlement, had little empathy and compassion for
  others, and had a low level of personal loyalty.  In
  personal relationships, her needs took priority over
  all others, and she was highly competitive.  In her
  world view, the ends would justify the means.

- o She displayed a high need to achieve, and appeared to
  be competent and efficient.  She was highly
  disciplined, organized, and methodical in her
  approaches to achieving her goals of self-interest.
  However, on the occasions when she felt under attack or
  a loss of control, she could be extremely impulsive,
  openly hostile and retaliatory.

- o She exhibited very strong narcissistic traits, wherein
  she had an inflated view of herself and a diminished
  view of others.  She routinely engaged in impression
  management, painting herself in the most favorable
  light possible.  She generally appeared to be in
  control of her emotions and displayed a high degree of
  self-confidence in most situations.  However, threats
  against her self-confidence would likely be defended
  against with anger and/or rage.  Individuals who
  exhibit strong narcissistic traits often exhibit
  features of psychopathy, a personality construct that
  involves emotional/affective deficiencies such as
  superficial social charm, inclination toward deceptive
  and manipulative behavior, and an inability to
  experience guilt.

- Based on Duckett's personality, it appears probable that her

13

NPP-3761

To: Jacksonville From: CIRG
Re: 7C-JK-50172, 12/15/2006

motivation for appearing on the Nancy Grace show was to
manipulate the panel, and thereby a national audience, into
viewing her in a more positive light and siding with her as
a "victim."

- Initially, Nancy Grace and the other participants on the
  show appeared to be supportive and understanding,
  sympathizing with Duckett as a victim. The events relating
  to the abduction as Duckett described them were not
  initially challenged, and in fact, appeared to be accepted
  and supported by the participants. At that point, she was
  confident and in control of the situation. When her
  statements were challenged, however, she became defensive
  and began externalizing blame on others, including her ex-
  husband and the case investigators. She then provided false
  and evasive answers, and misdirected the discussion, in a
  vain attempt to regain her sense of self-control. When she
  realized that these efforts were futile, she ended the
  interview by hanging up the telephone.

- The next day, Duckett committed suicide by shooting
  herself with a shotgun, at the home of her
  grandparents. This act appears to be entirely
  consistent with the personality, traits, and behaviors
  described within this report. Regarding the suicide
  there are two points of interest: First, as stated
  earlier within this report, Melinda's appearance on the
  Nancy Grace program appeared to be entirely self-
  serving, motivated by her need to manipulate the panel, and
  thereby the American public into viewing her as a
  sympathetic victim of a crime. This would have been
  consistent with Melinda's strong need for control and
  impression management. Second, and perhaps more
  importantly, appearing on the show potentially
  represented the worst case scenario for Melinda. By
  choosing to appear on a nationally televised show,
  Melinda, in essence, elevated the stakes to the ultimate win
  or lose proposition. In Melinda's mind, if she
  failed in her efforts to win over the American public, the
  blow to her self-image could be intolerable and
  something from which she could not recover. In that

14

To: Jacksonville  From: CIRG
Re: 7C-JK-50172, 12/15/2006

case, Melinda could perceive suicide as the only viable option. In fact, Melinda's history has shown that she had considered suicide as an option in instances of overwhelming stress.

- Melinda left behind several notes wherein she attempted to provide an explanation for her suicide. The notes were also consistent with Melinda's personality, in that they were remarkably void of any emotions indicative of guilt or remorse. While she professed love for her son in these notes, she also blamed the public for the frustration she felt due to the "ridicule and criticism." This demonstrates, as indicated above, her continuing need to externalize blame on others.

## CONCLUSION

Based on a comprehensive review of this investigation to date, and taking into account the BAU's research and experience in child abduction matters, it is the opinion of the BAU that Melinda Duckett falsely alleged that her child was abducted, in an effort to cover up a homicide. Further, the BAU believes that Melinda Duckett committed suicide in part based on her perception that her positive self-image was unrecoverable, but also to further her desire for the public to view her as a victim.

15