# EXHIBIT 15

Deposition of Dr. Dimitrios
Hatzivlassiou

**ESTATE OF MELINDA DUCKETT, ET AL**

**V.**

**CABLE NEWS NETWORK, LLP, ET AL**

**DIMITRIOS HATZIVLASSIOU, M.D.**

**December 22, 2009**

Barbara Perry
PHONE 407-422-2953
FAX 407-422-2990

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ESTATE OF MELINDA DUCKETT, by and
through her personal representative,
KATHLEEN CALVERT and BETHANN EUBANK
and WILLIAM GERALD EUBANK, as legal
parents of MELINDA DUCKETT, and as
grandparents and next friends of T.D.,
a child, and M.E., a minor sibling of
MELINDA DUCKETT,

       Plaintiffs,

vs.              CASE NO. 5:06-cv-444-Oc-10GRJ

CABLE NEWS NETWORK, LLP (CNN),
a Delaware corporation, NANCY
GRACE, individually and as an
Employee/agent of CNN, various
unnamed producers of the "Nancy Grace"
show, JOSHUA DUCKETT,

--------------------------------------------------------

                 December 22, 2009
                 10:09 a.m.

      The deposition of DIMITRIOS HATZIVLASSIOU,

M.D., taken on behalf of the Defendants, at 31736

Parkdale Drive, Leesburg, Florida 34748, before

Stacey Walters, Court Reporter and Notary Public,

in and for the State of Florida at Large.

Page 2

1  A P P E A R A N C E S :
2
3     JAY PAUL DERATANY, ESQUIRE
      Deratany, Skorupa & O'Hara, LLP
4     Crystal Tree Office Center
      1201 U.S. Highway One
5     Suite 315
      North Palm Beach, Florida 33408
6     561-624-7979
7        Representing the Plaintiffs
8
9
10    JUDITH M. MERCIER, ESQUIRE
      Holland & Knight, LLP
11    200 South Orange Avenue
      Suite 2600
12    Orlando, Florida 32801
13       Representing the Defendants
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1
2
3
4
5
6          S T I P U L A T I O N S
7     It is hereby stipulated and agreed by and between
8  counsel present for the respective parties and the
9  deponent that the reading and signing of the
10 deposition is expressly reserved.
11
12          (End of stipulation)
13
14          * * * * *
15 Reporter's key to punctuation:
16 --  at the end of question or answer references an
        interruption.
17
   ...  references a trail-off by the speaker.
18     no testimony omitted.
19 "uh-huh"  references an affirmative sound.
   "uh-uh"   references a negative sound.
20
21
22
23
24
25

---

Page 3

1           TABLE OF CONTENTS
2  DIMITRIOS HATZIVLASSIOU, M.D.:          PAGE
   December 22, 2009
3
   Appearances                     2
4  Exhibits                        3
   Stipulations                    4
5
6  Testimony of Dimitrios Hatzivlassiou, M.D.:

      Direct Examination by Ms. Mercier      5
7     Cross-Examination by Mr. Deratany     21
      Redirect Examination by Ms. Mercier   27
8     Recross-Examination by Mr. Deratany   29
9  Jurat                         30
   Certificate of Oath           31
10 Certificate of Reporter       32
11
12
13
14           E X H I B I T S
15 Hatzivlassiou exhibits
   for identification:
16
17 No. 1   Psychiatric Evaluation        7
   No. 2   Bates No. Schulte 1826       19
18
19
20
21
22
23
24
25

---

Page 5

1          P R O C E E D I N G S
2      DIMITRIOS HATZIVLASSIOU, M.D.,
3  having been duly sworn by the reporter, thereupon
4  testified upon his oath as follows:
5          DIRECT EXAMINATION
6  BY MS. MERCIER:
7     Q.  Please state your name.
8     A.  Dimitrios Hatzivlassiou.
9     Q.  And we're in your home right now; correct?
10    A.  Correct.
11    Q.  And the address of that is what?
12    A.  31736 Parkdale Drive, Leesburg, Florida.
13    Q.  And you're a medical doctor?
14    A.  Yes.
15    Q.  Okay.  And who is your employer today?
16    A.  It's Huntingdon Healthcare.
17    Q.  Okay.  And was there a time you were
18 associated with Lifestream Behavioral Center?
19    A.  Yes.
20    Q.  Okay.  When was that?
21    A.  2003 to 2006.
22    Q.  And what did you do for Lifestream between
23 2003 and 2006?
24    A.  I was a psychiatrist in charge of the fact
25 team that is for severely mentally ill people, and I

Page 6

1  was doing, also, once a week outpatient services every
2  Wednesday.
3      Q.  And for the outpatient services, how would
4  you -- how would patients be referred to you?
5      A.  Either by themselves or by other physicians
6  or by the inpatient unit.
7      Q.  And what is Lifestream?
8      A.  Lifestream is a not-for-profit behavioral
9  health organization.
10     Q.  And when did you obtain your M.D.?
11     A.  '95.
12     Q.  And where was that from?
13     A.  From Greece.
14     Q.  And when did you relocate to the United
15  States?
16     A.  '99.
17     Q.  Okay.  And did you come to Florida in '99?
18     A.  In Mississippi one year.  I did the
19  internship and three years in USF in Tampa, 2000 to
20  2003.
21     Q.  And so then 2003 is when you came to the
22  Leesburg area?
23     A.  Yeah, after I finished the residency.
24     Q.  Do you have any kind of specialty that you
25  practice?

Page 7

1      A.  I have a Ph.D. also in clinical sexology.
2      Q.  Clinical sexology?
3      A.  Yeah, but I'm just adult psychiatry.  Now I
4  specialize mostly in geriatric right now because I'm
5  doing geriatric psychiatry.
6          MR. DERATANY:  Clinical sexology?
7          THE WITNESS:  Sexology.
8          MR. DERATANY:  Sexology?
9          THE WITNESS:  Yeah, sex.
10  BY MS. MERCIER:
11     Q.  And when you were associated with
12  Lifestream, was that your full-time employment?
13     A.  Yes.
14     Q.  Okay.  And what were the ages of individuals
15  you dealt with while you were at Lifestream?
16     A.  Mostly adult.  Occasionally I was seeing
17  children but only on an occasional basis.
18     Q.  An adult being over 18?
19     A.  Eighteen.
20     Q.  Okay.  I have shown you, and I'd like to
21  mark as Exhibit 1 to this deposition -- it's a
22  psychiatric evaluation dated 6/29/05.  I gave this to
23  you when I came in.  Have you had a chance to review
24  it?
25     A.  Yes.

Page 8

1          (Defendant's Exhibit No. 1 was marked for
2  identification.)
3  BY MS. MERCIER:
4      Q.  Okay.  And is this something that you
5  prepared?
6      A.  Yes.
7      Q.  Okay.  Do you, as you're sitting here today,
8  have an independent recollection of Melinda Eubank,
9  who is the subject of this report?
10     A.  Very minimal.
11     Q.  Minimal?
12     A.  Yes.
13     Q.  Okay.  And you understand that she had spent
14  a night in Lifestream Behavioral Center?
15     A.  Yes.
16     Q.  As a result of a Baker Acting?
17     A.  Yes.
18     Q.  Okay.  Do you know the reason for your
19  evaluation in June of '05?
20     A.  I think it was, like, court ordered, I have
21  the impression.
22     Q.  Okay.  And so in the section where it talks
23  about -- actually, before we get to that, there's
24  handwritten notes "patient is a" and it's crossed out
25  "32" and written "20 HD."  Are those your initials?

Page 9

1      A.  Yes.
2      Q.  In the History of Present Illness, which is
3  a section on the first page, it talks about, in the
4  third line, that the patient reports that it was
5  probably provoked by the mother of her boyfriend and
6  it was exaggerated.  That's referring to her Baker
7  Acting; correct?
8      A.  Yes.
9      Q.  And this is information that Melinda Eubank
10  would have provided to you?
11     A.  Yes.
12     Q.  She denied she was ever going to harm
13  herself or her baby?
14         MR. DERATANY:  At this point I'm going to
15  ask not to cross-examination (sic).
16     Q.  Correct?
17     A.  Yes.
18     Q.  Okay.  And in her explanations to you, did
19  you understand that she believed the Baker Acting was
20  just done as part of a custody dispute?
21         MR. DERATANY:  Objection, leading.
22     A.  I don't know what -- I don't remember.  To
23  be honest, I don't remember.  I have to read it again,
24  but it was something like a legal -- yeah, I don't
25  recall.

Page 10

1    Q.  Okay.  And in the part of the Past
2  Psychiatric History, in your first sentence it says,
3  "She denies any involvement with psychiatric care
4  prior to her Baker Act in April of 2005."  Did you ask
5  her if she had psychiatric care previously?
6    A.  Yes.
7    Q.  Okay.  And your first sentence here, you
8  wrote that because she told you she wasn't --
9    A.  Yes.
10    Q.  -- in any other psychiatric care?
11       Okay.  She didn't tell you about any time
12  that she spent in a psychiatric facility when she
13  lived in New York; correct?
14       MR. DERATANY:  Objection, leading.
15    A.  No, the only thing that I have is that she
16  reported self-mutilation.  But again, she didn't say
17  that she received anything -- any care for that.
18    Q.  Okay.  Whether she had been seen by a
19  psychiatrist before?
20    A.  No.
21    Q.  Okay.  On the second page, under Patient's
22  liabilities, what is that section for, Patient's
23  Liabilities?
24    A.  I mean, it's like a general term when you
25  summarize what are the positive and the negative of

Page 11

1  the person, for instance, and the liabilities are like
2  the negative traits.
3    Q.  Okay.  And can you explain the first one for
4  me?  Can you read it?
5    A.  Yeah.  "At this point I am certain the
6  patient tries to minimize symptoms in order to present
7  a good picture of herself."
8       That's actually very typical where
9  somebody's in these kind of legal issues and they are
10  not coming by themselves to the psychiatrist.  They
11  always try to say that everything is okay.  That's a
12  very typical picture of everybody that's actually
13  mostly forced to come to see a psychiatrist and not
14  come voluntarily.
15    Q.  So if it's a forced or a
16  court-ordered evaluation, then you would expect a
17  patient to present --
18    A.  Yeah, most of the time, you know, that's a
19  typical picture.  And that's sometimes -- probably
20  it's the general picture that I got from the person,
21  you know.
22    Q.  Okay.  Based on just your impressions of her
23  as you were meeting with her?
24    A.  Yeah.
25    Q.  Okay.  How long does the evaluation take?

Page 12

1    A.  It varies between -- the average is around
2  30 minutes, 30 to 40 minutes.
3    Q.  Okay.  Do you remember specifically how long
4  this was?
5    A.  No.
6    Q.  No recollection of whether it was longer
7  than usual or shorter than usual?
8    A.  No, not even that.  Yeah, I don't remember.
9    Q.  Okay.  Under the next section, which talks
10  about diagnosis, can you go through this?  For
11  example, it says, "Axis I:  None."  What does that
12  mean?
13    A.  Axis I is the major psychiatric diagnosis,
14  and I couldn't -- at least from what she was telling
15  me, I couldn't say anything like, you know, major
16  depression, bipolar, schizophrenia.
17    Q.  You couldn't make a diagnosis?
18    A.  I couldn't make a diagnosis from what I had
19  so far.
20    Q.  And that was information she was providing
21  to you?
22    A.  Yeah.
23    Q.  And what about Axis II?
24    A.  The Axis II is mostly the personality
25  disorder.  Or if somebody's mental retarded, you put

Page 13

1  it in Axis II.  And the deferments, you know, you
2  defer it for further evaluation if you don't have it.
3  And it's more difficult to diagnosis somebody from the
4  first visit as a personality disorder unless it's very
5  prominent.
6    Q.  Okay.  So you couldn't make a diagnosis
7  under Axis I, you deferred Axis II, and Axis III
8  relates to?
9    A.  It's the medical.
10    Q.  Physical?
11    A.  Yeah, physical.
12    Q.  And IV?
13    A.  IV is the different stressors that
14  somebody's facing lately in his life.  I have here,
15  "problems with primary support group."  Probably, you
16  know, problems with this boyfriend, or the father of
17  the baby, I think.
18    Q.  And what does Axis V relate to?
19    A.  Axis V is the general -- you know, global
20  assessment of functioning, and it's from zero up to a
21  hundred.  A hundred is the best ever that you can be,
22  for instance, and zero you're almost dead.  So 70,
23  it's -- for a psychiatric evaluation, it's somewhat
24  good, I'd say.  You're still functioning, you know;
25  you work; you're at least more than the 60 range; you

Page 14

1  don't have severe mental health problems.
2      Q.  Okay.  So at the time that you saw her, you
3  made the recommendations that are reflected on that
4  third page of the evaluation under Treatment Plan;
5  correct?
6      A.  Uh-huh.
7      Q.  And can you read those for me?
8      A.  "Since there is no axis I diagnosis there is
9  no psychiatric indication for medication management.
10  At this point the patient does not need any
11  psychiatric intervention.  If the court decides there
12  is evidence of neglect and immature behavior from
13  mother I would recommend in that case to order
14  psychological testing such as an MMPI.  The patient
15  will see me only on an as needed basis."
16      Q.  And she didn't come back and see you;
17  correct?
18      A.  No.
19      Q.  Okay.  So under here there was no medication
20  management.  You didn't need to prescribe her any
21  medication?
22      A.  Yeah, as a psychiatrist, I do only
23  medication management.  We don't do psychotherapy, for
24  instance.  So if there is no need for psychiatric
25  medication, there's no need to see me.  But as I

Page 15

1  explained, later she might benefit from psychotherapy.
2      Q.  Okay.  So when you say doesn't need
3  psychiatric intervention, she didn't need to come to
4  see you again?
5      MR. DERATANY:  Objection.
6      A.  Psychiatric means psychiatrist, but that
7  doesn't mean that -- she might benefit from a
8  psychotherapist.
9      Q.  Which is different than you?
10      A.  I can do psychotherapy but not in managed
11  care situations.  I was not paid to do psychotherapy.
12      Q.  That wasn't your role at Lifestream?
13      A.  No.  It's psychiatric management.
14      Q.  Okay.  At the end of that page, Page 3 of
15  the evaluation, there's an addendum that's dated
16  8/24/05.
17      A.  Yeah.
18      Q.  What caused you to write that addendum?
19      A.  Actually, I don't recall -- now, this is
20  speculation.  Probably I spoke -- I think the case
21  coordinator called me.  But again, I speculate now
22  because I really don't recall.
23      MR. DERATANY:  I object and move to strike
24      if it's speculation.
25  BY MS. MERCIER:

Page 16

1      Q.  Well, the first sentence is, "After further
2  information provided patient's (sic) case
3  coordinator."  You don't provide information to the
4  case coordinator, correct, at this time?
5      MR. DERATANY:  Objection, foundation.
6      A.  Again, I don't recall but I have the
7  impression, you know, the case coordinator called me,
8  left a message, I think, and I called him back, or
9  something like that happened.
10      Q.  Something was triggered that had you write
11  this addendum on it?
12      A.  Yeah.
13      Q.  And you're second sentence on the addendum
14  says, "I would recommend psychotherapy as initial
15  treatment for this patient (sic) that seems to have
16  personality NOS disorder."
17      A.  Yes.
18      Q.  What is personality NOS disorder?
19      A.  The NOS stands for not otherwise specified.
20  That means she has different elements of personality
21  disorder problems but nothing that -- so far it
22  doesn't depict that it's one specific personality
23  disorder, and there are several personality disorders.
24      Q.  Okay.  What were the characteristics, if you
25  will, that she was exhibiting that made you write

Page 17

1  that?
2      MR. DERATANY:  Objection, foundation.
3      A.  The only thing that I can recall is probably
4  here in the liabilities that I have to say, some
5  dependency issues.  She trying to reconcile with the
6  person who made all these false accusations against
7  her and also the self-mutilation in the past, at least
8  the explanation here, to feel part of the crowd.  So
9  she might have these dependency issues.  And there is
10  a dependent personality disorder, but again, you
11  cannot diagnosis it easy unless you know the patient
12  for a longer period of time.
13      Q.  Okay.
14      A.  But definitely, you know, if somebody's
15  cutting themselves, you know, there is some
16  impulsivity there, so there is some problems with
17  controlling their impulses.
18      Q.  She actually denied that she was cutting
19  herself currently when she saw you on the 29th;
20  correct?
21      A.  Yeah.  That's why I didn't put too much
22  base (sic) on that, because again, according to her,
23  it was when she was a teenager.  And if it was an
24  isolated event during teenage years, you still cannot
25  base -- you know, you cannot diagnosis somebody only

**Page 18**

1  from that.
2     Q.  And she denied any suicidal ideations when
3  she was at your evaluation; correct?
4     A.  Correct.
5     Q.  And you didn't -- is it correct that you
6  didn't see any -- actually, strike that.  Did you see
7  any indications with her that led you to believe she
8  was a threat to herself?
9        MR. DERATANY:  Objection, foundation.
10    A.  Not at that point of the evaluation at
11  least.  But again, it was that time of the -- that
12  evaluation, and everything can change.
13    Q.  But at this point in time?
14    A.  That day, you know, that I evaluated her,
15  there was no indication.  And I can base it mostly on
16  the "future oriented," because she was trying to get
17  an associate degree.  I have here, you know, that
18  she's trying to get custody of the baby back and work
19  on her associate degree, so there was some
20  future-oriented thinking, at least at the point of the
21  evaluation.
22    Q.  Was there anything specific that she said,
23  or through her mannerisms, that made you certain she
24  was trying to minimize symptoms?
25       MR. DERATANY:  Objection, foundation.

**Page 19**

1     A.  I can't recall on that.
2        MR. DERATANY:  What was the answer?
3        THE COURT REPORTER:  "I can't recall on
4     that."
5  BY MS. MERCIER:
6     Q.  Let me just ask you, on the second page --
7  actually, the second document, it's listed as
8  Schulte 1826.  Do you see that?
9     A.  Yes.
10    Q.  Is that part of your evaluation?
11    A.  I have the impression that was asked from
12  her.  You know, usually I don't do stuff like that,
13  but I was asked because of the legal issues to just
14  write something quick until we get the evaluation.
15    Q.  That she could take with her?
16    A.  Yeah.
17       MS. MERCIER:  Okay.  Let me go ahead and
18  mark that as 2.
19    (Defendant's Exhibit No. 2 was marked for
20  identification.)
21  BY MS. MERCIER:
22    Q.  Okay.  Exhibit No. 2, it's actually on a
23  prescription form; correct?
24    A.  Yes.
25    Q.  And it's not ordering medication?

**Page 20**

1     A.  No.
2     Q.  It's just --
3     A.  These you can use -- sometimes if you want
4  to refer somebody to psychotherapy, you write it in a
5  prescription form.
6     Q.  Okay.  And this was like a short form of
7  what your report was?
8     A.  Yeah.
9     Q.  Something she could take with her that day?
10    A.  Yeah.
11    Q.  Okay.  And can you read it for me, please?
12    A.  "Ms. Eubank, Melinda, does not have any
13  major psychiatric disorder that needs psychiatric
14  attention and management.  If there is more evidence
15  of neglect/immature behavior, I would recommend
16  psychological testing (MMPI).  Psychiatric evaluation
17  (sic) to be dictated."
18    Q.  Okay.  So that means the evaluation you just
19  did of her you would dictate, and that's actually what
20  is Exhibit No. 1?
21    A.  Correct.
22    Q.  If Melinda Eubank had had prior psychiatric
23  evaluation or went to a psychiatrist before, was that
24  information you would have liked to have known?
25    A.  Yeah, of course.

**Page 21**

1     Q.  If she had been in a psychiatric facility
2  before, is that information you would have liked to
3  have known?
4     A.  Yes.
5     Q.  If she had run away from home and threatened
6  family members with a knife, is that something you
7  would have liked to have known?
8     A.  Of course.  The more information, as long as
9  it was legitimate information, you know, yes.
10    Q.  Okay.  And those kinds of things would be
11  legitimate information for you to know in order to
12  make a psychiatric evaluation of her?
13    A.  Yeah, if I know that.  Because I asked her
14  and she denied it, so it's difficult to -- I'm not an
15  investigator.  That's not my role.  And actually, I'm
16  a little bit opposed of (sic) this court order stuff
17  because I'm treating people, you know.  People come to
18  me to be treated, not just for somebody to come to see
19  me for something, so you can understand.
20       MS. MERCIER:  Okay.  That's all I have.
21       MR. DERATANY:  I just have a few questions,
22  Doctor.
23       THE WITNESS:  All right.
24          CROSS-EXAMINATION
25  BY MR. DERATANY:

Page 22

1    Q.  Did you meet or talk with defense counsel at
2  all at any time?
3    A.  No.
4    Q.  You saw Melinda Eubank one time --
5    A.  Excuse me.  I called somebody to reschedule
6  or something.
7    Q.  A scheduling purpose, that's okay.  I meant,
8  Did you talk about the case to anybody?
9    A.  No.
10    Q.  You saw Melinda Duckett one time?
11    A.  Yes.
12    Q.  And that was for 30 minutes?
13    A.  Yeah, 30 or 40 minutes.  It depends.
14    Q.  You would agree that you did not act as her
15  psychiatrist in terms of a treating psychiatrist;
16  correct?
17    A.  Not in this, you know.
18    Q.  There's a difference between a consulting
19  psychiatrist and a treating psychiatrist?
20    A.  Yeah.
21    Q.  And you were acting as a consultant or to do
22  an evaluation for Baker Act purposes; correct?
23    A.  Not for the Baker Act.  No, the Baker Act
24  was already done.  She was already admitted and
25  discharged the same 24 hours.  I think this was like a

Page 23

1  court -- I don't remember at that time why, but I
2  think it was DCF mandated this.
3    Q.  If you don't know, it's okay to say you
4  don't know.  You don't know the reason for the
5  evaluation, then, as you sit here?
6    A.  I have the impression it was ordered by DCF.
7    Q.  Do you know that?
8    A.  I'm almost positive, almost positive.
9    Q.  Okay.
10    A.  Because that's the only reason that --
11  usually DCF sends people sometimes to get a
12  psychiatric eval.
13    Q.  All right.  Would you agree it's pretty hard
14  to form opinions as to a DSM IV diagnosis and Axis I
15  diagnosis based upon a 30-minute evaluation?
16    A.  It depends on the severity of symptoms
17  actually.  If it's very prominent, you can actually
18  formulate easy (sic) a diagnosis of Axis I, if they're
19  very prominent.
20    Q.  Sure.  Well, with regard to this case with
21  Melinda, you did not have a diagnosis based upon an
22  Axis I because you really didn't have enough time or
23  history to form that opinion; correct?
24    A.  Yeah.
25    Q.  And with regard to an Axis II diagnosis, you

Page 24

1  also deferred that because you need further evaluation
2  of her; correct?
3    A.  Yeah.
4    Q.  And with regard to the DSM IV, you did reach
5  at least somewhat of a diagnosis by psychosocial
6  stressors; correct?
7    A.  Yeah, but that's not the diagnosis anyway.
8    Q.  Right.  That's not actually a DSM IV
9  diagnosis, is it?
10    A.  No.  The diagnoses are the Axis I and
11  Axis II.  The others are accessories.
12    Q.  Are you board certified in psychiatry?
13    A.  Yes.
14    Q.  As of what date?
15    A.  2004.
16    Q.  And where did you go to medical school?  Was
17  that at USF?
18    A.  No.  Aristotle University of Thessaloniki,
19  Greece.
20    Q.  And are you practicing -- what are you
21  practicing currently?
22    A.  Psychiatry, geriatric mostly.
23    Q.  So it does say -- on the first page, it says
24  "Reason for Evaluation" and that's left blank.  Do you
25  typically and customarily on your report put down the

Page 25

1  reason for the evaluation, if you know?
2    A.  I don't recall on that one.  Usually I put,
3  like, presenting/main complaint or something.  But
4  that was the formulation of the Lifestream, I think,
5  dictation.
6    Q.  With regard to your recollection, you said
7  very minimal recollection.  Do you have any
8  independent recollection of Melinda, or are you
9  testifying based purely on your report?
10        MS. MERCIER:  Objection, asked and answered.
11    A.  Very minimal picture of a young Asian person
12  coming into my office, very minimal.
13    Q.  But in terms of what you're relying upon,
14  it's your report; correct?
15    A.  Yes.
16    Q.  And in terms of -- you didn't see her other
17  than that 30-minute evaluation?  You didn't see her
18  that other time in August of '05, did you?
19    A.  Not that I recall, no.
20    Q.  An MMPI was not -- you didn't evaluate an
21  MMPI, did you?
22    A.  No.
23    Q.  A question was asked of you about whether
24  she could come back.  You didn't schedule an
25  appointment for her to come back, did you?

Page 26

1    A.  I don't recall that.  Probably not, because
2  it was like a PRN basis.  It says, "presents by
3  herself for a psychiatric evaluation."  So it only
4  as needed she can come back.
5    Q.  Typically and customarily, if there was
6  going to be follow-up or you were going to be her
7  treating psychiatrist, that would be something you
8  would know?
9    A.  Yeah, and because we said, also, I didn't
10  prescribe her any medication, so presumably I didn't
11  become the treating psychiatrist at that point.
12    Q.  You never became a treating psychiatrist for
13  her; correct?
14    A.  Correct.
15    Q.  When you put "personality disorder NOS," is
16  that a DSM IV diagnosis?
17    A.  Yes.
18    Q.  In terms of your opinion, any opinion that
19  you might have would be as of 6/29/05, based upon the
20  30-minute evaluation; correct?
21    A.  As of 6/29, yeah.
22    Q.  You have no opinion as to her -- you would
23  have no basis or no opinion as to her condition in
24  June, July, or August of 2006, a year later, would
25  you?

Page 27

1    A.  No.
2    Q.  You would have no opinion as to whether or
3  not she would have suicidal ideation or homicidal
4  ideation or would be a harm to herself or others --
5    A.  No.
6    Q.  -- as of 2006; correct?
7    A.  No opinion.
8    MR. DERATANY:  That's all.
9    MS. MERCIER:  Just a couple of follow-ups.
10    REDIRECT EXAMINATION
11  BY MS. MERCIER:
12    Q.  Counsel asked you in connection with your
13  Axis I diagnosis about where it said it was none
14  because you didn't have enough history.  The history
15  is what was provided by the patient; correct?
16    A.  Correct.
17    Q.  So if you didn't have enough history, it's
18  because she didn't provide you with anything; correct?
19    MR. DERATANY:  Objection.
20    A.  Or any clinical signs that I can see in
21  the interview.  Axis I you can -- if somebody's
22  floridly psychotic -- I mean, you can probably
23  diagnosis the extreme stuff.  If somebody's manic, you
24  know, floridly psychotic, probably you can even see
25  it, you know, in five minutes; you don't need even 30

Page 28

1  minutes.  But other major stuff, you know, you cannot
2  see.
3    Q.  And if she wasn't being honest with you
4  about her past mental health history --
5    MR. DERATANY:  Objection, foundation and
6    form as to the word "honesty."
7    Q.  -- is that --
8    A.  I mean, as I described before, that was not
9  a person that came to request treatment, so it's way
10  different the way they will present the picture of
11  themselves.
12    Q.  Okay.  Are you familiar with the Baker Act?
13    A.  Yeah.
14    Q.  Okay.  Did you ever treat any individuals
15  who were at Lifestream having been Baker Acted?
16    A.  Yes, multiple times.
17    Q.  Okay.  Do you know under the Baker Act how
18  long a person can stay in the facility?
19    A.  Up to 72 hours.
20    Q.  Up to 72 hours?
21    A.  Yeah.
22    Q.  And Ms. Eubank was released in 24 hours?
23    A.  Yes.
24    Q.  Is that unusual?
25    A.  Not unusual.  As long as -- she needs to be

Page 29

1  seen by a psychiatrist there, and the psychiatrist
2  will judge if she needs further days in the hospital.
3  Or if he deems that she's not a danger to herself or
4  others, then she can be released on the spot.
5    MS. MERCIER:  That's all I have.  Thank you.
6    MR. DERATANY:  Just one question.
7    RECROSS-EXAMINATION
8  BY MR. DERATANY:
9    Q.  You don't have anything in your report to
10  indicate that she was directly dishonest with you, do
11  you?
12    A.  No.
13    MR. DERATANY:  Thank you.
14    MS. MERCIER:  All right.  Thank you for
15  accommodating us.
16    (The deposition concluded at 10:43 a.m.)

Page 30

```
 1              J U R A T
 2  Deposition of DIMITRIOS HATZIVLASSIOU, M.D.
 3     Taken December 22, 2009
 4        Barbara Perry & Company
          3101 Maguire Boulevard, Suite 150
 5        Orlando, Florida 32803
 6  Page 5 - 29, inclusive.
 7  Errata attached:   Yes____     No____
 8
 9
10
11
12           _____
             SIGNATURE OF DEPONENT
13
14
15
16     Read and signed by witness this   day of  2010.
17
18
19
20
21
22
23
24
25
```

Page 32

```
 1           CERTIFICATE OF REPORTER
 2  STATE OF FLORIDA
    COUNTY OF ORANGE
 3
 4       I, STACEY B. WALTERS, Certified Shorthand
 5  reporter, certify that I was authorized to and did
 6  stenographically report the foregoing proceedings at
 7  the time and place herein designated; and that the
 8  foregoing pages 5 through 29, inclusive, constitute a
 9  true, complete and accurate transcription of my said
10  stenotype notes.
11       I further certify that I am not of counsel
12  for, related to, or employed by any party hereto or
13  attorney involved herein, nor am I financially
14  interested in the outcome of this action.
15       Witness my hand this 28th day of December,
16  2009.
17
18
19           _____
             STACEY B. WALTERS
20           Court Reporter
21
22
23
24
25
```

Page 31

```
 1        CERTIFICATE OF OATH
 2  STATE OF FLORIDA
    COUNTY OF ORANGE
 3
        I, Stacey B. Walters, do hereby certify that
 4  I placed under oath the Deponent, DIMITRIOS
    HATZIVLASSIOU, M.D., at the time and place herein
 5  designated.
 6       WITNESS MY HAND AND OFFICIAL SEAL this 28th
    day of December, 2009.
 7
 8           _____
             STACEY B. WALTERS
 9           Court Reporter, Notary Public,
             State of Florida at Large
10
             Commission # DD 680636
11           Expires:  August 30, 2011
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



SUPER CONFIDENTIAL
Not to be released without specific
written consent of the patient
A general authorization for
release is not sufficient
for this purpose.

**LIFESTREAM BEHAVIORAL CENTER**
**PSYCHIATRIC EVALUATION**

**CLIENT NAME: EUBANKS, MELINDA**                    **EVALUATION DATE:6-29-05**
**PROGRAM/UNIT: MAGNOLIA PLAZA**
**OUTPATIENT CLINIC**
**MIS #: 46667**

HD   8/24/-5
20

**IDENTIFICATION DATA:** The patient is a 32-year old Asian-American female who presents by herself for a psychiatric evaluation.

**REASON FOR EVALUATION:**

**SOURCE OF INFORMATION:**

**HISTORY OF PRESENT ILLNESS:** The patient reports in April of 2005 she was Baker Acted after allegations she wanted to harm the baby and kill herself. The allegations were made by the father of the baby. The patient reports that it was probably provoked by the mother of her boyfriend and it was exaggerated. She denies she has ever intended to harm the baby or herself. DCF was involved. In the DCF report it was stated there was no evidence of neglect or abuse of the baby. Also it was stated there were allegations the patient reacts by cutting herself with razor blades when she gets stressed out. The patient denies that and reports that happened a few times when she was 14 or 15 years old and because she just wanted to "fit in with the crowd." When I checked her arms there was no evidence of any significant scarring. There was only one mild scarring on the left forearm. There was nothing that shows there is a recent problem. The patient has an 11 month old baby and she denies having postpartum depression after the birth. At this point of her life she is trying to reconcile with the baby's father since she thinks he is making efforts to change and be more responsible and more independent. The patient denies any history of mania or psychotic symptoms. She denies any post traumatic stress disorder-type of symptoms. The patient is future oriented. She wants to get back the custody of her baby and work on her associate degree.

**PAST PSYCHIATRIC HISTORY:** She denies any involvement with psychiatric care prior to her Baker Act in April of 2005. She was hospitalized for less than 24 hours and was discharged with no medication. At this point I do not have the Lifestream records but it seems the patient was not given any medication. It was just an adjustment-type of reaction. There is no history of suicidal attempts. There was self-mutilation when she was 14 but was explained as part of fitting in with the crowd.

**SUBSTANCE ABUSE HISTORY:** Denies.

CONFIDENTIAL AND PRIVILEGED
For Professional Use Only

GEN-595-A-N-07/03

**PSYCHIATRIC EVALUATION**
**PAGE 2 OF 3**
**MIS#: 46667**

**EUBANKS, MELINDA**
**DATE OF EVALUATION: 6-29-05**
**FACILITY: MAGNOLIA PLAZA OUTPATIENT CLINIC**

**LEGAL HISTORY:** None.

**PAST MEDICAL HISTORY:** Psoriasis.

**ALLERGIES: PENICILLIN, SULFA.**

**CURRENT MEDICATIONS:** None.

SUPER CONFIDENTIAL
Not to be released without specific
written consent of the patient.
A general authorization for
release is **not** sufficient
for this purpose.

**SOCIAL HISTORY:** The patient was born in South Korea. She was adopted when she was 4 months old. She has one younger sister. She was raised by both parents. She had good childhood years. She denies any abuse. When she was 17 years old she moved to Florida to be with her adoptive grandparents. She worked varied jobs. She is working now and wants her associate degree. She has been working in a hardware store since November of 2004. She lives by herself in a 2 bedroom apartment. She is trying to reconcile with the father of her 11 month old baby. They have been dating for the last 3 years. No legal problems besides the current one.

**FAMILY HISTORY:** Unknown.

**MENTAL STATUS EXAMINATION:** The patient is awake, alert, and cooperative. She is well-dressed and casually groomed. No psychomotor agitation is noted. No abnormal movements. Speech was within normal limits. Mood is euthymic. Affect is restricted. Thoughts are goal directed. She denies delusions. She denies auditory, visual, or tactile hallucinations. She denies suicidal or homicidal ideation. Cognition is grossly intact. Insight and judgment are good.

**PATIENT'S ASSETS**
1. The patient is healthy.
2. She is future oriented.
3. She has a stable job.
4. She has good moral values.
5. There is no history of substance abuse or alcohol abuse.

**PATIENT'S LIABILITIES**
1. At this point I am certain the patient tries to minimize symptoms in order to present a good picture of herself.
2. There might be some dependence issues since she is trying to reconcile with the person who made all these false accusations against her, and also since she has a history of cutting herself just to feel part of the crowd.

**DIAGNOSES**
　　　Axis I:　　None.
　　　Axis II:　　Deferred.
　　　Axis III:　　Psoriasis.

GEN:535-A-N-07/03

CONFIDENTIAL AND PRIVILEGED
For Professional Use Only

PSYCHIATRIC EVALUATION
PAGE 3 OF 3
MIS#: 46667

EUBANKS, MELINDA
DATE OF EVALUATION: 6-29-05
FACILITY: MAGNOLIA PLAZA OUTPATIENT
CLINIC

Axis IV:    Psychosocial stressors, problems with primary support group.
Axis V:     Current global assessment of functioning is 70.
            Past year's highest global assessment of functioning was

**TREATMENT PLAN AND RECOMMENDATIONS**
1. Since there is no axis I diagnosis there is no psychiatric indication for medication management. At this point the patient does not need any psychiatric intervention. If the court decides there is evidence of neglect and immature behavior from the mother I would recommend in that case to order psychological testing such as an MMPI.
2. The patient will see me only on an as needed basis.

_____                    _____
Dimitrios Hatzivlassiou M.D.                        Date

DH: cp

DOD: 6-29-05
DOT: 6-29-05
GAF: 70

Start time:  9:30 a.m.
End time:   10:15 a.m.

SUPER CONFIDENTIAL
Not to be released without specific
written consent of the patient.
A general authorization for
release is not sufficient
for this purpose.

Check One:   TP    TPR    SP    New Admit Grace Period          Service ordered:  Yes  No
LPHA _____          Date LPHA signed: _____

NPP 0576

Addendum  8/24/05
After further information provided
pt's case coordinator I would
recommend psychotherapy as initial
treatment for this pt that seems
to have personality NOS disorder. IP therapist
believes that she will need med management ...
... I would be glad to see her.
Also I would recommend MMPI psychological testing.

CONFIDENTIAL

**CONFIDENTIAL AND PRIVILEGED**
**For Professional Use Only**

GEN.535-A.N.07/03

**LIFESTREAM BEHAVIORAL CENTER**
THOMAS J. VALENTE, M.D.
DEA # BV 3392595
JORGE SALAZAR, M.D.
DEA # AS 7896080
DIMITRIOS TSATZNYCASSIOU, M.D.
DEA # BH 7845293
KRANTHI K. BOYAPATI, M.D.
DEA # BB 7372238
MARY JOHNSON, ARNP
LIC. # ARNP1466102
CARYL CONNELL, ARNP
LIC. # ARNP2884922
MEDICAL DIRECTOR BOARD CERTIFIED
2020 TALLY ROAD
LEESBURG, FL 34748-3426
(352) 315-7800 TEL.   (352) 360-6610 FAX

BATCH # MDR41123P50258064

NAME _Mclmd~ Eubank_____ AGE ____

ADDRESS _____ DATE 6/23/05

Rx ILLEGAL IF NOT SAFETY BLUE BACKGROUND
RESISTS ERASURES AND ALTERATIONS
ILLEGAL APPEARS IF COPIED

R/ Ms Eubanch Mclind
does not have any major
psychiatric disorder that
needs psychiatric attention and
management. If there is more
Label   evidence of neglect/immature behavior
Refill _____ times I would recommend
psychological testing (MMPI)

_____ (Signature)

Psych Eval to be dictated

In order for the brand name product to be dispensed, the prescriber
must write 'Medically Necessary' on the front of this prescription.

4KPS0258064

**Schulte 1826**