# EXHIBIT 18

Deposition of Dr. Christopher Martin

Deposition of Sarah Douglas

Declaration of Clarice McClure (Casey House Youth Shelter)

Declaration of Kristine Spada (Niagara Falls Memorial Medical Center)

CHRISTOPHER MARTIN, M.D.

1                UNITED STATES DISTRICT COURT

2                MIDDLE DISTRICT OF FLORIDA

3                     OCALA DIVISION

4      - - - - - - - - - - - - - - - - - - - - - - - -

5      ESTATE OF MELINDA DUCKETT, by and through her personal
       representative, KATHLEEN CALVERT, and BETHANN EUBANK
6      and WILLIAM GERALD EUBANK, as legal parents of
       MELINDA DUCKETT, and as grandparents and next friends
7      of T.D., a child, and M.E., a minor sibling of
       MELINDA DUCKETT
8                                    .

9           Plaintiffs,

10                        CASE NO. 5:06-cv-444-Oc-10GRJ
       v.
11
       CABLE NEWS NETWORK, L.L.P. (CNN), a Delaware
12     corporation, NANCY GRACE, individually and as an
       employee/agent of CNN, various unnamed producers of
13     the "Nancy Grace" show, JOSHUA DUCKETT

14          Defendants.

15     - - - - - - - - - - - - - - - - - - - - - - - -

16

17          Deposition of CHRISTOPHER MARTIN, M.D., held

18     before Lisa A. Peterson, Court Reporter and Notary

19     Public, at Suburban Psychiatric Associates, 85

20     Bryant Woods South, Amherst, New York, taken on

21     Wednesday, October 21st, 2009, commencing at 4:00

22     p.m., pursuant to Subpoena.

23

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075
(716) 649-2233

2

```
 1              W I T N E S S   I N D E X
 2
 3    Name                    Page
 4    ----------------------------------------------
 5    CHRISTOPHER MARTIN, M.D.  BY MS. MERCIER    6
 6                              BY MR. DERATANY   41
 7                              BY MS. MERCIER    45
 8
 9
10                  *   *   *
11
12
13
14
15
16
17
18
19
20
21
22
23
```

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

4

```
 1    APPEARANCES:
 2
 3                    DERATANY, SKORUPA & O'HARA, P.A.
                      BY:  JAY PAUL DERATANY, ESQ.
 4                    Crystal Tree Centre
                      1201 U.S. Highway One, Suite 315
 5                    North Palm Beach, Florida 33408
                      Appearing for the Plaintiffs.
 6
                      HOLLAND & KNIGHT, L.L.P.
 7                    BY:  JUDITH M. MERCIER, ESQ.
                      200 S. Orange Avenue, Suite 2600
 8                    Orlando, Florida 32801
                      Appearing for the Defendants.
 9
                      CONNORS & VILARDO
10                    BY:  JOHN T. LOSS, ESQ.
                      Suite 1020 Liberty Building
11                    420 Main Street
                      Buffalo, New York 14202
12                    Appearing for Christopher Martin,
                      M.D.
13
14                  *   *   *   *
15
16
17
18
19
20
21
22
23
```

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

3

```
 1              E X H I B I T S
 2
 3    Exhibit    Description        ID
 4    ----------------------------------------------
 5    5      Cover letter from Mr. Loss and
             Dr. Martin's attached records in
 6           response to Subpoena              11
 7
 8
 9                  *   *   *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

5

```
 1    C H R I S T O P H E R   M A R T I N, M. D., 85 Bryant
 2    Woods South, Amherst, New York 14228, after having
 3    been first duly sworn, was examined and testified as
 4    follows:
 5
 6           MR. DERATANY:  Wait a minute.  I can't hear you
 7    very well and I wanted to make a statement on the
 8    record.
 9           MS. MERCIER:  He just got sworn in and gave his
10    address to the court reporter.
11           MR. DERATANY:  Maybe you can move the device
12    closer to the doctor.
13           MS. MERCIER:  Not possible.  It's a wall-mounted
14    phone.  You agreed to do this telephonically.
15           MR. DERATANY:  Is there a way to make it louder?
16    Can you turn the volume up on the phone?
17           MR. LOSS:  We put the doctor right next to the
18    phone.
19           MR. DERATANY:  I just want the record to reflect
20    that I've been waiting an hour and five minutes,
21    through no fault of the doctor and counsel.  Doctor
22    and counsel was present.  I've been here -- it's
23    four-o-five right now.  This deposition is just
```

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

6

1  proceeding.
2       We have a limit on when this -- I have to be
3  somewhere at five-thirty your time and, you know,
4  Ms. Mercier was not present during the beginning so
5  that we could not proceed.
6       MS. MERCIER: To clarify the record, I was with
7  your partner doing another deposition in this case
8  about thirty minutes away. We didn't finish until
9  three o'clock. He was aware this wasn't going to go
10  forward.
11       I've accommodated the doctor's schedule. It was
12  originally scheduled on another day. He asked it to
13  be put on this day because he doesn't see patients
14  today. I advised him it would be set for three
15  o'clock, but advised him it might start later because
16  of the earlier deposition.
17       MR. DERATANY: We thought it would at least go
18  by three-thirty. That's what Kara indicated. Let's
19  go. We have to be finished by five-thirty.
20
21  EXAMINATION BY MS. MERCIER:
22
23  Q. Please state your name.

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

7

1  A. Christopher Martin.
2  Q. Dr. Martin, have you had your deposition taken before?
3  A. No.
4  Q. I'm just going to go through some background
5     information for you. I'm going to ask you a series of
6     questions. If you don't understand something that I
7     ask, let me know and I'll rephrase it for you. If at
8     any time you need a break, let me know.
9       Your answers to this deposition need to be oral,
10     either "yes", "no" or an answer to the question
11     another way, but the court reporter can't take down a
12     nod of the head, shaking of the head; "uh-huh",
13     "uh-uh". I ask that you make your answers oral. I
14     would ask you to let me completely ask my question
15     before you start your answer. In turn, I will let you
16     complete your answer before I ask you another
17     question.
18  A. Okay.
19  Q. MR. DERATANY, who is appearing by the telephone, may
20     have objections to some of my questions. If he does,
21     he'll put that on the record, the objection. You
22     should go ahead and answer the question after his
23     objection is on the record. He's just doing that for

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

8

1  record purposes.
2       If you can answer the question, go ahead and
3     answer the question after the objection has been noted
4     by the court reporter.
5  A. Okay.
6  Q. What is your profession?
7  A. Psychiatrist.
8  Q. How long have you been a psychiatrist?
9  A. Thirteen years.
10  Q. Where -- what licenses do you hold?
11  A. New York State.
12  Q. Okay. Do you have a specialty?
13  A. Yes.
14  Q. What is your specialty?
15  A. Child and Adolescent Psychiatry.
16  Q. Has that been your practice for thirteen years?
17  A. I'd say both children and adults.
18  Q. And where did you go to school?
19  A. SUNY Buffalo.
20  Q. For your M.D.?
21  A. Yes.
22  Q. When did you receive that?
23  A. 1991.

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

9

1  Q. Do you have any certifications or anything like that?
2  A. Yes.
3  Q. What do you have?
4  A. Board Certified in General Psychiatry and Board
5     Certified in Child and Adolescent Psychiatry.
6  Q. When did you achieve those certifications?
7  A. 1996.
8  Q. Both of them?
9  A. Yes.
10  Q. And are you employed by someone right now?
11  A. Self-employed.
12  Q. And how long have you been self-employed?
13  A. Thirteen years.
14  Q. Do you go under a different name for your business?
15  A. I practice with Suburban Psychiatric Associates.
16  Q. So that's not -- is that the name of your business or
17     is that who you work with?
18  A. That's who I work with.
19  Q. Okay. Do you personally know Bethann or William
20     Gerald Eubank?
21  A. No.
22  Q. Do you know anything about this lawsuit that we're
23     here on today?

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

10

1  A. Just very peripheral. No.
2  Q. You can prescribe medications; correct?
3  A. Yes.
4  Q. And did you do an internship?
5  A. Residency.
6  Q. A residency. Where did you do your residency?
7  A. SUNY Buffalo.
8  Q. And what was the residency in?
9  A. General Psychiatry.
10  Q. Do you have any specialty within your practice?
11  A. My specialty would be considered child psychiatry.
12  Q. When you first meet with a patient, do you have them
13     fill out paperwork, do you take notes; explain to me
14     your first kind of like intake with someone.
15        MR. LOSS: He's here as a fact witness. If you
16     want to ask him about this case, that's fine. I don't
17     know why we're getting into the general practice he
18     does. I'm happy to have him, for the forty dollar
19     witness fee, answer questions about what he did in
20     this case. That's fine.
21        MR. DERATANY: I'll join in that objection.
22     Also, by the way, John, you can charge the full fee,
23     not just the Subpoena fee. You can charge his full

11

1     hourly rate away from his practice.
2        MS. MERCIER: Why don't we start with this; when
3     was the first time that you saw -- strike that. Let
4     me show you Exhibit Number 1; do you have records
5     that -- can you verify that these were records that
6     were produced by you in connection with this case?
7        THE WITNESS: Yes.
8        MR. DERATANY: A letter dated 5/29/02; Intake
9     Assessment.
10        MS. MERCIER: We're going to mark this Exhibit
11     Number 5.
12        MR. DERATANY: Okay.
13        MR. LOSS: I don't know if you have it or not,
14     it's my cover letter of July 31st, 2009 and then the
15     rest of the records.
16        MR. DERATANY: Yeah, I have it.
17
18     (Whereupon the reporter marked Exhibit 5, a cover
19     letter from Mr. Loss and Dr. Martin's attached
20     records in response to Subpoena, for
21     identification.)
22
23  BY MS. MERCIER:

12

1  Q. Okay. And whom did you see of the Eubanks?
2  A. I saw Melinda and her mother.
3  Q. And how did it come about that you ended up seeing
4     Melinda and her mother?
5  A. They were referred to me, I believe, by her
6     pediatrician.
7  Q. Who is the pediatrician?
8  A. Dr. Giller -- excuse me. She was referred by her
9     therapist, Shelly Rosen.
10  Q. What is your -- for what? What was she referred to
11     you for?
12  A. Evaluation.
13  Q. And so when you first saw Melinda, did you have
14     Melinda or her mother fill out any paperwork?
15  A. Her mother did.
16  Q. And can you show us what -- identify which document
17     relates to what she filled out?
18  A. This one right here (indicating).
19  Q. On the bottom it says NPP 1191?
20  A. And 92.
21        MR. LOSS: You've got to go slow for the record
22     and loud. Read the page numbers.
23        THE WITNESS: 1191, 1192, 1193, 1194.

13

1        MS. MERCIER: These were filled out by her
2     mother, Beth Eubank?
3        MR. LOSS: There's pages they -- she filled out,
4     too, like authorizations. Do you want to do that now
5     or later?
6        MS. MERCIER: Medical authorizations, insurance
7     authorizations?
8        MR. LOSS: There's confidentiality in the back;
9     insurance numbers and --
10        MS. MERCIER: Why don't we go through what she
11     filled out.
12        THE WITNESS: 1213, that's right, right?
13        MR. LOSS: Yes.
14        THE WITNESS: 1214. 12 --
15        MR. DERATANY: I don't have a 1214. My records
16     stop at 1212. There's 1213.
17        MR. LOSS: Is your 1212 a Discharge Planning
18     Form from Niagara Falls Memorial Medical Center?
19        MR. DERATANY: Yes.
20        MR. LOSS: Okay. Just read what it is, Doctor;
21     1213.
22        THE WITNESS: It is an Authorization to Release
23     Information from Niagara Falls Memorial Medical

14

1  Center.
2      1214 is authorizing this information to New
3  Directions.
4      1215 is Authorizing to Release Information to
5  Shelly Rosen.
6      1216 is Limits of Confidentiality.
7      1217 is Release of Information to the Insurance
8  and Primary Care Physician.
9      1218 is Office Policy.
10     1219 is a demographic sheet, patient
11  information, and that's it.
12  BY MS. MERCIER:
13  Q. Okay.  On 1214, what is New Directions?
14  A. That's an Intensive Case Management.
15  Q. Intensive Case Management, what is that?
16  A. Usually a social worker assigned to work with the
17     family on an in-home basis.
18  Q. Did you have any contact with Margaret Donahue or New
19     Directions after you released information to them?
20  A. No.
21  Q. Did you have any conversations with anyone from New
22     Directions?
23  A. No.

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

15

1  Q. How many times did you see Melinda Eubank?
2  A. One.
3  Q. And was that alone or with her mother?
4  A. I saw her alone and -- actually, it was alone.
5  Q. And how many times did you see Beth Eubank?
6  A. Once.
7  Q. And you saw her alone?
8  A. Yes.
9  Q. Was it at the same time, the same date?
10  A. Yes.
11     MR. DERATANY:  I want to interpose -- I'm not
12  sure if it's an objection or request for
13  clarification, as to whether or not the doctor
14  qualified Bethann Eubank for providing treatment for
15  the daughter because the daughter was a minor; not for
16  the purpose of treating Beth Eubank?
17     THE WITNESS:  Correct.
18     MR. LOSS:  I mean, the doctor saw Beth Eubank
19  because he was seeing the child.
20     MR. DERATANY:  Right.  A psychiatric minor.
21     MR. LOSS:  Right.
22     MR. DERATANY:  Okay.
23  BY MS. MERCIER:

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

16

1  Q. On the document which is NPP 1191, under the recent
2     stressors, "pulled knife on parents, cut herself on
3     wrist"; did you get further information about this
4     event?
5  A. If I did, it's written in the notes.  I don't recall.
6  Q. Is this form -- would a mother have filled out this
7     form with you while you were there or is this before
8     you even see her?
9  A. Prior to the appointment.
10  Q. Before she even comes in?
11  A. Yes.
12  Q. Okay.  Can you go to -- and actually, I don't see a
13     Bates number on it.  It's after 1194 after the
14     handwritten notes.  It should be 1195, but I can't see
15     it.
16     MR. DERATANY:  It's on the left portion, I
17  think.
18     MS. MERCIER:  Mine might be cut off.
19     MR. DERATANY:  With the star on the bottom?
20     MS. MERCIER:  Yes.  My number is cut off.
21     MR. DERATANY:  So you know, Judy, it's 1195.
22  BY MS. MERCIER:
23  Q. Can you read, into the record -- first of all, these

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

17

1     are your notes --
2  A. Yes.
3  Q. -- dated May 29th of 2002?
4  A. Yes.
5  Q. Read your notes into the record, please.
6     MR. LOSS:  Go slow, Doctor, so the court
7  reporter can take it down.
8     THE WITNESS:  The whole page?
9     MR. LOSS:  Read it verbatim.
10     THE WITNESS:  "Melinda Eubank, 5/29/02 was D/c
11  today in hospital.  Was there for around one week to
12  ten days.  Pulled a knife on parents - especially when
13  told "no".  Never know what will tip off.  Started few
14  months ago.  Very manipulative if things don't go her
15  way.
16     Has a four-year-old sibling.  Sometimes will hit
17  four-year-old sibling.  Always aggressive child.
18  Never affectionate.  Never vocal about things.  Always
19  kept things to herself.  Preschool would hit other
20  kid."
21  BY MS. MERCIER:
22  Q. Does that continue on to 1196?
23  A. Yes.

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

18

1  Q. Can you continue.

2  A. "Mindy went to Casey House. Was caught with male.

3     *Times two weeks. Went to see therapist. Likes*

4     *school. Ninety something average. Maternal*

5     *grandfather died in January. Told father never*

6     *grieved. 3/2001, cut self with"* -- and I can't make

7     out the word.

8          Next line, "Year from hell in school. Sprayed

9     bleach on a girl's shirt. Stole one hundred dollars

10    from a friend last year, end of year. Did well over

11    Summer. September changed friend group. Boyfriend

12    was being treated for depression."

13 Q. And these pages 1195 and 1196, who were you speaking

14    to when you're making these notes?

15 A. Mother.

16 Q. This was from the mother?

17 A. Yes.

18 Q. 1197, is this a continuation of your conversation with

19    the mother?

20 A. Yes.

21 Q. What does 1197 say?

22 A. "Would lie excessively. Confronted regarding cut "X"

23    on apron. Looks like cutting regarding -- and I'm not

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

19

1     sure -- something breaking and then cut "X" on apron.

2     Started on Zoloft at hospital. Will go to family

3     therapy.

4          *Always a high achiever. Sometimes too hard on*

5     *self. Would be sneaky and manipulative."* And the

6     next line is "with Mindy". So it would then be "with

7     *Mindy alone".*

8  Q. Up until this, it was just with the mother?

9  A. Yes.

10 Q. And on the -- if I can just ask you some questions

11    before we go on to the Mindy part; D/c today, which

12    was on 1195, does that mean discharged?

13 A. Yes.

14 Q. And the -- on 1196, you had times two weeks. What

15    does that mean, the top of 1196?

16 A. That's referring to how long she was at Casey House.

17 Q. What is Casey House?

18 A. A runaway home for teenagers.

19 Q. Okay. There are stars on the left-hand side next to

20    "preschool"?

21 A. Yes.

22 Q. What do the stars indicate?

23 A. Things that I might think might stick out from my

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

20

1     other writings that might be of more importance.

2  Q. And so on 1195, you starred "preschool, would hit

3     other kids"?

4  A. Yes.

5  Q. Why does that stick out? Why did you put a star

6     there?

7  A. Aggression from an early age.

8  Q. And how about on the 1196; you said "maternal

9     grandfather died in January"?

10 A. Yes.

11 Q. "Told father never grieved"?

12 A. Yes.

13 Q. What does that mean, "told father never grieved"?

14 A. I don't recall.

15 Q. Why did you star that?

16 A. The grandfather dying as a stressor.

17 Q. Why did you star the "stole hundred dollars"?

18 A. Because it was from a friend.

19 Q. And why is that significant?

20 A. Because a lot of the problems seemed to be confined to

21    the family and just demonstrating those problems with

22    peer relationships.

23 Q. All right. Why didn't you star the "pulled a knife on

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

21

1     the parents" on 1195?

2  A. I don't recall.

3  Q. Go to 1197, your conversation with Mindy. What do

4     these notes say?

5  A. "With Mindy, got into a verbal argument with parents.

6     Lockport High School; tenth grade. High honors". I

7     *can't read what I wrote next. And below that --*

8          MR. DERATANY: Next to the arrow?

9          THE WITNESS: Right.

10         MR. DERATANY: Okay.

11         THE WITNESS: Below that, the next arrow I got

12    "very" -- I can't read it. Below that, "has got into

13    physical" -- and then I can't read it.

14 BY MS. MERCIER:

15 Q. How about the next page?

16 A. It looks like it says, "Wants to be a college -- I

17    like my friends. Likes teachers. Will go into BOCES

18    program. Got suspended a couple of times last year.

19    No suicidal ideation. Has been engaging in self-

20    injurious behaviors. Felt she had no means to cope

21    with urges.

22         No alcohol or marijuana. Sleep okay. Appetite

23    okay. Occasional less appetite. Denies eating

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

22

1     disorder symptoms."
2   Q. Okay. On the -- you said, "no suicidal ideation", is
3     that S1?
4   A. SI.
5   Q. That's based what, on a question you asked her?
6   A. Yes.
7   Q. Is that your observation or what she's telling you or
8     both?
9   A. What she's telling me.
10  Q. Okay. The next page, which is NPP 1199, what is this?
11  A. That's a Discharge instructions sheet that was
12     given -- presumably given from the hospital.
13  Q. This was turned into you when they came to see you?
14  A. Yes.
15  Q. So the hospital was referring her to you?
16  A. From what I could already gather, she already had an
17     appointment with me and they already knew that was a
18     follow-up appointment in place.
19  Q. She had already scheduled an appointment with you?
20  A. Yes.
21  Q. Before she left, she scheduled an appointment with
22     you?
23  A. Before she was hospitalized, she had an appointment

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

23

1     scheduled with me and her hospital discharge date
2     coinciding with the date of our appointment.
3   Q. Okay. 1200 represents what?
4   A. Lab work that was done in the hospital.
5   Q. Anything significant on here?
6        MR. DERATANY: Well, I'm going to object.
7     Foundation in terms of lab values.
8   BY MS. MERCIER:
9   Q. Did you review these when they came to you?
10  A. Not that I can recall.
11  Q. You don't remember seeing these before?
12  A. I remember seeing them now when I was reviewing the
13     record for this, but not back then, since it was four
14     years ago.
15  Q. It was 2002, right; about six years ago?
16  A. Yes. Seven years ago.
17  Q. And so what is your understanding of why you have
18     these in your chart?
19  A. I believe they -- my understanding is that they came
20     with the request for the discharge information from
21     the hospital.
22  Q. Does this information come directly to you or from the
23     patient?

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

24

1        MR. LOSS: Just to be clear; if you look at
2     page, I don't know, 1204, I think these -- and if you
3     look at the lab reports, they're printed on June 4th
4     of '02. I think these reports were faxed from the lab
5     on June 4 of '02.
6        MS. MERCIER: Why would the lab have faxed these
7     to you?
8        MR. DERATANY: Objection. It's speculation.
9     State of mind of another individual.
10       THE WITNESS: She had --
11       MR. LOSS: I don't know if you have it, Jay, a
12     Message Form; document 1188?
13       MR. DERATANY: Yes, I see it.
14       THE WITNESS: It looks like the labs were sent
15     as a result of this concern whether or not she was
16     dizzy or she passed out.
17  BY MS. MERCIER:
18  Q. Is there anything in your notes that reflects you
19     reviewed the blood work --
20  A. No.
21  Q. -- in connection with her being dizzy?
22  A. No.
23  Q. Okay. On the 1188, the Recommended Action, is that

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

25

1     something that you recommended?
2   A. Yes.
3   Q. What is the recommended action?
4   A. To follow up with PMD.
5   Q. PMD being --
6   A. Her primary medical doctor.
7   Q. Okay. May 29th of 2002 was the only time that you saw
8     either Melinda or her mother?
9   A. Yes.
10  Q. Look at NPP 1207, 1208, 1209, 1210 and 1211?
11  A. Yes.
12  Q. What does this represent?
13       MR. DERATANY: I guess I'm objecting as to form
14     and foundation as to what does this represent? It's
15     self-explanatory it's a report that he didn't author.
16     I'm not sure what the question --
17       MS. MERCIER: You can answer the question.
18       THE WITNESS: It was the Admission Summary from
19     her admission at Niagara Falls Memorial Medical
20     Hospital.
21  BY MS. MERCIER:
22  Q. And so how did this get in your chart?
23  A. I requested it.

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

26

1  Q. Why did you request it?
2  A. To get more background information of what happened in
3     the hospital.
4  Q. Did this provide you more background information?
5  A. Yes.
6  Q. And what did you do with this information?
7  A. I don't recall. I never saw the patient after the
8     initial appointment, so I don't recall.
9  Q. Did you see or did you receive this, these documents,
10    the 1207 to 1211, prior to your seeing her on May
11    29th?
12 A. I don't think I did, but again, it was seven years
13    ago. I don't see any notations that I had seen it
14    when I saw her, so I doubt I did.
15 Q. Why didn't you see her again?
16 A. They cancelled the last two appointments and never
17    rescheduled.
18 Q. And were you told the basis for why they were
19    cancelling the appointments?
20    MR. LOSS: It's separated out. I think you put
21    them both together.
22 BY MS. MERCIER:
23 Q. Did you have -- the last two appointments that were

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

27

1  cancelled, whom were they for?
2  A. For Melinda.
3  Q. They were two appointments for Melinda?
4  A. Yes.
5  Q. What was the reason for the first cancellation?
6     MR. DERATANY: Objection. It requires
7     speculation as to -- the way the form of the question
8     was phrased -- as to what he was told.
9  BY MS. MERCIER:
10 Q. What were you told was the reason for the cancellation
11    of the first appointment that they cancelled; Melinda
12    cancelled?
13 A. I'd have to see if I have it in here.
14 Q. He's not answering, he's looking through his records.
15 A. It says, "Mom won't be able to make Monday's
16    appointment."
17 Q. But the appointment was scheduled for Melinda;
18    correct?
19 A. Yes.
20 Q. The mother couldn't get Melinda there; is that your
21    understanding?
22 A. Yes.
23    MR. LOSS: Just for the record, he's looking at

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

28

1  page 1186, which is a phone message or Message Form of
2  8/4/02.
3     MR. DERATANY: Thank you.
4  BY MS. MERCIER:
5  Q. Okay. Did you suggest that they should come in --
6     strike that. After you saw her in May on May 29th,
7     did you suggest that she come in again within the next
8     month?
9  A. According to the note that I wrote, it was six weeks.
10 Q. You suggested they come in in six weeks?
11 A. Yes.
12 Q. And so 8/4, was that the first appointment that was
13    cancelled?
14    MR. LOSS: By them, is that what you mean?
15    MS. MERCIER: Yes. He said there were two
16    appointments. I'm asking if 8/4/02 was the first
17    appointment or the second.
18    THE WITNESS: I had an appointment scheduled for
19    7/24 that I had to reschedule.
20    MR. LOSS: Again, he's looking at 1187.
21    MR. DERATANY: 1187, I have it.
22 BY MS. MERCIER:
23 Q. So you had to cancel the --

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

29

1  A. July 24th.
2  Q. And the appointment for 8/4, the mother -- Beth
3     cancelled?
4  A. Yes.
5  Q. Was there another appointment that was set?
6  A. 9/25.
7  Q. And what happened with that appointment?
8  A. I don't know. I don't see it in the record.
9  Q. Do you have a notation whether it was cancelled?
10    MR. DERATANY: Objection. Asked and answered.
11    He doesn't have a record.
12    THE WITNESS: I have, on the computer schedule,
13    that it was scheduled.
14 BY MS. MERCIER:
15 Q. But not in these records?
16 A. Correct.
17 Q. You know that it was cancelled and this was not
18    cancelled by you?
19 A. No.
20    MR. DERATANY: Objection. Requires speculation.
21    Foundation. How does he know?
22 BY MS. MERCIER:
23 Q. Do you know whether you cancelled the appointment on

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

**30**

1      September 25th, 2002?

2  **A. Yes.**

3  **Q.** Did you cancel it?

4  **A. No.**

5  **Q.** Did you prescribe any medication to Melinda Duckett?

6  **A. Yes.**

7  **Q.** What did you prescribe?

8  **A. Zoloft.**

9  **Q.** I think her name is Melinda Eubank, but we know who

10     we're talking about. And the prescription that you

11     prescribed to her, did it -- was it for what time

12     frame; was it a thirty-day treatment or --

13         MR. DERATANY: 1185 has a pharmacy record.

14         THE WITNESS: Yes.

15 BY MS. MERCIER:

16  **Q.** Yes what?

17  **A. It was for thirty days and one refill.**

18  **Q.** The note, it says "called in"?

19  **A. Yes.**

20  **Q.** What does that mean; called in what?

21  **A. The pharmacy.**

22         MR. DERATANY: Doctor, it was one hundred

23     milligrams?

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

**31**

1         THE WITNESS: Yes.

2         MR. DERATANY: Okay. Thank you.

3  BY MS. MERCIER:

4  **Q.** And on 1187, can you tell me what this Medication Form

5     reflects?

6  **A. Mom calling in to get another refill on medicine.**

7  **Q.** And so that I'm clear; the initial prescription was

8     for a thirty-day treatment and one refill and then she

9     called in and asked for another refill?

10  **A. No. She would have had medicine initially when she**

11     **was discharged from the hospital and then when they**

12     **ran out, they called to get more medicine because the**

13     **appointment was rescheduled.**

14  **Q.** Let's go to NPP 1189 and 1190; what does that reflect?

15  **A. The letter that I sent to her therapist outlining my**

16     **evaluation and impression.**

17  **Q.** Why did you send this letter?

18  **A. To formalize my thoughts on Melinda and to communicate**

19     **with her therapist who had initially made the**

20     **referral.**

21  **Q.** Under the Past Psychiatric History you write, "Is

22     significant for Mindy having been hospitalized and

23     seeing yourself."?

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

**32**

1  **A. Yes.**

2  **Q.** What does that mean?

3  **A. That those are significant and those are the events of**

4     **previous treatment.**

5  **Q.** 1190, your Mental Status Examination?

6  **A. Yes.**

7  **Q.** You wrote the last line, "She denies any suicidal

8     ideation."?

9  **A. Correct.**

10  **Q.** That's from what she told you?

11  **A. Yes.**

12  **Q.** Did you have any other impression?

13         MR. LOSS: Form.

14         THE WITNESS: I'm sorry?

15         MS. MERCIER: Did you have any impression, at

16     the time, that she was suicidal?

17         THE WITNESS: Based on what I wrote, no.

18         MR. LOSS: Object to the form. Did he have an

19     impression or was she suicidal?

20         MS. MERCIER: No. She says she wasn't suicidal.

21         MR. LOSS: I think you said, "Did you have an

22     impression?", and he said "no". He might have had an

23     impression and the impression might be "no".

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

**33**

1         MR. DERATANY: Your opinion is, Doctor, there

2     was no indication that the patient was suicidal on

3     that day; correct?

4         THE WITNESS: Correct.

5  BY MS. MERCIER:

6  **Q.** Did you ever have any contact with Beth or Jerry

7     Eubank since 2002?

8  **A. No.**

9  **Q.** And you never had any contact with Jerry Eubank at

10     all?

11  **A. No.**

12  **Q.** That's correct?

13  **A. Yes.**

14  **Q.** Did you have any telephone conversations with Shelly

15     Rosen about Melinda Eubank?

16  **A. No.**

17  **Q.** Did you have any conversations with any doctor that

18     saw her at Niagara Falls Memorial Medical Center?

19  **A. No.**

20  **Q.** Have you had -- I'm not asking you about any

21     conversations that you may have had with your

22     attorney; have you had any conversations with anyone

23     about Melinda Eubank since the last time you saw her?

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

34

1  A. No.

2      MR. LOSS: Other than what he reviewed in his

3  chart; there's some Message Forms and stuff like that?

4  BY MS. MERCIER:

5  Q. Any conversations with Melinda Eubank that your

6  records make it clear?

7  A. No.

8  Q. What was the purpose of prescribing Zoloft to Melinda

9  Eubank?

10 A. To treat depression.

11 Q. And your Diagnostic Impression, can you explain what

12 Depressive Disorder NOS means on 1190?

13 A. Depressive Disorder NOS would mean symptoms of

14 depression, but not enough to meet the diagnostic

15 requirements for major depression or any other mood

16 disorder.

17     MR. DERATANY: I'll tell you, it cut out a

18 little bit. It didn't make the diagnosis criteria,

19 Doctor?

20     THE WITNESS: Correct.

21     MS. MERCIER: And what is the second line there,

22 "Rule out borderline personality traits"; what does

23 that mean?

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

35

1      THE WITNESS: The rule out would indicate that

2  it's a consideration on the differential diagnosis.

3  The borderline personality traits would indicate that

4  she had symptoms of borderline personality, but since

5  she is not eighteen, according to DSMIV --

6      MR. DERATANY: It met the criteria?

7      THE WITNESS: One of the criteria is age

8  eighteen.

9  BY MS. MERCIER:

10 Q. When you say, "rule out borderline", is that an action

11 to be taken in the future?

12 A. It would indicate it's on a differential diagnosis.

13 The longer you would see somebody, you would decide if

14 you think it's applicable.

15 Q. If she had come in and seen you, that would have been

16 something that you would have been able to do?

17 A. Yes.

18 Q. Did you attempt to get a family history from Melinda?

19 A. All I can vouch for is what is in the record.

20 Q. Do you know whether, with Melinda, there was any

21 depression in her family history?

22 A. I do not know.

23     MR. DERATANY: Objection. She's been adopted

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

36

1  from Korea it says on 1189.

2      MS. MERCIER: Jay, please don't testify for the

3  doctor. You can put your objection on the record.

4      MR. DERATANY: I'm making an objection. What --

5  he's already indicated it's in the record. Whatever

6  is in the record, I'm pointing out where he's

7  indicated. I'm not stating anything. I'm reminding

8  you as well.

9      MS. MERCIER: Jay, please just put your

10 objection on the record.

11     MR. DERATANY: I did quite clearly, thank you.

12     MR. LOSS: Do you want the doctor to change what

13 he said; would that change your answer?

14     THE WITNESS: No. I don't know, because she was

15 adopted.

16     MR. DERATANY: Is there a question?

17 BY MS. MERCIER:

18 Q. Not yet, Jay. Do you remember her? As you sit here

19 today, do you remember seeing her?

20 A. Yes.

21 Q. With the way that her mother described her --

22 A. Yes.

23 Q. -- and the issues that she was facing, was that

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

37

1  consistent with how she presented to you?

2      MR. DERATANY: I'm going to object to that

3  question. Form and foundation.

4      THE WITNESS: No.

5      MS. MERCIER: No, it wasn't consistent?

6      THE WITNESS: Correct.

7      MS. MERCIER: Explain to me what was different.

8      MR. DERATANY: I don't know "what was different"

9  means. Objection as to form.

10     THE WITNESS: As is typical in child psychiatry,

11 the child presented herself in more pleasant terms

12 than the mother described her behaviors.

13 BY MS. MERCIER:

14 Q. Why do you say that is usual?

15 A. Yes. That's fairly typical in child psychiatry.

16 Q. Did you ask Melinda about what her mother described as

17 "pulling a knife on her parents"; did you inquire to

18 Melinda about that?

19 A. I do not recall.

20 Q. Does the fact that you can't get an individual's --

21 that you couldn't get Melinda's family history affect

22 your diagnosis?

23 A. No.

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

38

1  **Q.** The fact that her mother wrote, on 1193 that she --
2     "Melinda had a delay in speech and started
3     kindergarten at age six" and that she had "difficulty
4     toilet training; a bedwetter until six.", any of these
5     kind of things affect child development?
6        MR. DERATANY: I'm going to object. There's a
7     mischaracterization as to the statements made on 1193.
8        THE WITNESS: I can only speak to this case?
9  BY MS. MERCIER:
10 **Q.** Right.
11 **A.** I'm not sure what the relevance is for Melinda.
12 **Q.** How about the affect of sexual abuse at 4/5?
13       MR. LOSS: I don't understand the question.
14 BY MS. MERCIER:
15 **Q.** Does that have a developmental impact on Melinda?
16 **A.** It would raise the risk for depression as well as for
17    borderline personality traits.
18 **Q.** Why is that?
19 **A.** We know that sexual abuse is a risk factor.
20 **Q.** Did you come to any conclusion about the family
21    relationship between Melinda and her mother?
22       MR. DERATANY: You know, I've got to object to
23    form. Does he have an opinion to a reasonable degree

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

39

1     of psychiatric certainty or are you just asking if he
2     put some sort of nonpsychiatric conclusion down on
3     paper? Calls for clarification or form objection.
4        MS. MERCIER: You can answer.
5        THE WITNESS: Only what I would have written
6     down in the -- on 1189 and 1190.
7  BY MS. MERCIER:
8  **Q.** What you wrote down on 1189 and 1190 is what the
9     mother reported. Mother -- "Mindy's mother reports
10    there was a history of Mindy not being close. Always
11    distant and aloof with the family."?
12 **A.** Yes.
13 **Q.** And that "she has ongoing conflicts with her parents"
14    as reflected on 1189?
15 **A.** Yes.
16       MR. DERATANY: I object. At this point, I'm not
17    sure if you're asking him if it's his opinion it
18    occurred or a reasonable opinion to psychiatric
19    certainty or whether or not it's a report from the
20    mother.
21 BY MS. MERCIER:
22 **Q.** Okay. The information that is listed on the social
23    history is information that came from her mother;

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

40

1     correct?
2  **A.** Correct.
3  **Q.** On 1190, you say that you "discussed my diagnostic
4     impression with Mindy's mother"?
5  **A.** Correct.
6  **Q.** So, what did you tell her?
7  **A.** I would have told her what I thought the diagnosis is.
8  **Q.** Which is what, depressive disorder?
9  **A.** Yes.
10 **Q.** And the rule out borderline personality traits?
11 **A.** Yes.
12 **Q.** And that you wanted to see Mindy again?
13 **A.** Yes.
14 **Q.** You write, "Consideration made with whether or not any
15    other alternatives that provide for more mood
16    stability."; what are you referring to there?
17 **A.** Other medications.
18 **Q.** Did you discuss other medications with the mother?
19 **A.** I don't recall.
20 **Q.** And so this note is referring to what -- just what you
21    did yourself; you considered other medications?
22 **A.** Correct.
23 **Q.** And you didn't see any reason for her to do any

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

41

1     inpatient in psychiatric therapy?
2  **A.** Not at that time.
3  **Q.** Did Mindy's mother tell you that they were considering
4     putting her in an inpatient treatment facility?
5  **A.** Not that I recall.
6        MS. MERCIER: Have you had any -- actually,
7     that's it. Strike it. No further questions.
8
9  EXAMINATION BY MR. DERATANY:
10
11 **Q.** Okay. Doctor, I have a few questions, probably two
12    minutes worth. Can you hear me all right?
13 **A.** Yes.
14 **Q.** I apologize for being on the phone, but I just have a
15    few questions here based on -- you know, it's
16    primarily about 1189 and 1190; your report and your
17    care and treatment. You only saw her one time, so you
18    would not have been able to make a DSMIV diagnosis; is
19    that correct?
20 **A.** The Depressive Disorder NOS is a DSMIV diagnosis.
21 **Q.** I'm not sure if you had met the criteria for a full
22    DSMIV or not?
23 **A.** For the NOS, yes.

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

42

1 Q. Okay. All right. With regard to "rule out borderline
2 personality traits" though, that was a differential
3 though; correct?
4 A. Yes.
5 Q. You didn't reach a definitive diagnosis or opinion as
6 of that time; correct?
7 A. Correct.
8 Q. And obviously, if you had thought she was a threat to
9 herself or others, then you would have not put down,
10 "I am not seeking indications for inpatient
11 psychiatric treatment."; correct?
12 A. Correct.
13 Q. A normal practice, in psychiatry, if you think
14 somebody is an immediate, present threat to themselves
15 or others, you work for immediate psychiatric
16 treatment; is that correct?
17        MS. MERCIER: Objection.
18        THE WITNESS: That would be one of the options.
19 BY MR. DERATANY:
20 Q. At least as of the date that you saw her in -- I think
21 May of -- May 29th of 2002; do I have that date
22 correct?
23 A. Yes.

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

43

1 Q. You would agree that she was not either suicidal or
2 homicidal?
3 A. Correct.
4 Q. Okay. There's no -- you did not diagnose and you did
5 not find that she had any psychosis at that point;
6 correct?
7 A. Correct.
8 Q. And in terms of her history, you would agree that her
9 history indicated that this young woman is
10 psychiatrically fragile?
11        MS. MERCIER: Object to the form.
12 BY MR. DERATANY:
13 Q. In your opinion, to a reasonable degree of psychiatric
14 certainty based on your opinion when you saw her on
15 5/29/02, were there several triggering factors that
16 you already identified?
17 A. Yes.
18 Q. And one of the triggering factors that indicate
19 psychiatric or being psychiatrically fragile would be
20 sexual abuse at age five; would that be correct?
21        MS. MERCIER: Object to the form.
22        THE WITNESS: I'm not sure what you mean by
23 "fragile"?

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

44

1 BY MR. DERATANY:
2 Q. Okay. In terms of her psychiatric history, what would
3 you consider -- what you would consider to be
4 significant findings, would be the fact that she had a
5 history of being sexually abused; correct?
6 A. Yes. Correct.
7 Q. And that she had -- would being adopted at four
8 months, would that be something that would be -- I
9 don't want to say statistically significant, but
10 psychiatrically significant?
11 A. Yes.
12 Q. And you don't have any idea -- strike that. As to the
13 appointment of 9/25, you don't have any understanding
14 as to why they, the mother, would have cancelled or if
15 the mother or father cancelled or who exactly
16 cancelled; do you?
17 A. No.
18 Q. And there's nothing in Bethann Eubank's recitation of
19 her child's history that you found to be, at that
20 time, false; would that be a fair statement?
21 A. Yes.
22        MR. DERATANY: That's all the questions that I
23 have.

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

45

1 RE-EXAMINATION BY MS. MERCIER:
2
3 Q. Okay. You said that there was nothing that you found
4 in the -- read back the last question, please.
5        (Whereupon the reporter read back the requested
6 testimony.)
7 BY MS. MERCIER:
8 Q. How would you know whether something she wrote was
9 false or not?
10 A. I would say, based upon my own impression in terms of
11 how she characterized things as being realistic or
12 unrealistic in my opinion or if I had seen her again
13 in the future and there were contradictions.
14 Q. But you didn't see her again; right?
15 A. Correct.
16        MS. MERCIER: Okay. That's all.
17        MR. DERATANY: One question; in other words, if
18 a parent states something that you believe to be an
19 outright lie or something that would be -- something
20 that would be damaging to her child's interest, that
21 would be something that you would usually know or
22 typically or customarily know; would that be a fair
23 statement?

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

46

1    MS. MERCIER:  Object to the form.

2    THE WITNESS:  Yes.

3    MR. DERATANY:  Okay.

4    MS. MERCIER:  Do you have anything further, Jay?

5    MR. DERATANY:  No.  Nothing further.

6    MS. MERCIER:  You have the right to read the

7    deposition or you can waive it.

8    THE WITNESS:  I'll waive it.

9    MS. MERCIER:  Thank you for your time.

10   (Whereupon the deposition concluded at 4:55 p.m.)

11

12              (Whereupon the following stipulation

13              was entered upon the record:

14                   It is hereby stipulated by and

15              between the attorneys for the

16              respective parties hereto, that the

17              oath of the Referee is waived; that

18              signing, filing and certification of

19              the transcript are waived, and that

20              all objections except as to the form

21              of the questions are to be reserved

22              until the time of trial.)

23         * * * * * * * *

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

47

1         C E R T I F I C A T I O N

2    STATE OF NEW YORK

     COUNTY OF ERIE

3

4         I, LISA A. PETERSON, Notary Public in and for

5    the State of New York do hereby certify:

6         That the transcript appearing hereinbefore was

7    taken pursuant to notice at the time and place as

8    herein set forth; that said transcript was

9    stenographically recorded through machine shorthand by

10   me and thereafter computer transcribed into laser

11   printing.

12        I HEREBY CERTIFY, that the foregoing transcript

13   is a full, true and correct transcription of my

14   machine shorthand notes so taken.

15        IN WITNESS WHEREOF, I have hereunto subscribed

16   my name and affixed my stamp this 3rd day of November

17   2009.

18

19              PETERSON REPORTING

                3293 Hickox Road

20              Hamburg, New York 14075

                Telephone (716) 649-2233

21

22        BY:_____

                LISA A. PETERSON

23

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

Michael P. Hallett, M.D.
Andrew R. Reichert, M.D.
Daniel J. Willis, M.D.
Christopher G. Martin, M.D.
Maria T. Cartagena, M.D.

# Suburban Psychiatric Associates, L.L.P.

Jasvinder K. Dhingra, M.D.
Maria Nickolova, M.D.
James A. Brigante, C.S.W.
David Gray, C.S.W.
Jeanne Salada-Conroy, RNPc

June 2, 2002

Shelley Rosen, CSW-R
508 Bewley Building, Suite # 503
Lockport, NY 14094

RE: Melinda Eubank

Dear Ms. Rosen:

I had the opportunity to see your patient, Melinda Eubank, in psychiatric consultation on 05/29/02. As you know, Melinda is an almost 17-year-old girl who presents with a lengthy history of behavioral difficulties. Mindy had been admitted to Niagara Falls Memorial Hospital after threatening her parents with a knife and then cutting herself. She has had other incidents in which she has made threats to harm herself. Has engaged in self-mutilation in the past. Mindy has had problems with getting very easily angered and rageful, mom reports these have escalated over the past year. She has had multiple difficulties in her peer relationships, had also broken up with her boyfriend, which was a large precipitant for behavioral changes. Mindy had been started on Zoloft 50 mg per day. Mother reports that as an elementary school child there were behavioral problems, teachers would describe her as a sneaky manipulator, there had been some stealing episodes from other children. Mindy does not have any current legal problems. Mindy denies any drug or alcohol use. She denies any eating disorder symptoms. There is no evidence of any manic type symptoms.

**PAST PSYCHIATRIC HISTORY:** Is significant for Mindy having been hospitalized and seeing yourself. Mindy does have a history of having been sexually abused as a child, was in treatment at that time.

**FAMILY HISTORY:** Is not known as Mindy was adopted at four months of age from Korea.

**MEDICAL HISTORY:** Is unremarkable.

**SOCIAL HISTORY:** Mindy lives at home with her adoptive parents and four year old sister. She is in the tenth grade at Lockport High School, does well with her academic performance. She has had difficulties maintaining friendships. Mindy does have a delay in her speech, did kindergarten late due to not being ready. She was noted to be aggressive towards other children in preschool. She was sexually abused at age five, the perpetrator was prosecuted. Mindy has had ongoing conflicts with her parents; she had run away from home and stayed at a runaway shelter for two weeks this year. Mindy's

mother reports that there has been a history of Mindy not appearing to be close, always distant and aloof with the family.

**MENTAL STATUS EXAMINATION:** Mindy is a pleasant young female, cooperative in the interview. No psychomotor abnormalities are noted. Speech is normal. Her affect is euthymic. Her mood is euthymic. No psychotic symptoms are present. She denies any suicidal ideation.

**DIAGNOSTIC IMPRESSION:**      Depressive disorder NOS.
                               Rule out borderline personality traits.

**TREATMENT RECOMMENDATIONS:** I discussed my diagnostic impression with Mindy's mother. At this point, I would continue with medication that she is taking - consideration made with whether or not any other alternatives that provide for more mood stability. I will see Mindy again in four to six weeks to reassess her progress. I am not seeing indications for inpatient psychiatric treatment. She will continue to see you for psychotherapy.

Thank you for referring Mindy to me. Please do not hesitate to call me with any questions.

Sincerely,

Christopher G Martin, MD

CGM/cze/nrp/rc/sur/h2          157597.doc
DD: 06/02/02
DT: 06/03/02

# Suburban Psychiatric Associates, L.L.P.

Dr. Martin                    5/29/02 @
                              1:00PM

## Child and Adolescent Psychiatry Intake Assessment
Please complete this form and bring it with you to the first appointment

Patient Name _Melinda Marie Eubank_    DOB _8/4/85_ Date _____

Referred by _Shelly Rosen_

Mother's Name _Beth Ann Eubank_    Age _41_  Lives with child? _yes_

Marital status _yes_ –  Marital History _21 yrs_

Mother's Employment _Western Division Credit Union_

Father's Name _William G. Eubank_    Age _46_  Lives with child? _yes_

Marital status _yes_    Marital History _21 yes_

Father's Employment _Akzo Nobel_

| Others in household | Age: | Relation to patient |
|---|---|---|
| _Molana_ | _4_ | _Sister_ |
| _____ | ____ | _____ |
| _____ | ____ | _____ |
| _____ | ____ | _____ |
| _____ | ____ | _____ |

**PATIENT UNDER AGE 18 MUST BE ACCOMPANIED BY PARENT/GUARDIAN**

Reason seeking evaluation _Stress, Depression, Manipulation, Self Mutilation - Lying, Stealing, rages and outburst does not talk to parents about her problems, moodswings vomits. Went into rage ranaway to School was put in crazy home in Niagra Falls -_

Recent stressors _pulled knife on parents Cut herself on wrist_

Duration of problem _12 - 14 months_

How affects child? _Anger, rages outburst over nothing_

How affects family? _Greatly, 4yrs peeling pys. at school - family is greatly stressed over her behavior_

NPP 1191

How affects school work _Doesnot_

How it affects friendships? _Doesnt_

What makes better? _When she suceeds @ manipulation gets away_

What makes worse? _when told "No" about something_

Is child in counseling? _yes_ With whom? _Shelly flore_         How often? _wkly_ How Long _2mo to_

Previous counseling _Sexual Abuse as child was released of on it_

Is child on psycotropic medication? Yes _X_ No___ If yes, Name/dosage/duration _Zoloft 50 mg - Since_

Previous medication name/dosage/duration _none_

Has child ever been hospitalized? _yes_ When/where/how long? _5/20 - N. Falls Memorial Bridges_

Problems now or in the past with/describe: _She is_

Excessive worries _School work - not saying what they are_

Sleep _- excessive after outburst of rage_

Appetite _REGULAR - eat when angry or upset_

Hyperactivity _NORMAL_

Compulsive behaviors _DOTS ← now_

Drug/alcohol use _none_

Excessive crying _yes -_

Hallucinations (hearing / seeing things) _none aware of_

Unusual of strange thoughts _none aware of_

Temper tantrums _yes - when doesn't get any way - now_

Fighting _yes - with sibling or parents - now_

Excessive lying of stealing _yes - now_

Extreme mood changes _yes - now_

Suicidal thoughts / actions _yes - now_

Child's pediatrician _Dr Nazic Gilkar_

Current medical problems _none_

Allergies _Cat, Cherries_

Any history of seizures / head trauma / neurologic problems   lead exposure / heart problems / lung problems endocrine problems? If yes, describe _No_

Is there anyone in the child's biologic family that has had depression, attention deficit, anxiety disorder, obsessive compulsive disorder, bipolar disorder, learning disability, schizophrenia, or and other psychiatric disorder? If yes, describe: _Child adopted at 4 months from Korea - Don't know_

Does anyone in the child's family have a substance abuse problem? If yes, describe: _No_

Were there any complications in the pregnancy, delivery or early medical problems?? If yes, describe: _____

Did the child have any early difficulties with feeding, sleeping, colic? If yes describe: _No_

Child's primary caretaker _parents_

Did the child have any delays in motor or speech development? If yes, describe _Speech Started kindergarten at age 6 was not ready for Kindergarten School testing recomend holding back._

Child's age at toilet training _3 yrs_   How long did it take? _5 months_ Was it easy or difficult _difficult_ _bedwetter until 6_

Did child attend preschool? If yes, were there any problems with the separation from parents, aggression toward other children or any concerns at that time? _Aggression Towards other children was very sneaky_

Was the child ever the victim of physical, sexual or verbal abuse? If yes, describe: _Sexual at 4/5 yes. of family member - was prosecuted_

NPP 1193

Was the child ever involved with Child Protection Services? If yes, describe: _____

_No_____

Did child ever witness domestic violence? If yes, describe: _No_____

School child attends _Lockport HighSchool_____ Grade _10_

Is child receiving special education services? If yes, describe: _____

_____

Does child have friends? _yes_ How would you describe your child's ability to get along with other children. ____

_many - very quiet about who they are doesnot keep_
_with the Same friends any duration_

Is child invited to birthday parties, sleepovers, etc.? _Yes_

Child's relationship with other adults: _average_

Does child have hobbies, participate in sports, school clubs, scouts, etc.? _Has no interest_
_or sticks with any 1 thing_

Child's best qualities _Smart, intelligent always thinking ahead of_
_the game - Always has a "angle"_

What would you most like to be different for your child? _Anger under control_
_more communication with parents deal with her_
_problems not self mutilate - Control mood swings_

SARAH DOUGLAS

1                UNITED STATES DISTRICT COURT

2                MIDDLE DISTRICT OF FLORIDA

3                     OCALA DIVISION

4      - - - - - - - - - - - - - - - - - - - - - - - -

5      ESTATE OF MELINDA DUCKETT, by and through her personal
       representative, KATHLEEN CALVERT, and BETHANN EUBANK
6      and WILLIAM GERALD EUBANK, as legal parents of
       MELINDA DUCKETT, and as grandparents and next friends
7      of T.D., a child, and M.E., a minor sibling of
       MELINDA DUCKETT
8

9          Plaintiffs,

10                          CASE NO. 5:06-cv-444-Oc-10GRJ
       v.
11
       CABLE NEWS NETWORK, L.L.P. (CNN), a Delaware
12     corporation, NANCY GRACE, individually and as an
       employee/agent of CNN, various unnamed producers of
13     the "Nancy Grace" show, JOSHUA DUCKETT

14         Defendants.

15     - - - - - - - - - - - - - - - - - - - - - - - - -

16

17         Deposition of SARAH DOUGLAS, held before

18     Lisa A. Peterson, Court Reporter and Notary Public,

19     at the Law Offices of Brandt, Roberson & Brandt,

20     P.C., 929 Lincoln Avenue, Lockport, New York, taken

21     on Wednesday, October 21st, 2009, commencing at

22     10:00 a.m., pursuant to Subpoena.

23

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075
(716) 649-2233

**2**

```
 1                    W I T N E S S   I N D E X
 2
 3      Name                              Page
 4      ------------------------------------------
 5      SARAH DOUGLAS    BY MS. MERCIER       5
 6
 7
 8                      *    *    *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

**4**

```
 1      APPEARANCES:
 2
 3                      DERATANY, SKORUPA & O'HARA, P.A.
                        BY:  KARA SKORUPA, ESQ.
 4                      Crystal Tree Centre
                        1201 U.S. Highway One, Suite 315
 5                      North Palm Beach, Florida 33408
                        Appearing for the Plaintiffs.
 6                      HOLLAND & KNIGHT, L.L.P.
                        BY:  JUDITH M. MERCIER, ESQ.
 7                      200 S. Orange Avenue, Suite 2600
                        Orlando, Florida 32801
 8                      Appearing for the Defendants.
 9                      BRANDT, ROBERSON & BRANDT, P.C.
                        THOMAS H. BRANDT, ESQ.
10                      929 Lincoln Avenue
                        Lockport, New York 14094
11                      Appearing for Sarah Douglas.
12
13
14                        *  *  *  *
15
16
17
18
19
20
21
22
23
```

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

**3**

```
 1                    E X H I B I T S
 2
 3      Exhibit    Description           ID
 4      ------------------------------------------
 5      1     Records of Ms. Douglas        50
 6      2     Letter to Shelly Rosen from Dr.
              Martin dated June 2nd         50
 7
 8
 9                      *    *    *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

**5**

```
 1      S A R A H  D O U G L A S, 5710 West Bluff in Olcott,
 2      New York 14126, after having been first duly sworn,
 3      was examined and testified as follows:
 4
 5      EXAMINATION BY MS. MERCIER:
 6
 7      Q. Please state your name.
 8      A. Sarah Douglas.
 9      Q. Were you formerly known as Sarah Brandt?
10      A. Yes.
11      Q. And let me show you what I've marked as Exhibit Number
12         1.  These were records produced to us in connection
13         with the Subpoena that was served on you.  Can you
14         take a look and verify that those are the records that
15         you produced?
16      A. Yes, these are my records.
17      Q. Okay.  What is your address?
18      A. My home address or business?
19      Q. Business is fine.
20      A. Business is Center For Family Therapy, Suite 508, The
21         Bewley Building, Lockport, New York 14094.
22      Q. Do you have any relationship with Bethann or William
23         Gerald Eubank --
```

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

6

1  A. Nothing but a professional relationship.

2  Q. -- in connection with the records that we just looked

3     at as Exhibit 1?

4  A. There's no personal relationship.

5  Q. You said professional relationship. I'm referring to

6     the exhibit.

7  A. Yes, exactly.

8  Q. Let me give you some background. What we're going to

9     do here today is I'm going to ask you a series of

10    questions. If you don't understand something I'm

11    asking, ask me to rephrase it. If you do answer the

12    question, I'm going to assume you understood the

13    question. If at any time you need a break, let me

14    know and we can do that.

15       Your answers need to be verbal. "Uh-huh",

16    "uh-uh" can't be taken down for the record and also

17    counsel appearing by phone can't see that. I would

18    also ask you to let me finish a question completely

19    and then I'll give you an opportunity to answer and I

20    also will let you answer completely before I ask my

21    next question; okay?

22 A. Okay.

23 Q. And what is your profession?

8

1     insurance and private practice. I have a Master's

2     Degree in social work and additional licensing

3     obtained after graduation from there.

4  Q. Where did you get your Master's?

5  A. Where?

6  Q. Yes, where?

7  A. At UB.

8  Q. That's --

9  A. SUNY Buffalo.

10 Q. And when was that?

11 A. '83 -- 1983. 1981 to '83 is when I was there.

12 Q. Do you have any certifications other than what we just

13    talked about?

14 A. ACSW; Academy of Certified Social Workers.

15 Q. Are you licensed to prescribe any kind of medication?

16 A. No. That's a physician. I'm not a physician.

17 Q. Do you work in conjunction with any physician?

18 A. Not at this time, no. We refer out, such as in this

19    case. We -- I think Mindy was referred to Dr. Chris

20    Martin. We coordinate care with psychiatrists quite

21    often. We don't have anyone on-site in our office. I

22    have one business partner.

23 Q. What is your partner's name?

7

1  A. I'm a clinical social worker.

2  Q. How long have you been doing that?

3  A. Since 1983.

4  Q. And do you have a specialty area?

5  A. I work with adolescents and adults. Really a pretty

6     full range of things; anxiety, depression, family

7     issues, a lot of court work; Family Court work.

8     Adoption, Child Protection issues, therapeutic foster

9     care work. Marital family issues in general.

10 Q. And how do you -- how do patients usually come to you;

11    is it by referral?

12 A. Through a self-referral and through a lot of the

13    agencies that I just mentioned from Child Protection,

14    from lawyers, from teachers. I've been practicing for

15    a very long time here. People just know me. They

16    refer their friends, neighbors, extended family. They

17    keep coming back because they've known me from before.

18 Q. Do you have a license?

19 A. Yes, I do; the State of New York. I'm a licensed --

20    it's called an LCSW-R, which is Licensed Clinical

21    Social Worker. The "R" means that I've had additional

22    training post Master's Degree; six years additional of

23    supervision which enables me to bill third-party

9

1  A. Rochelle Rosen.

2  Q. And does she also go by Shelly?

3  A. Yes.

4  Q. And you said, "In this case, we referred Mindy to a

5     child psychiatrist."; did you refer her?

6  A. I believe she -- Shelly may have. Shelly began seeing

7     the family before I did. There was a hospital

8     administration for Mindy. My guess would be that they

9     referred her to Chris Martin for outpatient

10    psychiatric care after the admission, but I did not

11    personally refer her to him because other things had

12    happened prior to me seeing her.

13 Q. And how did -- how did you end up being involved with

14    this family?

15 A. I believe it was when she was admitted to Niagara

16    Falls Memorial Medical Center. It's called the

17    Bridges unit. It was a child and adolescent

18    psychiatric inpatient unit for children. She was

19    admitted there while she was seeing my partner,

20    Shelly, and I believe they referred the family for

21    additional family counseling.

22       That was what they told me when they came to see

23    me initially. At that point, the father was included.

10

1    Prior to them seeing me Beth, the mother, and Mindy,
2    the daughter, had been seeing Shelly.
3 Q. Okay. Was one of the individuals, Beth or Mindy,
4    Shelly's patient or --
5 A. Beth was. The -- we open cases under the identified
6    client; like who is calling in on the phone asking for
7    help. Both of the charts are opened up under the
8    adults. Shelly's was opened under Beth Eubank. Mine
9    was opened under William who goes by Jerry Eubank.
10   Mindy was included in family sessions within that
11   approach.
12 Q. Do you know how it ended up that Beth became Shelly's
13   patient?
14 A. I don't know that, no.
15 Q. Do you know when that was?
16 A. I can give you the date of when she saw Shelly.
17 Q. Sure.
18 A. The first date -- the first date Beth saw Shelly Rosen
19   was March 20th, 2002 and she saw Shelly by herself.
20 Q. And do you know if there was any kind of an event that
21   caused -- that caused Beth to see Shelly?
22 A. I think at that point, it was just overall
23   difficulties in parenting Mindy and dealing with sort

11

1    of family disruptions that were going on. The
2    emotional aspects of dealing with a child that's
3    having emotional problems, as a parent.
4 Q. What is your basis for that statement?
5 A. Supposition; knowing what I do and why people come to
6    us. Shelly's notes aren't extensive.
7 Q. You're just giving a general --
8 A. Why patients are coming with kids that have personal
9    problems.
10 Q. You don't have any knowledge why she was there?
11 A. No, that wasn't my case.
12 Q. Do you know what Casey House is?
13 A. Yes.
14 Q. What is Casey House?
15 A. It's a place for runaways that children can go to.
16 Q. Do you know -- do you have any knowledge of whether
17   Melinda spent any time at Casey House?
18 A. I do, based on reviewing my partner's record and the
19   case in general. Do you want me to continue
20   explaining?
21 Q. Sure.
22 A. The intake on March 20th was with Shelly and I
23   believe, from just looking at the notes of Shelly,

12

1    that Mindy was probably at Casey House at the time and
2    that is why her mother came in by herself. By the
3    second appointment, in Shelly's notes, she referred to
4    Mindy being home from Casey House.
5    The second appointment was on April 9th. That
6    appointment with Shelly consisted of Beth and Mindy
7    together and Mindy had been discharged from Casey
8    House, which was the runaway house.
9 Q. When a patient comes in to see you, what is the
10   first -- the first time they see you, what do they do;
11   is there paperwork to fill out; what happens?
12 A. Our secretary does the basic paperwork with insurance
13   work; name, address and birthdays, all those basics.
14   I'll introduce myself out in the waiting room and kind
15   of ask the parents if they want to come in all
16   together as a family or do they need to come in and
17   share some adult information first.
18   I try to do that tactfully. Sometimes if
19   there's information that they need to share that's not
20   appropriate in front of the child, I give them a way
21   to do that. I believe, in this case, my notes reflect
22   that the parents were there with Mindy.
23   To the best of my recollection, I believe I had

13

1    them come in all together to give me the history all
2    together and I will ask some general questions; what
3    is bringing you here and kind of let them talk for a
4    while to let them get a sense of what their issues are
5    and see how they interact with each other and then my
6    questions get more specific from there.
7 Q. Do you take notes during your sessions?
8 A. Most of the time. In intake, for sure I do.
9    Sometimes with sessions after -- I write them
10   afterwards.
11 Q. And is there -- does the patient, coming in, write
12   down the reasons why they're coming in?
13 A. Some clinicians do that, I don't. I just take my own
14   notes.
15 Q. Are you -- do you have any kind of professional
16   association with either Casey House or Bridges?
17 A. Not with Casey House, not officially. Just that I
18   get -- I refer clients to the hospital if they're
19   suicidal. If I need to send them to the hospital, I
20   do that, but I don't have any link -- any formal link,
21   no.
22 Q. And Bridges is no longer operating; correct?
23 A. No, they're not.

14

1   Q. When did that stop; do you know?

2   A. My guess is about a year ago.

3   Q. What is Bridges?

4   A. An inpatient child and adolescent psychiatric unit for

5       more severe psychiatric problems that relate to

6       children who need to be provided with safety and

7       medication stabilization and inpatient psych care.

8   Q. Okay. You said that Beth had been a patient of your

9       partner prior to when you saw the family. Had you

10      ever had any contact with any of the family members

11      before you saw them?

12  A. No. I never knew them.

13  Q. Were you ever consulted by Ms. Rosen about anything

14      relating to Beth or Mindy while Ms. Rosen was seeing

15      them?

16  A. I don't think so. It's kind of far back to remember

17      that.

18  Q. Okay. Were -- before you were referred -- strike

19      that. Before you saw Mr. Eubank, were you aware that

20      your partner was seeing Beth and Mindy?

21  A. No.

22  Q. Is there a difference between your partner's practice

23      and your practice?

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

15

1   A. In great part, it's very similar. It's -- people are

2       randomly assigned. If you're wondering how she got to

3       one versus the other of us, it depends on who's got

4       openings and who is able to see somebody. Shelly and

5       I don't necessarily talk to somebody -- what was the

6       question?

7   Q. Is there a difference between your practice?

8   A. Is there a difference? We do a lot of the same

9       things. I tended to see younger children, at one

10      point, than Shelly. Shelly preferred adolescents and

11      up. Shelly has a CASAC; Certified Alcoholism and

12      Substance Abuse Counselor, I do not. Sometimes she'll

13      get more alcohol-related cases or DMV cases for DWI.

14          I deal with alcoholism and substance abuse

15      obviously within families, but I don't have the

16      credential for it. We're pretty similar really.

17      We're both social workers.

18  Q. Why would the family counseling not have been done by

19      Shelly?

20  A. Sometimes we split it up. If there's -- if there's

21      individuals within the family that have a lot of

22      different needs and it's just become -- someone else

23      might need individual work within the family work, so

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

16

1       I don't know. Sometimes Shelly will refer somebody to

2       me if somebody needs a little more within the

3       one-to-one sessions. This one, I can't remember why

4       other than the hospital recognized a need for more

5       family treatment.

6   Q. But you don't have a recollection of why the family

7       treatment?

8   A. Why Shelly didn't do it all, you mean?

9   Q. Yes.

10  A. I'm not sure. If the family had continued to work

11      with me, certainly I would have talked to Shelly and

12      then we would have figured out how to divide it up and

13      who was doing what and what the needs were, but it

14      just didn't progress that far with my interaction with

15      them.

16  Q. Okay. When was the -- I'm going to give you Exhibit

17      Number 1 so you can look at that. When was the first

18      time that you saw anyone in the Eubank family?

19  A. It was the first and the only time that I saw the

20      family, June 13th of 2002. I had one subsequent phone

21      call after that, but that was just over the phone;

22      6/19/02, and I just have the last name. I don't

23      remember who actually called; whether it was the

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

17

1       mother or the father, but those were the only two

2       contacts that I had.

3   Q. So on June 13th, 2002, who did you see?

4   A. I saw Mindy with her parents, Jerry and Beth Eubank,

5       altogether as far as I can remember.

6   Q. Okay. The -- there's a document and in the lower

7       right-hand side it's NPP 1252; those are numbers that

8       we've put on here, 1252.

9   A. That's the attendance sheet.

10  Q. What does that reflect?

11  A. That's just the attendance sheet from the date that

12      they come and we can keep track of attendance for

13      billing purposes.

14  Q. This goes into your chart?

15  A. Yes.

16  Q. What is -- I see there's six visits?

17  A. That's just an insurance authorization they've

18      authorized us six times to use. It doesn't mean I saw

19      her six times. The date of the session is 6/13. The

20      type of intake is a first session.

21  Q. So the insurance that they had would have covered six

22      visits?

23  A. Yes.

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

18

1   Q. You found that out right away?

2   A. Yes. Our secretary does that so we know what we have

3      to use and the cost for the co-pays for people. This

4      is just business stuff.

5   Q. You write the name of the client as William Eubank as

6      opposed to the family; do you know why that is?

7   A. We have to identify a patient for billing purposes and

8      diagnostically as well. Whatever person is the

9      identified client, you diagnose them because insurance

10     requires a diagnosis. I guess when they called, it

11     was Mr. Jerry Eubank asking for help for himself.

12  Q. You say, you guess; did you talk to him?

13  A. No, because my secretary does that.

14  Q. And up in the right-hand side it says co-pay,

15     one to five visits fifteen dollars, that means the

16     first five visits they would have a fifteen-dollar

17     co-pay?

18  A. Yes.

19  Q. On the sixth visit, either twenty-nine, fifty for an

20     individual or thirty-one, fifty for a family?

21  A. Yes.

22  Q. Do you know if their insurance would have allowed any

23     other visits or covered any other visits?

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

19

1   A. It probably would have. At that time, we either

2      submit more paperwork or did oral reviews; I can't

3      remember how it was done. You get six to start with

4      and justify a need for more further visits by a review

5      form. Insurance coverage wasn't an issue.

6   Q. NPP 1253, it says "patient information"?

7   A. Yes.

8   Q. Who fills that out?

9   A. My secretary.

10  Q. She fills them out when they come?

11  A. When they call on the phone.

12  Q. So that means Jerry would have called?

13  A. I don't know who called.

14  Q. Okay. Who ever called gave Jerry's name as the

15     patient?

16  A. Yes. Sometimes a wife will call for a husband who

17     didn't want to call.

18  Q. You don't know, at this time, who called?

19  A. No, I don't.

20  Q. The next form is Members Rights and Responsibilities;

21     NPP 1254?

22  A. Yes. This is kind of insurance-driven. We have to

23     give this to people so they're given their rights in

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

20

1      terms of participating in family sessions. It's kind

2      of a given.

3         MS. SKORUPA: The last minute you guys cut out

4      and I couldn't hear anything. I last heard, her

5      secretary filled out the registration form.

6         MS. MERCIER: The patient form she just -- yeah.

7      She just said she doesn't know who called in, whether

8      it was Jerry or the wife, and then we just went on to

9      the next page; the Members Rights and

10     Responsibilities.

11        MS. SKORUPA: All right. Sorry. I just didn't

12     know what had happened there for a second.

13  BY MS. MERCIER:

14  Q. Okay. You have this Members Rights and

15     Responsibilities signed for insurance purposes?

16  A. Just to let them know what their responsibilities are

17     in treatment and to cooperate with us and provide

18     information and we want people to be active

19     participants in their care. That just kind of

20     explains that.

21  Q. The next page is 1255; and that is a consent?

22  A. Yes.

23  Q. And what is the purpose of the consent?

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

21

1   A. It's a confidentiality issue. We wouldn't release

2      information to anyone without signed consents. One of

3      the basic ones is to the primary care physician, which

4      is pretty much what insurance companies want us to do.

5         It's a coordination of care with everyone pretty

6      much, but a client has a choice whether to sign it.

7      They can decline release of information to anyone.

8      That one reflects the fact that they do not authorize

9      release of information to the physician.

10  Q. Do you know why that was?

11  A. No, I don't. My secretary did that, too. Sometimes

12     people just choose to keep their family problems to

13     themselves or they don't want it discussed anywhere

14     else.

15  Q. The secretary fills it out, but Mr. Eubank signed it?

16  A. Yes.

17  Q. Is Kathy Donavan your secretary?

18  A. Yes.

19  Q. And the next -- the clinical progress notes that start

20     at 1256 and that go onto 1257 -- or is 1257 a

21     different --

22  A. I'm looking at my own. 1256, that's your page number?

23  Q. Yes, at the bottom.

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

22

1   A.   Yes.   The back of mine would have been 1257.

2   Q.   1256 and 1257 is the clinical progress note?

3   A.   Yes.

4   Q.   Who fills that out?

5   A.   I do.

6   Q.   And that's based on your conversations?

7   A.   I kind of scribble notes.   As I'm talking to a family,

8        I'm taking notes as I'm discussing things.   They're

9        not full sentences, they're abbreviations.   I try to

10       get the gist of what people are saying to me.

11  Q.   So can you read through your notes at the bottom of

12       1256; read them into the record?

13  A.   Do you want me to extrapolate a little bit?

14  Q.   Read them directly as they are into the record and

15       then we can talk about it.

16  A.   I started out with a quotation which I guess it's

17       Mr. Eubank stating this, but when -- I ask someone, in

18       general, what they're coming in for.   It looks like he

19       said, "Mindy's been a model citizen since discharge.

20       Family therapy recommended after an admission from

21       Mindy, age seventeen.   She was almost seventeen.   May

22       20th to 29th in Bridges.   Cut wrist with no intent to

23       die."

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

23

1        Then I started to get a little bit of anybody

2        else in the family.   A five-year-old sister they say

3        is outspoken.   Issues in the home.   Were arguments

4        amongst all of them.   Dad talks a lot.   Dad gets

5        irritated.   Argues about Mindy.   Somebody said, "We're

6        learning to give each other space."

7        Other issues, I don't know if this was me

8        commenting on the session or a general issue, but

9        communication; Mindy wasn't talking at all.   I can't

10       remember if that was in session or not.   Another issue

11       is her playing one parent against the other.   I

12       believe this was probably Beth talking about her

13       husband.

14       I saw Jerry per Beth and the characteristics,

15       she was ascribing to him.   "He's judgmental.

16       Controlling.   He nags.   He won't shut up.   He's

17       overprotective.   Wants to pick Mindy's friends."   That

18       didn't really copy, but that's what it is from my

19       original.

20       Then the next page, this would have been Jerry

21       Eubank who piped in, "Dad continued to say how much

22       better Mindy is doing.   (He didn't want to dredge up

23       any issues), in parentheses, while I was trying to

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

24

1        explore the problem with them."

2        I was getting some resistance to really giving

3        me any detail and it was kind of glossed over I'm

4        thinking.   Parenting -- I was going to look at

5        parenting issues but I didn't put any notes.   I can't

6        remember anything there.

7        "Leading to more resistance to being in the

8        session."   I put, "Dad not wanting to come here."   I

9        put in quotation, "Mindy said in the session, 'We need

10       to come.   I'm still cutting.'"

11       At that point, dad was saying not to come back.

12       Mindy, upset, left the office angrily I'm sure.   "You

13       don't want to help."   I think she said that to her

14       dad, not to me.

15       At that point, she left the office and I

16       probably wound down because I probably talked to the

17       parents for a while after that, but that's the end of

18       the note.

19  Q.   Okay.   When you put in the quotes, "You don't want to

20       help.", that's Mindy saying it --

21  A.   Yes.

22  Q.   -- to her dad who said he didn't want to come back?

23  A.   Yes.

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

25

1   Q.   Do you recall whether he explained why he didn't want

2        to come back?

3   A.   No.   I didn't put it in the note.   I can't really

4        remember.   I mean, some people just don't want to work

5        on things or they think they can solve them on their

6        own.   That's the general reason why.

7   Q.   You said, "I tried to explore the problem."; what does

8        that mean?

9   A.   Then I try to look at -- you ask a lot more questions

10       than what's the nature of it.   How do they interact

11       with each other.   What has been a history of Mindy's

12       problems?   Just asking questions about specific

13       symptoms and behaviors and these aren't the greatest

14       notes in terms of me keeping notes.

15       When things are a little bit more

16       straightforward in a session, everybody is getting

17       along, talkative and willing to give the history --

18       this was a little crazier session.   I look at

19       symptoms, symptomatology, aggression, anxiety; all

20       those kinds of things.   Maybe a developmental history

21       from a child or whole history of the problem.

22  Q.   Okay.   So your impression on this was that the father

23       didn't want to be there?

PETERSON REPORTING

3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

26

1  A. Right.

2  Q. He didn't want to give you information?

3  A. Right.

4  Q. He resisted you going in deeper?

5  A. Right. In reference to what he was saying, he's

6     trying to gloss over it a little bit. She's doing

7     fine, kind of in denial of how much a problem it truly

8     was, given what had been happening. "Mindy has been a

9     model citizen." Denial there.

10 Q. Everything is fine, we don't need you?

11 A. Right.

12 Q. On the last page that I have of Exhibit Number 1, are

13    these continued notes?

14 A. No. These were notes that I took from a phone call

15    that came June 19th, 2002, which was a few days after

16    the intake. This was not a face-to-face note.

17 Q. Okay. And so what are -- can you explain what these

18    notes are?

19 A. I took a phone call, like I said before. I don't know

20    if it was Jerry or Beth who called. I'm guessing it

21    was Jerry, but he gave me a report as to what happened

22    after the session; which was the first hyphenated

23    section, I believe, and then I think the second

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

27

1     hyphenated section was what happened later. These

2     notes aren't real clear, not even for me.

3  Q. Mindy never came back into the session?

4  A. No. She never came back.

5  Q. Can you read these notes into the record.

6  A. Yep. This was the person on the phone told me -- I

7     believe this was after the session when she left my

8     office in a huff. "She went for a walk. She didn't

9     come back until the EMT, the emergency tech, was

10    called. She had a panic attack after the session.

11    She wouldn't get up and seemed attention seeking."

12 Q. This is coming from one of her parents?

13 A. One of the parents, yes. Just to follow up in terms

14    of what happened and I probably told them to call me

15    if they wanted to return and to let me know what

16    happened. Sometimes kids will do this. You kind of

17    ride it out and they come back and you work on your

18    relationship the next time.

19       He was probably calling to tell me this is what

20    happened; they didn't want to come back. The next

21    session was -- and I believe this is like many years

22    ago, "She hitchhiked home after getting out of a car

23    on Maple and Transit when mad about dinner out."

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

28

1        I believe that's something that happened not

2  right after my session, but in the few days in-between

3  there when he was talking about erratic behavior or

4  acting out behavior; disruptive behavior. Maple and

5  Transit is way up going towards Amherst, that's not

6  down here, and they were going out to dinner. They

7  wouldn't have been going out to dinner after my

8  session with them.

9        The next -- this was a reporting from one of the

10 parents describing Mindy. "She uses manipulation.

11 She's sneaky. She gets in control of the situation

12 like she did in my office." The person said, "I can

13 see how it was going. When she walked out of the

14 room, we knew where it was heading. If she's not in

15 control, she gets upset." And then in parentheses I

16 said, (per her father). That's probably who I was

17 talking to.

18       And then this sounds more like what he would

19 have said, "We're not the National Bank." They don't

20 have money to pay the co-pays or fork out money. "We

21 want to try Wyndham Lawn."; which is a higher level of

22 care that children can go to -- they can go to above

23 counseling level. Wyndham Lawn is a residential

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

29

1  facility. "She has her own issues she needs to deal

2  with them."

3        ICM; Intensive Case Management, a higher level

4  of care. It's not residential but done through

5  Wyndham Lawn. And after -- it didn't Xerox on here.

6  The other word half on there says "cancel"; which

7  means just that they don't want to come back.

8  BY MS. MERCIER:

9  Q. Okay. So did he tell you they wanted to try Wyndham

10    Lawn?

11 A. Yes.

12 Q. Wyndham Lawn is a place where she would go and live

13    outside the house?

14 A. Wyndham Lawn is residential care. Before someone gets

15    admitted to residential, I can refer -- parents can

16    seek referral themselves, too. It's outpatient.

17    It's -- they have a team of five people that go into

18    the home and work with people hands-on with parenting

19    things.

20       It's more than like a one-hour a week in my

21    office every week or every other week. They're

22    working in the community with a child; with the

23    family. They're working on things as they develop in

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

---

**30**

1    the house.

2  Q.  Okay.  On the comment about the manipulations and
3      sneakiness, did you have any discussion with the
4      father?

5  A.  If I did, I can't remember because it's not in the
6      notes.  On the phone, I'm not really going to develop
7      that conversation.  If they're not coming back,
8      there's no need for me to get back into it at that
9      point.

10 Q.  Did you have an impression, when she walked out, that
11     she was frustrated that the father didn't want to help
12     her; didn't appear that he wanted to help her?

13 A.  If I would say, I would be guessing.  I really can't.

14 Q.  You don't remember at that time?

15 A.  No.

16 Q.  Okay.  Had you looked at your partner's notes before
17     you saw the family?

18 A.  No, not back then.  Only in preparation for this.

19 Q.  Do you know if your partner continued to see Bethann
20     or Mindy after this?

21 A.  Yes.  I can give you the dates.  I have a sequence of
22     who saw who when, if you'd like me to tell you?

23 Q.  Sure.

---

**31**

1  A.  Which date do you want me to start with?

2  Q.  After your visit.

3  A.  After mine.  Mine was 6/13.  The telephone call was
4      6/19, which was the end of my contact.  Shelly saw
5      Mindy for an individual session on July 1st, 2002.  On
6      8/20/02, there's a note from Shelly that she was
7      closing the case and I think, if I'm not mistaken,
8      that was a phone call also, documented just on that
9      date, not face-to-face.

10     On 8/20/02, the case was closed under Shelly per
11     Beth.  Mindy had run away to her grandparents in
12     Florida.  There was no Mindy to treat at that point
13     and they were going in a different direction.

14 Q.  Do you know if there's a cost associated with Wyndham
15     Lawn?

16 A.  It might be more a sliding scale they have.  There
17     might be county funds that supplement it.  I don't
18     really know the ins and outs of payment for that.

19 Q.  Do you know whether there would be any cost to a
20     patient?

21 A.  If they have a sliding scale, that would imply if they
22     have income, that they would have enough to pay
23     something.  They may have to pay, but I don't really

---

**32**

1    know.

2  Q.  The -- did you have an understanding of what the
3      father's comment, "We're not the National Bank.", was
4      in connection with him saying that?

5  A.  That we don't have the money to pay for this or we
6      don't want to pay for it.

7  Q.  In the case of seeing you, it was fifteen dollars?

8  A.  Yes.

9  Q.  Were you ever provided with the records from Bridges?

10 A.  No, I wasn't.  If I continued to see the family, I
11     would have gotten a signed release to request them.
12     It would have been part of my background work to get
13     myself up to speed on everything that I could.  I
14     would have requested them, but there was no need to.
15     I just saw them once.  Shelly didn't have them.  I
16     didn't have them.

17 Q.  Do you recall them being in your office?

18 A.  Not really.

19 Q.  Do you recall the individuals?

20 A.  Just a little bit.  I see lots and lots of people.
21     When I looked, refreshed my memory with the current
22     case on-line, I could remember her, but it was like
23     nine years ago or seven years ago.

---

**33**

1  Q.  Had you been told by Jerry, the father, that he was
2      afraid to have Melinda in the house?

3  A.  My notes don't reflect that.

4  Q.  You don't have any independent recollection?

5  A.  No, I don't.  Obviously, there would have been reasons
6      for fear because of -- the hospital admission was
7      because she pulled a knife on the parents.

8  Q.  That was in the Bridges?

9  A.  Yes.  That's what led to the Bridges admission, I
10     believe.  That was before I saw Mindy and I knew that
11     because I looked at Chris Martin's psychiatric record
12     that was in Shelly's chart, but I did not have that
13     when I saw them.

14 Q.  You're not aware of that?

15 A.  That was probably told to me, but just wasn't in my
16     notes.  That's a pretty big precipitating factor.
17     Certainly parents would be worried about managing a
18     child if that was going on; worried about their own
19     safety.

20 Q.  The notes that say "cut wrist and no intent to die",
21     who would have said that?

22 A.  Me.

23 Q.  Based on --

---

34

1   A. I was trying to assess lethality issues there. People
2      will slash wrists. Sometimes they don't intend to
3      commit suicide. It can be for other different
4      reasons. My notes would reflect questioning on my
5      part.
6           Was she suicidal? Does she have a plan? Did
7      she try something very dangerous? Kids do that to get
8      attention. Personal disorders for emotions. Self
9      mutilation; something to regulate emotion.
10          They cut because it's painful. It distracts
11     from things. It doesn't necessarily mean they want to
12     kill themselves.
13  Q. That's what is --
14  A. A little bit of a gist of what I was looking for.
15  Q. At that point in time, you didn't think there was a
16     suicide risk at all?
17  A. She was out of Bridges. Hopefully she's stable by
18     then. She had just been out and --
19  Q. Okay.
20  A. Right. I'm assessing, do I need to send her back or
21     what things are going on here. There would have been
22     more questioning or more thought on my part as to
23     whether it's serious here. It's just a little snippet

35

1      of what I was thinking at the time.
2   Q. The five-year-old sister was not there; correct?
3   A. No. I never met her.
4   Q. Did anybody try to get Melinda back in the room with
5      the three of you after she walked out?
6   A. It would -- I don't believe so. I think they just let
7      her go. And that happens in my office. Sometimes
8      they'll go in the waiting room and cool off and
9      depending what the situation, how bad the person,
10     sometimes I'll go get them if I really need to.
11     Sometimes they go and cool off and come back. I don't
12     remember if her parents going out to get her, she just
13     took off. I don't think I went to get her.
14  Q. Did you recommend that they come back?
15  A. I'm sure what I generally would say is, "Let her cool
16     down." I'd like to work with you. We need to keep
17     working at this. That would be my general envision
18     for somebody to do. "This happens. You can't give up
19     on it. Kids do that. Make another appointment and
20     come back. We can keep working on this."; unless
21     someone is absolutely resistant.
22          I'm not going to psych someone to come in.
23     They're seeking treatment voluntarily, depending on

36

1      the attitude. If they don't want to come in or
2      comments about the co-pays, I'm not going to fight
3      with somebody. I invite them to come back. I go
4      along with the resistance. It doesn't phase me.
5           "You work to bring her back." That's generally
6      what you do with people. I would have worked to
7      convey that.
8   Q. Based on your notes, the father wasn't interested in
9      you helping him?
10  A. No. It didn't sound like it.
11  Q. And you can't really help people that aren't willing
12     to help themselves?
13  A. Right. Like I said before, you're kind of triaging.
14     In intake, you're observing the family; what the
15     intakes are. Who needs help. Who is the most
16     symptomatic. Where is it most important to focus even
17     if he wasn't interested.
18          You could take Mindy, she needed individual help
19     herself. Shelly was seeing the mother. The mother
20     was the open case. Mindy probably needed to be
21     identified in need of help herself.
22          Since they didn't come back to me, I didn't get
23     that. It could have led to that. Shelly and I would

37

1      have talked and figured out how to do that. My notes
2      said they weren't interested. "Trying Intensive Case
3      Management as the next approach."
4           At that point, I'm not going to argue with
5      somebody to come back. It's their decision.
6   Q. Do you know if they did anything further?
7   A. I had a release sent to me from Wyndham Lawn
8      requesting the records. I have no way of knowing if
9      they continued with that.
10  Q. Did you recommend Wyndham Lawn to them?
11  A. I don't remember if I did or not. They had been in
12     Bridges. They were probably educated as to what the
13     community resources were. I don't think I got to that
14     in this session, given the way it went.
15  Q. Did you have any contact with any of the family
16     members after the 6/19 phone call?
17  A. No. That was it for me.
18  Q. Do you and Ms. Rosen ever share patients; like cover
19     for each other for patients?
20  A. We do if we need to.
21  Q. Did you ever cover for her in visits with Beth or
22     Mindy?
23  A. No, I didn't.

38

1    Q. Do you have Shelly Rosen's records with you?
2    A. I do.
3    Q. You had not reviewed them before you saw the family?
4    A. No.
5    Q. Can you look at --
6        MS. SKORUPA: I don't have those records with
7    me.
8        MS. MERCIER: Kara, you don't have a copy of
9    them?
10       MS. SKORUPA: I didn't bring them for this
11   deposition.
12       MS. MERCIER: But she's got them with her, so
13   I'm going to ask her some questions on some of the
14   records.
15   A. On Shelly's?
16       MS. SKORUPA: Can you fax those to me now?
17       MS. MERCIER: How many are there?
18       THE WITNESS: She's got more progress notes.
19   It's not a whole lot. Shelly does not take a lot of
20   detailed notes. It's in here. The bookkeeping part
21   is in here.
22       MS. SKORUPA: I mean, if we're going to ask her
23   questions, I'd like to have them in my hands.

40

1    A. This is what we both use.
2    Q. And so on the current symptom checklist, what -- why
3    would -- I'm not asking about this particular one, but
4    why would you or Shelly check one of these boxes; what
5    is that?
6    A. It's a format they give; less writing to do. This
7    kind of checks mental status.
8    Q. Would this be a current symptom checklist based on
9    what a patient would tell you or both?
10   A. Both.
11   Q. Under the name of those attending the session at the
12   top half of this page there's something written there?
13   A. "Beth Eubank".
14   Q. And under the mental status, again, are these boxes
15   checked based on what a patient reports as well as
16   what your observation is?
17   A. Either/or. They may tell us, but they're
18   observations, too.
19   Q. Can you read the notes as best you can from the bottom
20   of page --
21   A. "Beth presents as an alert and oriented white female.
22   Her affect is sad; tearful." I can't read the next
23   one. Let's see. I think, "They were sent by

39

1        MS. MERCIER: Let me see how many there are.
2    What is your fax number?
3        MS. SKORUPA: (561) 627-5734.
4        THE WITNESS: Also there's a psychiatric --
5        MS. MERCIER: We can go off the record.
6    (Whereupon a discussion was held off the record.)
7        MS. MERCIER: Sure. I'll let the court reporter
8    go on the record to put your objection on there.
9        MS. SKORUPA: I'm going to object to
10   Ms. Douglas reading the clinical progress notes of
11   Ms. Rosen into the record.
12   BY MS. MERCIER:
13   Q. Okay. How long have you been partners with Shelly
14   Rosen?
15   A. Since 1995.
16   Q. And have you, over the last fourteen years, reviewed
17   records of hers?
18   A. Yes.
19   Q. All right. Can you look at the progress note which is
20   dated March 20th, 2002?
21   A. Yes.
22   Q. And have you seen this kind of a clinical progress
23   note before; not this document, but --

41

1    sixteen-year-old something behavior runaway at Casey
2    House."; referring to their daughter, Melinda. "She
3    will return next week or next something."
4    Q. Okay.
5    A. It's just hard to read that.
6    Q. Sure. Let's go to the progress note.
7    A. A genogram, which is a family tree which we kind of
8    write out and draw out ourselves to help sort out
9    family stuff --
10   Q. Okay. And can you explain what this says and read it
11   as best you can.
12   A. Actually, I looked at this last night and Casey asked
13   me these things and I highlighted things I could read.
14   It just basically gives a family tree. It has the
15   parents together. If they're married, divorced;
16   certain lines. These two are married. It's a solid
17   line.
18   Q. Because this is a record, we need to identify it.
19   There's a line in about the middle of the page and on
20   the right side of the page, there's a circle and it
21   has -- looks like the word "Beth" in it and on the
22   left there's a square or rectangle and looks like
23   "William"?

---

42

1  A. Yes.

2  Q. That's what you were referring to, the parents?

3  A. Yes. Squares are males; circles are females.

4  Q. Okay.

5  A. How do you want me to describe this?

6  Q. And so then there's lines coming down from the

7     parents' line?

8  A. You've got -- it's generational. You may start out

9     basically a parent, a father, a husband and wife and

10    then the lines coming down with more circles are their

11    children. In this case, these two were adopted.

12      In actuality, there would have been other

13    parents that should have been there. They're adopted

14    children, not birth children. Mindy is sixteen years

15    old. We go from oldest to youngest, from left to

16    right. Mindy is a sixteen-year-old on the left. On

17    the right is the four-year-old child, also adopted.

18    And then you go up generationally; you do the line

19    going up from William, would be his parents, and "X"s

20    would mean deceased.

21      Beth's side, you go to her parents and you can

22    put names and ages and just significant life events to

23    try to patch things together. If there's a history of

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

43

1    alcoholism, suicidal tendencies, depression, you can

2    make a note of it. It's a quick way to do a history

3    and go back. That's what you're saying.

4      There's not a whole lot on the other generation.

5    You're seeing it down below. The notes that Shelly

6    put were in relation to Mindy on here, as given by

7    Beth. It would have been done on the first intake

8    session we refer to on 3/20; you want me to give the

9    descriptions?

10  Q. Sure, best you can.

11  A. I can. I looked at these last night. Looks like "the

12    past three years" would have been probably describing

13    how long the problem had been developing. "She was

14    adopted from Korea." Describing her mental status or

15    her behavior, "She went into rages. Held a knife to

16    Beth." That preceded the hospitalization.

17      There's a note on William that he was another --

18    it's another psychosocial stressor; "William, losing

19    his job after twenty-seven years of being there. Akzo

20    Nobel is the place he worked. It was going out of

21    business."

22      Moving further on this in reference to Mindy,

23    there's a note that says, "She was sexually molested

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

44

1    at age four by Beth's nephew. Casey House runaway."

2    That means Mindy was there at the time Beth

3    talking to Shelly. She had run to Casey House and was

4    probably there.

5      "Trouble at school last year." Just a basic

6    school question. "Stole" -- I can't read some of

7    this, but she stole "a hundred dollars" from somebody.

8    I can't read that.

9      Then there's notes on the other adopted sibling.

10    I can't really pronounce her name. She's biracial.

11      "Alcohol in the mother"; probably referring to

12    the adopted child. There's notes on Beth, but I can't

13    really read them.

14  Q. Okay.

15  A. "Verbal arguments describe between" -- that's on top

16    of the line "between", so there was marital arguing

17    between the two of them. And I'm assuming, from what

18    I know, the whole family had a lot of arguing.

19      And the other stuff is really not pertinent, but

20    as far as I can see --

21  Q. Okay. Up at -- the circles are females?

22  A. Females deceased with an "X" in it.

23  Q. Beth's mother is deceased?

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

45

1  A. Yes. There's a note, "Lou Gehrig's disease". She

2    must have had that. Also, "molested by her

3    grandfather"; that would have been Beth's mother.

4  Q. Okay. If you go to the progress note on April 9th of

5    2002, under the names of those attending the

6    session --

7  A. This one, it's open under Beth Eubank, but the names

8    of those attending the session would be Beth -- I

9    can't read it. It looks like mom and dad and then

10    there's another name. It looks like -- it's hard to

11    read. It looks like Beth again. I'm thinking Mindy

12    is at that session.

13  Q. You can't really tell that?

14  A. I can't tell that.

15  Q. That's fine. Can you read any of the notes at the

16    bottom?

17  A. What I highlighted, I could read. "Had stayed at

18    Casey House for two weeks."; that would be referring

19    to Mindy, which would be Beth reporting that. All

20    right. Let me try from the beginning.

21      "Beth presents as alert and well-oriented. Her

22    affect was -- I think it looks like -- cogent"; it's

23    not right. Coherent or something.

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

46

1   Q. If you don't know, that's fine.
2   A. The content big -- I can't read it.
3   Q. Don't guess.
4   A. I think now -- "now is at home." I can read that.
5      That would have been Mindy. This is just very, very
6      general. I can't -- "We'll see again in two weeks.",
7      at the bottom. I can't really read anything else.
8   Q. How about on April 15th?
9   A. Beth is the client. Mindy is the person being seen in
10     session and I believe, since it's just Mindy's name,
11     it might have been just Mindy; the notes would reflect
12     a conversation with her.
13  Q. Can you read any of the notes at the bottom?
14  A. "Mindy presents as alert and well-oriented. On the
15     other hand, her affect is sad." It looks like she's
16     just put general notes of exploring what her history
17     of abuse is. "Being adopted. Helping her verbalize
18     feelings" is in there somewhere. "Verbalizing
19     feelings. Getting the history of abuse and being
20     adopted."
21  Q. Is that N-I-T?
22  A. I think it's R slash T, but I can't remember what
23     Shelly means by that.

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

47

1   Q. Okay. And then, "She'll return in two weeks."; that's
2      what you said on the bottom?
3   A. Yes.
4   Q. How about on April 22nd?
5   A. Again, this was a session for Mindy. "She presents as
6      alert and well-oriented. Her affect was less
7      depressed." That's the D-E-P; less depressed. "Less
8      angry."
9         I can pick out just a few words. "Looking at
10     the source of her anger." It's hard to -- "she will
11     return in two to three weeks." I can't really read
12     it.
13  Q. Okay. May 9th.
14  A. Same thing. "Mindy presents -- "Mindy and her mother.
15     Mindy presents as alert and well-oriented. Her affect
16     is less depressed, less anxious." I'm just trying to
17     read this.
18  Q. Okay.
19  A. Something about "working on coping skills". It looks
20     like the word "adoptions", I'm not sure. "Will see
21     Dr. Martin", referring to a psychiatric eval coming
22     up, and Shelly is going to see her again in two weeks.
23  Q. Okay. And June 4th?

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

48

1   A. This was again an individual meeting with Mindy from
2      the looks of it. "Mindy presents alert and
3      well-oriented. Her affect was anxious." The "W" --
4      it looks like a "W", it might be a "CL" for client,
5      it's a guess. "Client is" --
6   Q. If you can't read it, don't guess.
7   A. Something, "is discharged from Niagara Falls Memorial
8      Hospital for cutting wrist. On Zoloft." That would
9      have been after the admission -- after the discharge
10     from the hospital. "Upset with ex-boyfriend, Dave."
11     I think that was seen as the trigger for the admission
12     in her acting out.
13        Something about her boyfriend -- "not happy with
14     him". I don't know if it's describing her throughout
15     the session, but I don't know what that word is
16     (indicating).
17  Q. That's fine. And so that would have been -- June 4th
18     would have been before you saw the family?
19  A. Yes, that was a week before.
20  Q. And then the next record that you have is July 1st?
21  A. Yes. So I had seen her in-between there. I had seen
22     her on 6/13 then with her family, her dad, and 7/1 is
23     when she went back to Shelly.

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

49

1         "Melinda presents as alert and well-oriented.
2      Her affect is congruent with regard to content."
3      Basically her mood matched what she was saying.
4      Sometimes somebody can be laughing when they're
5      talking about something serious; it doesn't match.
6         "She was presenting herself pretty well that
7      day. It was consistent with the content by
8      individual. Focus with" -- something, I don't know.
9      I can't really read it.
10  Q. You don't have to read it. How about 8/20?
11  A. This -- I believe this is one of our telephone sheets.
12     It's not a session. It's not a face-to-face. It
13     was -- client is Mindy. The caller was Beth Eubank.
14     The date of the content, August 20th, '02. There's a
15     telephone number.
16        The summary was to Shelly that, "Mindy has run
17     away several times over the past few weeks. Finally
18     ended up at grandparents' home in Florida. Beth
19     is" -- something. That, "Mindy had -- something and
20     something -- and they've reached their limits." I
21     don't know.
22        Something -- "stolen money and articles from the
23     family home, et cetera". So Mindy had left at that

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

50

1    point and apparently Beth didn't want to continue with
2    Shelly and Shelly is saying, case closed.
3  Q. Okay.  And there's a letter in here directed to Shelly
4    Rosen from Dr. Martin on June 2nd; did you see this
5    letter before you saw the family?
6  A. No, I didn't.  Just in preparation for this today.
7           MS. MERCIER:  Okay.  I don't need to ask you any
8    questions on that.  I'm going to mark these exhibits
9    as Exhibit Number 2 for the deposition.
10          When you get a chance after, you can give me a
11   thing (indicating).
12          That's all the questions I have.  Kara, do you
13   have any questions?
14          MS. SKORUPA:  No, I don't.
15          MS. MERCIER:  Thank you, Ms. Douglas, for your
16   time.
17          THE WITNESS:  You're welcome.
18          MS. MERCIER:  This ends it.  (Whereupon the
19   deposition concluded at 11:10 a.m.)
20
21   (Whereupon the reporter marked Exhibit 1, records of
22   Ms. Douglas, for identification.)
23   (Whereupon the reporter marked Exhibit 2, a letter

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

51

1    to Shelly Rosen from Dr. Martin dated June 2nd, for
2    identification.)
3    (Whereupon the deposition concluded at 11:15 a.m.)
4
5                  (Whereupon the following stipulation
6                  was entered upon the record:
7                      It is hereby stipulated by and
8                  between the attorneys for the
9                  respective parties hereto, that the
10                 oath of the Referee is waived; that
11                 filing and certification of the
12                 transcript are waived, and that all
13                 objections except as to the form of
14                 the questions are to be reserved
15                 until the time of trial.)
16
17        *  *  *  *  *  *  *  *
18
19
20
21
22
23

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

52

1              **WITNESS SIGNATURE CERTIFICATION**
2
3       I, *SARAH DOUGLAS*, the witness whose testimony
4    appears hereinbefore do hereby certify
5    and sign my name saying that I have read my
6    foregoing testimony of the official transcript of
7    proceedings in this action, and that I agree
8    with the content and accuracy of said testimony.
9
10      IN WITNESS WHEREOF, I have hereunto
11   subscribed my name.
12
13
14   ----------------------------------------------
             SIGNATURE OF WITNESS
15
16
17   --------------------------------
         SIGNATURE OF NOTARY PUBLIC
18
19
20   -------------------------------
     DAY     MONTH      YEAR
21
22
23

PETERSON REPORTING
3293 HICKOX ROAD, HAMBURG, NEW YORK 14075

---

53

1  STATE OF NEW YORK     )
                          :  ss.
2  COUNTY OF ERIE        )
3      I WISH TO MAKE THE FOLLOWING CHANGES, FOR
4  THE FOLLOWING REASON:
5  PAGE      LINE      CHANGE:
6            REASON:
7
8            CHANGE:
             REASON:
9
10           CHANGE:
11           REASON:
12
13           CHANGE:
             REASON:
14
15           CHANGE:
16           REASON:
17
18           CHANGE:
             REASON:
19
20   --------------------------------
21       (WITNESS SIGNATURE)
     SUBSCRIBED AND SWORN TO BEFORE ME THIS
22   _____ DAY OF_____, 20 ___.
23   NOTARY PUBLIC

PETERSON REPORTING
65 PHILSON DRIVE, ORCHARD PARK, NEW YORK 14127

```
 1              C E R T I F I C A T I O N
 2   STATE OF NEW YORK
     COUNTY OF ERIE
 3
 4          I, LISA A. PETERSON, Notary Public in and for
 5   the State of New York do hereby certify:
 6          That the transcript appearing hereinbefore was
 7   taken pursuant to notice at the time and place as
 8   herein set forth; that said transcript was
 9   stenographically recorded through machine shorthand by
10   me and thereafter computer transcribed into laser
11   printing.
12          I HEREBY CERTIFY, that the foregoing transcript
13   is a full, true and correct transcription of my
14   machine shorthand notes so taken.
15          IN WITNESS WHEREOF, I have hereunto subscribed
16   my name and affixed my stamp this 2nd day of November
17   2009.
18
19                    PETERSON REPORTING
                      3293 Hickox Road
20                    Hamburg, New York 14075
                      Telephone (716) 649-2233
21

22                    BY:_____
                         LISA A. PETERSON
23
                      PETERSON REPORTING
            3293 HICKOX ROAD, HAMBURG, NEW YORK 14075
```

The Center for Family Therapy - The Bewley Building , Suite 508, Lockport, N.Y. 14094

# Clinical Progress Note

Name of Client _William Eubank_          Date of Session _6-13-02_

Clinician Signature _S. Brandt_          Type/Duration _Intake_

Names of those attending session _Jerry w/ Parents — Mindy_

## CURRENT SYMPTOM CHECKLIST

| | | | |
|---|---|---|---|
| Depressed Mood | ☐ | Dissociative Behavior | ☐ |
| Suicidal Ideation | ☐ | Aggressive Behavior | ☐ |
| Fatigue/Low energy | ☐ | Conduct Problems | ☐ |
| Anxiety/Panic | ☐ | Oppositional Behavior | ☐ |
| Mood Swings | ☐ | Appetite Disturbance | ☐ |
| Irritability | ☐ | Sleep Disturbance | ☐ |
| Poor Concentration | ☐ | Psychotic symptoms | ☐ |

## Mental Status

| | | | | | |
|---|---|---|---|---|---|
| Affect: | Appropriate ☐ | Labile ☐ | Expansive ☐ | Blunted ☐ | |
| Mood: | Normal ☐ | Depressed ☐ | Anxious ☐ | | |
| Appearance: | Well-groomed ☐ | Disheveled ☐ | Inappropriate ☐ | | |
| Motor Activity: | Calm ☐ | Hyperactive ☐ | Tense ☐ | Withdrawn ☐ | |
| Thought Process: | Intact ☐ | Loose ☐ | Flight of Ideas ☐ | | |
| Hallucinations: | Auditory ☐ | Visual ☐ | Olfactory ☐ | Command ☐ | |
| Delusions: | Paranoid ☐ | Grandiose ☐ | Reference ☐ | | |
| Memory: | Intact ☐ | Impaired. Immediate ☐ | Recent ☐ | Remote ☐ | |
| Judgment: | Intact ☐ | Impaired ☐ | Immature ☐ | | |
| Insight: | Adequate ☐ | Impaired ☐ | Immature ☐ | | |

NOTES: "Mindy's been a model citizen since d/c"

(age 17) Family therapy rec'd. after an admission for Mindy @ (May 20-29 in Bridges). Cut wrist & no suicidal intent to die.

3 y.o. — sister
3 y.o. — outspoken

"Arguments" — amongst all
— Dad talks a lot
— Dad gets irritated
— argue re: Mindy
We're learning to give each other space

— Communication — Mindy wasn't talking at all
— Playing one parent against the other

— Judgmental
Controlling        Jerry
won't shut up      (per Beth)
nosy
overprotective  ↓ Mindy

NPP 1256

Dad continued to say how much better Mindy's doing —
didn't want to dredge up issues — (while I tried
to explain problem)

<u>Parenting</u> —

Dad not wanting to come — here

" Mindy — we need to come. I'm still cutting "

Dad saying <u>Not to come back</u>
      Mindy upset — left — "you don't want
                    office            to help "

*Eubank*

# The Center for Family Therapy, L.L.C.

**The Bewley Building - Suite 508**
**Lockport, New York 14094**
**(716)-434-7430**

*Call 6/19/02*

**Sarah Brandt, csw-r and Shelly Rosen, casac, csw-r**

632-9328
x 138 (w)

- She went for a walk. didn't come back until the EMT called - she'd had a panic attack after session. Wouldn't get up, seems attention seeking

- hitch hiked home after getting out of car on Maple & Transit when mad about a dinner out

manipulation / sneakiness - she gets in control of the situation like in my office. I can see how it was going. When she walked out of the room we knew where she was heading. If this not in control she gets ups
(per father)

We're not the National Bank

Wants to try Wyndham Lawn.

She has her own issues she needs to deal with ↔ IDM,

NPP 1258

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

ESTATE OF MELINDA DUCKETT,
by and through her personal representative,
KATHLEEN CALVERT, and BETHANN
EUBANK and WILLIAM GERALD
EUBANK, as legal parents of MELINDA
DUCKETT, and as grandparents and next
friends of T.D., a child, and M.E., a minor
sibling of MELINDA DUCKETT,

      Plaintiffs,

v.                        CASE NO.:  5:06-cv-444-WTH-GRJ

CABLE NEWS NETWORK LLLP (CNN),
a Delaware corporation, NANCY GRACE,
individually and as an employee/agent of
CNN, various unnamed producers of the
"Nancy Grace" show, JOSHUA DUCKETT,

      Defendants.

_____/

## DECLARATION OF CLARICE McCLURE

Pursuant to 28 U.S.C. § 1746, I, Clarice McClure, under penalty of perjury, declare as follows:

    1.    I am over the age of eighteen (18) years, and am competent to testify to the matters contained herein from personal knowledge and a review of all available relevant records.

    2.    I am the Vice President of Family & Children's Service of Niagara, Inc., a/k/a Casey House Youth Shelter ("Casey House") located in Niagara Falls, New York.  I am the records custodian for Casey House.

    3.    The attached documents that have the added bates numbers NPP 0953 through NPP 0974 (the "Records") are true and accurate copies of Casey House records that are

responsive to the subpoena served on Casey House dated July 8, 2009.

4.    The Records were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters.

5.    The Records were kept in the course of the regularly conducted business activity of Casey House.

6.    The Records were made by the regularly conducted activity of Casey House as a regular practice.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on January 27, 2010.

Clarice McClure

**CONFIDENTIAL**

## CASE SUMMARY

CLIENT'S NAME: Melinda Eubank                    CLIENT #: 649

Dates of stay at CH: 3/10/02 to 3/25/02        Number of times at CH: 1

Case Manager: Lisa Sankey

Where did client go? home

Address and telephone where the youth can be reached:

4326 Sunset Drive, Lockport

Notification date/time: 3/25/02 3:10pm    By: Kim Pooch

To Whom & relationship: Picked up by Beth Eubank ~ mother

Case Summary: Youth came to shelter on referral from Lockport H.S. She eluded to physical and emotional abuse by parents at first but recanted and said the problem was that her parents are strict and don't trust her because of some past behaviors. Youth was molested as a child and has been known to harm herself. She has never had counseling to help her deal with it. Parents are a bit smothering and overprotective. Many problems in this family and counseling was suggested as a means to help the family work through these issues.

Behavioral concerns during stay: NONE

Medical concerns during stay: NONE

Readmittance concerns?    Yes ✓    No ____

**CONFIDENTIAL**

## CASE/HOUSE INTAKE 2001

NAME: MELINDA EUBANK _____ AGE: 16 DOB 8-14-85 RACE A

DATE: 3-12-02 TIME: 2:51 AM/PM DATES OF MOST RECENT STAY: _____

LAST ADDRESS: 4325 SUNSET DRIVE _____ ZIP CODE: 14094

CITY: LOCKPORT _____ COUNTY: N/A _____ TELEPHONE: 434-9938

MARITAL STATUS: S _____ PRIMARY LANGUAGE: ENGLISH _____ REFUGEE: yes or no

CUSTODIAL PERSON: WILLIAM & BETH EUBANK _____ RELATIONSHIP: PARENTS

ADDRESS: SAME _____ CITY: _____ PHONE: _____

YOUTH'S REASON FOR REQUESTING SHELTER: HAVING DISAGREEMENTS
AT HOME ABOUT VARIOUS ISSUES ~ YOUTH STATES THERE IS SOME
PHYSICAL FIGHTS (SCRATCHES, BEING PULLED & PUSHED) AND EMOTIONAL
ABUSE. SAYS SHE DOES NOT LIVE UP TO PARENTS EXPECTATIONS.

_____

### PARENTAL NOTIFICATION

STAFF: LISA SANKEY _____ DATE: 3/12/02 TIME: 4:20 pm

TO WHOM: Beth Eubank _____ RELATIONSHIP: mother

PHYSICAL CONDITION AND REASON FOR YOUTH BEING AT SHELTER DISCUSSED YES/NO

PHYSICAL CONCERNS: NONE _____

_____

BEHAVORAL CONCERNS: NONE _____

_____

### RESIDENTIAL HISTORY (last year)

| DATES | ADDRESS | WITH | REASON FOR LEAVING |
|---|---|---|---|
| | LIVED AT ABOVE ADDRESS ALL HER LIFE | | |
| | | | |
| | | | |

1

CONFIDENTIAL

**PLACEMENT HISTORY** (If placed when, where and why)

NONE

**EDUCATIONAL**

ATTENDING (YES) NO   SCHOOL: LOCKPORT HIGH   GRADE: 10

COUNSELOR: MRS. ISHERODD   DETENTIONS? YES (NO)

WORKING: (YES) NO   WHERE: YELLOW GOOSE - P1
WORK P1 FOR DAD'S BUSINESS

**PHYSICAL:**

CURRENT CONDITION: GOOD

TAKING MEDICATION (YES) NO (FILL OUT MED SHEET)

ALLERGIES: CATS, CHERRYS, ANY FORM OF PENICILIAN

IS YOUTH SEXUALLY ACTIVE: N   DOES YOUTH PRACTICE BIRTH CONTROL: ____

WHAT METHOD: ____

IS YOUTH INTERESTED IN HIV/ BIRTH CONTROL INFORMATION: NO

IF FEMALE

DOES SHE BELIEVE SHE IS PREGNANT: Y (N)   TESTED? Y / N

IF PREGNANT, HOW LONG? ____   PRE-NATAL CARE: Y / N

YOUTH'S CHILDREN - ( NAME, AGE AND WHERE ARE THEY LIVING)
NO

HAS THE YOUTH CONTEMPLATED SUICIDE: NO   ( IF YES FILL OUT SUICIDE RISK ASSESSMENT)

NUMBER OF ATTEMPTS: ____   NUMBER OF HOSPITALIZATIONS: ____

DATES AND DURATION: NONE

ALCOHOL/ SUBSTANCE USE (WHAT AND HOW OFTEN): NO

RELIGIOUS PREFERENCE: PROTESTANT

2

**CONFIDENTIAL**

## LEGAL

HAS YOUTH BEEN CHARGED WITH A FELONY OR MISDEMEANOR? (CIRCLE) __NO__

IF YES, WERE DRUGS OR ALCOHOL INVOLVED? __NO__

IS YOUTH CURRENTLY ON PROBATION OR SUSPENDED SENTENCE? __NO__

IS YOUTH ON PINS OR PENDING IN COURT? __NO__

PROBATION OFFICER _____

LAW GUARDIAN _____

IS THE YOUTH INVOLVED WITH IMMIGRATION/NATURALIZATION? __NO__

ARE THERE ANY WARRANTS OR MISSING PERSONS REPORTS (CIRCLE) __NO__

COURT HISTORY: __NONE__

## FAMILY

MOTHER __BETH EUBANK__    FATHER __WILLIAM EUBANK__

STEPFATHER _____    STEPMOTHER _____

SISTERS __MOYONA__    AGE __4__    BROTHERS _____    AGE _____

MOTHER'S PLACE OF WORK: __WESTERN DIVISION CREDIT UNION    8am-2pm__
__WILLIAMSVILLE__

OCCUPATION: _____    TELEPHONE __632-9328 X138__

FATHER'S PLACE OF WORK: __SPIER ENTERPRISES / EXXON MOBIL CHEMICAL PLANT__

OCCUPATION: __SELF EMPLOYED / UNKNOWN__    TELEPHONE __778-8554 x 118 or 119__

DOES FAMILY RECEIVE: _____ FOOD STAMPS _____ LOW INCOME HOUSING _____
AFDC _____ SSI _____ OTHER ASSISTANCE _____

HAS THERE EVER BEEN AN ABUSE/NEGLECT REPORT ON THE YOUTH? __NO__    CURRENT? _____

IF YES WHEN AND FOR WHAT. _____

3

**CONFIDENTIAL**

## POTENTIAL RESIDENTIAL RESOURSES:

| NAME | ADDRESS | TELEPHONE | RELATIONSHIP |
|------|---------|-----------|--------------|
| | | | |
| | | | |
| | | | |
| | | | |

## RECREATIONAL ( WHAT DOES THE YOUTH LIKE TO DO)

READ, WRITE, LEARN ABOUT COMPUTERS, PHONE CALLS
KICK-BOXING, WORKING, LIKES CARS

## SUMMARY OF PRESENTING PROBLEMS

POSSIBLE DOMESTIC VIOLENCE ~ YOUTH CLAIMS THAT PHYSICAL ALTERCATIONS
ARE MINOR BUT 1/W FEELS SHE IS HOLDING BACK. EMOTIONAL ABUSE
ALSO - YOUTH HAS LOW SELF-ESTEEM AND FEELS THAT SHE
IS OVERREACTING BY BEING HERE. PARENTS WOULD NOT LET
HER LEAVE HOME TODAY AND GO TO SCHOOL THEREFORE SHE
WENT OUT THROUGH WINDOW.

## HOW DOES PARENT WANT TO SEE THE CRISIS RESOLVED

Parents don't know what to do ~ Mindy out of control
been suspended 2x within 3 weeks ~ has temper tantrum)
when she doesn't get her way. Boyfriend might be contributing
to the problem.

## INITIAL SERVICE PLAN

4

NPP 0959

**CONFIDENTIAL**

## SUICIDE RISK ASSESSMENT

NAME _MELINDA EUBANK_          DATE _3-12-02_

AGE _16_                    CASE NUMBER _____

|  | YES | NO |
|---|---|---|
| 1. Have you had any recent losses like, leaving home, death in the family break up with boyfriend/girlfriend in the past 3 months (circle & explain) _Grandfather died_ | ✓ |  |
| 2. Do you feel like you have no one to count on like friends or family? |  | ✓ |
| 3. Do you have a history of self destructive behavior like self mutilation, Reckless behavior, prone to accidents, alcohol abuse or drug abuse? (circle and explain) _____ |  | ✓ |
| 4. Do you experience big mood swings? |  | ✓ |
| 5. Have you ever been treated for mental illness? |  | ✓ |
| 6. Has a family member either attempted or committed suicide? If yes, explain _____ |  | ✓ |
| 7. Have you ever thought about suicide? If yes explain _____ |  | ✓ |
| 8. Have you ever attempted suicide?   a. When and how. _____   b. Were you hospitalized? ___ Where? _____   c. Did anyone know of the attempt? Who? _____ |  | ✓ |
| 9. Do you regret you were unsuccessful? |  | ✓ |
| 10. Do you plan to try suicide again? If yes When and how. _____ |  | ✓ |
| 11. Do you hear voices telling you to harm or hurt yourself? |  | ✓ |
| 12. Do you want to hurt yourself now? |  | ✓ |

**\*\* YES answer to any questions 9 thru 12 should be considered HIGH RISK \*\***

Worker's evaluation of Risk:

( ) HIGH      ( ) MODERATE      ( ) LOW      (✓) NO RISK

Suggested action _____

STAFF _[signature]_                    DATE _____

CASE MGR _[signature]_                DATE _3-12-02_

CONFIDENTIAL

## Work Sheet

STAFF PERSON: Lisa Sankey

DATE: 4-6-02          CLIENT NAME: Mindy Eubank

AGE: 16          SEX: F          RACE: Asian

RETURN RESIDENT: NO____ YES X____ FILE # 649

CONTACT PERSON: Mindy Eubank/ William Eubank

CUSTODIAL PERSON:

ADDRESS: 4325 Sunset Dr., Lockport

PHONE: 434-0938          WORK

T/w rec'd call from DeDe @ CH stating that Mindy had called and would only speak to me. I called M. back and she was crying and very upset. She and parents had a fight over the music that she listens to and from there the parents started bringing up a lot of other issues and Mindy felt backed up against a wall. They do not listen to her and make a lot of assumptions and decisions about/for her. They were supposed to be in counseling but cancelled first appt. Another is scheduled for 4/9 but Mindy is doubtful that it will help. T/w also talked to Bill Eubank who said that he felt the music M. listens to makes her angry, he went on to say that he feels she shouldn't date Dave anymore because he ties, they feel she is bulimic (Mindy says she had a stomach bug - but is better now) and they are concerned because Mindy is reading a book about Malcolm X (M states it is a school project). T/w told Dad that he needs to back off a bit and let her make her own decisions ~ they need to trust her judgements. As far as the bulimia goes ~ they should express this concern to their counselor so that he/she can discuss it w/Mindy. I also told him it was imperative that they begin counseling as these issues are only scratching the surface of a much bigger problem. I then spoke again to Mindy who had calmed down a bit but was still upset. She asked that I come see her in school next week and also asked if she could call C.H. if she needed to talk to me again ~ I assured her that she could.

NPP 0963

CONFIDENTIAL

**CASEY HOUSE**
**CLIENT FOLLOW-UP**

NAME: Mindy Eubank          DATE: 4-5-02

CURRENT ADDRESS: 4326 Sunset Drive, Lockport

TELEPHONE: 434-9938

TYPE OF CONTACT: telephone

CONTACT PERSON: Mindy

REPORT OF CONTACT: Mindy reports that things are going okay ~ she has been doing a lot of babysitting and is looking forward to getting back to school. She seemed very hesitant to talk (parents were heard in the background) and when I asked if she would like me to come out to school to talk to her she said she would look forward to it. She did mention (in a whispered voice) that when she got home she became sick and couldn't keep anything down for a few days and her Dad thought she was doing it on purpose. They have not yet attended counseling (appt. was cancelled) but she thinks they will be going next week.

CASE WORKER: _[signature]_

NPP 0964

CONFIDENTIAL

## CASEY HOUSE
## CLIENT FOLLOW-UP

NAME: Melinda Eubank          DATE: 4-16-02

CURRENT ADDRESS: 4325 Sunset Drive, Lockport

TELEPHONE: 434-9938

TYPE OF CONTACT: face to face

CONTACT PERSON: Mindy

REPORT OF CONTACT: Spoke to Mindy at Lockport H.S. ~ She reports that things are getting better at home ~ parents have eased up a bit. She is involved in kick-boxing and explorers club and is looking for a part-time job. She seems to be in good spirits but said she is somewhat upset because her parents are probably adopting another child ~ so there will be 3 girls in one bedroom and she feels she will get stuck babysitting. Mindy is also involved in counseling and says that it is helpful.

CASE WORKER: Lisa Clarkey

NPP 0962

**CONFIDENTIAL**

## CASEY HOUSE
### CLIENT FOLLOW-UP

**NAME:** Mindy Eubank          **DATE:** 4-25-02

**CURRENT ADDRESS:** 4325 Sunset Dr., Lockport

**TELEPHONE:** 434-0938

**TYPE OF CONTACT:** telephone

**CONTACT PERSON:** Mindy

**REPORT OF CONTACT:** Mindy called because she is fighting again with her parents. This time they accused Mindy of taking her sisters toy out of spite. They are threatening to put her in placement and no longer want her to be in counseling because they say it is too much of an expense and too time consuming. Mindy does not want to run away but is considering other options (she states that adult family friends have offered to let her stay with them). She does not want to do anything drastic right now but feels that if things don't get better she will not have any other choice.

**CASE WORKER:** Lisa Sharkey

NPP 0961

CONFIDENTIAL

Lisa,

Last night I called my parents for the first time since last Tuesday. I was ready to talk to them and resolve things but it all blew up in my face. Deede had to talk to them and they were told to call you this morning. I don't want to stay here any longer but I heard that if I went to a friends, my parents could call the police, have me brought back here, put on PINS (I'm not positive what that is) and after that I could be sent to a detention home if it went through court or some process like that. I do not want anything like that to happen and now I feel that I need your help more than ever. I don't belong here and I don't want to stay. Its nice but its not where I want my future headed. Please set up a meeting with my parents, here or wherever else ASAP and I will see you when I get back from school. I want things to work out with my parents but last night I was under the impression that they won't change no matter what I do. I want to leave but they don't seem to want to resolve things, leaving me between a rock and a hard place. Thank you for your help.

P.S. I hope this is understandable. I'm in a rush. In a nutshell, I'm scared and I want out of this whole situation. the most positive way out would be to resolve things w/ my parents.

Sincerely,

Mindy Eubank

## DECLARATION OF _Kristine P. Spada, RHIA_

Pursuant to 28 U.S.C. § 1746, I, _Kristine P. Spada_ under penalty of perjury, declare as follows:

1.      I am over the age of eighteen (18) years, and am competent to testify to the matters contained herein from personal knowledge and a review of all available relevant records.

2.      I am the _Director, HIM_ of Niagara Falls Memorial Medical Center ("NFMMC") located in Niagara Falls, New York.  I am the records custodian for NFMMC.

3.      The attached documents that have the added bates numbers NPP 0646 through NPP 0786 (the "Records") are true and accurate copies of NFMCC records that are responsive to the subpoena served on NFMCC dated May 7, 2009.

4.      The Records were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters.

5.      The Records were kept in the course of the regularly conducted business activity of NFMMC.

6.      The Records were made by the regularly conducted activity of NFMMC as a regular practice.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on October _15_, 2009.

_Kristine P. Spada, RHIA_

**PSYCH HISTORY**
**Niagara Falls Memorial Medical Center**
NIAGARA FALLS, NEW YORK 14302

Name: Eubank, Melinda M
MR#: 366697
Admission Date: 05/20/2002
Attending Physician: Samson Adegbite, M.D.

Date of Birth: 08/14/1985
Location: S2 S243 2

## THIS REPORT IS NOT TO BE RELEASED WITHOUT THE PERMISSION OF THE DICTATING PHYSICIAN

CHIEF COMPLAINT: "I got into a fight with my parents."

HISTORY OF PRESENT ILLNESS: Melinda Eubank is a 16 year old adopted Korean female who was admitted to our facility today after an outburst at home where she argued with her family and apparently grabbed a knife and cut her wrist superficially. This came after an argument about whether or not she would be allowed to have friends come over for a party by her description. Melinda claims that her mother said this was not allowed yet states that her father told her that she could have friends over. In defiance she refused to go to school today and during the argument she herself called the police to intervene "because I knew that if I didn't my parents would." Melinda has been having increasing problems for the past year if not two with mood instability, escalating defiance and oppositionality towards her parents, and outbursts of uncontrolled anger. Her mother describes that she has always been somewhat headstrong if not aggressive but there has been a significant increase in this over the past year especially. Melinda tends to minimize the description that her parents provide. She does admit to being moody and irritated with her parents on occasion. She also admits to "having an attitude for a long time." She recognizes this as causing some interpersonal difficulties for her and does describe herself as "hot tempered." She adds that she does get angered easily in places outside the home but feels more comfortable acting out in the home environment. In particular she feels that if she does this at school she will get in trouble. Melinda's mother claims that towards the end of the school year last year Melinda was in trouble after stealing a student teacher's purse. She had also thrown bleach on another student. In this past year both parents have become increasingly concerned about Melinda's tendency to lie and manipulate situations such as pitting one parent against the other with malicious intent. Mother also feels that Melinda may be stealing money from them though she cannot prove this. She describes Melinda as increasingly labile. She also reports that Melinda does not wish to abide by the rules of the house or do her chores. In addition they describe Melinda as "raging" over the slightest provocation. Mother claims that depending on whether she is having a good day or bad day, Melinda may be prone to bouts of yelling, swearing, and throwing things in the household when frustrated or when limits are placed on her. On occasion she has been aggressive with her 4 year old adopted sister. In the past year mother claims that Melinda has pulled a knife on her twice. She also attempted to tip over a curio cabinet in the home when she was upset. She seems to have engaged in malicious and willful destruction of property in the home when angered. A significant stressor in the family was the fact that her maternal grandfather passed away this January. The very next month Melinda apparently bruised her own arms and then made up a story about getting into a fight with a female peer over her current boyfriend. The parents enlisted the help of the police to investigate this before they discovered that Melinda had been lying about the whole ordeal. Mother claims that Melinda is very attention seeking and prone to making up such stories in order to be the center of attention. Two weeks after this event she climbed out of her bedroom window and ran away from home. She eventually wound up at the Casey House. The parents have enrolled her in therapy at the Bewley Building with

**CHART COPY**

NPP 0654

366697                                   Page 2

Shelly Rosin. They have only had approximately five sessions and mother is already getting frustrated with her perception that there is a lack of progress. Mother is clearly frustrated with Melinda and actually suggested that she was reluctant to take her back home based on her recent behaviors. She claims that she has been instructed to place Melinda on a PINS, a suggestion that I fully support. Mother does not see Melinda as pervasively depressed yet rather as labile. Melinda herself recognizes feeling depressed at times but does not subjectively feel pervasively depressed. She denies any significant changes in her sleep or appetite patterns. She claims that she made herself throw up one time when she was feeling sick in the past but denies any history of repeated binging or purging. She denies any history of restricting her intake. She denies any thoughts of suicide yet she has engaged in self injurious behaviors on many occasions by her own claim. This has been going on for at least the last year. She states that usually engages in such behavior after arguments with her parents or with friends. She admits to cutting herself on her arm, hand, and her upper arm. She also admits to hitting things when angry. At times she grapples with feelings of emptiness. She has been dating for the last two years yet claims that her relationships with boyfriends have been fairly stable. She admits to not feeling connected with her parents. In addition she feels no particular connection with her Korean heritage. She knows little about her biological parents other than "my mom was 4 feet tall." She denies that being adopted has been a significant issue for her, yet does voice some resentment about being adopted by her parents when angry at them. She has some ambivalent feelings about learning more about her birth parents "when I'm 18." She denies any serious anxiety including panic attacks or obsessive anxiety. She has no history to suggest mania or hypomania. She has no history of perceptual disturbances. She does have a past history of sexual molest but does not identify this as contributing to any difficulties at this time.

PAST PSYCHIATRIC HISTORY: Melinda was adopted by her parents at the age of 4 months. She apparently was molested between the ages of 4 and 5 by a teenage cousin over a period of nearly one year. Melinda claims that she remembers this vividly though she was reluctant to talk about it. Mother claims that Melinda disclosed this to her older female cousin at a time when there was a great deal of chaos in the family including the fact that mother's father had just undergone a triple bypass surgery and her mother was diagnosed with amyotrophic lateral sclerosis. Mother claims that the molestation was limited to inappropriate touching and that a physical examination revealed that there had been no penetration. In retrospect mother feels that Melinda may have looked more depressed at that time but quickly adds "she was never a sweet child, she always seemed aggressive and would hit other kids." She does not recall any serious outbursts of anger coincident with the time that she was molested or disclosed molest. She did have some problems with at least mild oppositionality from an early age and was described by teachers as not being cooperative per mother's claim. Mother denies any signs that would suggest full diagnostic criterion for attention deficit disorder. Melinda herself claims that she was always a little bit too social in class however. In regards to Melinda's self reports about her molest experience, she denies any recollection of recurrent nightmares about this but has experienced intrusive recollections about her experiences. She does not feel that this has effected in her ability to relate with boyfriends. It is significant however that when her grandfather passed away in January Melinda saw the cousin who molested her for the first time since she was a small girl. She denies that this incidental meeting has contributed to any difficulties currently though mother is not quite as certain. Melinda did get some counseling for this as a young girl but the only recent counseling that she has received has been through Shelly Rosin. She was scheduled to see Dr. Martin for an evaluation of medication treatment for "mood swings."

PSYCH HISTORY

CHART COPY

NPP 0655

366697                                   Page 3

PAST MEDICAL HISTORY: Melinda has an allergy to Penicillin. She has been diagnosed with psoriasis and takes two prescription creams. Her psoriasis has flared up as of late and mother did not buy the prescriptions as she claims she could not afford the co-pay until her next paycheck. Melinda also has asthma for which she takes Albuterol on a p.r.n. basis. She has no history of seizures or head trauma. There is no past surgical history.

REVIEW OF SYSTEMS: Melinda denies any recent weight gain or loss. She is however concerned about "getting fat." She was recently treated for a right otitis media. She has psoriasis as mentioned. She has no joint effects with this. She is nearsighted and wears glasses for this. She has asthma as mentioned. She has no history of cardiac trouble. She had her first menstrual period at the age of 12 and has had them regularly with the exception or the past six weeks where she claims that she has been getting a period every two weeks. She does identify some increase in her moodiness just prior to the onset of her menstrual periods. She is right handed.

DEVELOPMENTAL HISTORY: Little is known about the biological mother's pregnancy history of Melinda's birth history. She was adopted at the age of 4 months by the Eubank family. She walked by the age of 9 months but did have significant speech delays for which she received speech therapy prior to kindergarten. She had no delays in toilet training. Mother claims that she was held back in kindergarten due to social immaturities. She has always done well academically however. As a young girl mother described her as being always on the go but not overly hyperactive. She tended to get bored easily with things but did not seem extremely impulsive. It is significant to note that mother described Melinda as a young girl in terms of that "she was never a sweet loving child."

SCHOOL HISTORY: Melinda is currently in the 10th grade at Lockport High School. She is on the high honor roll. She has not been suspended this year but was suspended twice at the end of last year. She had never refused to attend school prior to this morning. She does not have any history of truancy. Her future scholastic endeavors include studying forensic science in the law enforcement field.

SOCIAL HISTORY: The patient's mother is in her late 30's and works at a credit union. Her adopted father is in his mid 40's and will soon be losing his job as the company that he works for is relocating. The father does have a car detailing business on the side. There have been a number of recent family stressors including the death of mother's father and mother is having a difficult time getting along with one of her sisters by the patient's claim. Father's losing his job has also placed a financial strain on the family. Mother claims that Melinda's "manipulation" has caused marital stress. Mother is clearly at odds with Melinda at this time likely due to the multiple stressors and presents as being somewhat resentful of her. Melinda does have a number of friends and enjoys spending time socializing. She is involved in Student Council and the Spanish Club. She enjoys writing and talking on the phone. She has been involved with the police on three occasions. The first was in 9th grade when she was involved in a bogus magazine subscription with one of her friends. She externalizes blame to the friend for this entirely. The parents also called the police to their home after an argument when she was in the 9th grade. The third time was this morning. Mother claims that Melinda is a habitual liar and that she has been stealing for some time. Melinda admits only to stealing the student teacher's purse last year. She denies that she took money out of the purse though a good deal of money was missing from it. She did run away from home once in this past year and went to the Casey House. Mother claims that she was asked to leave because she was "becoming too comfortable

PSYCH HISTORY

CHART COPY

NPP 0656

366697                          Page 4

there because she didn't have to follow rules." She has gotten physically assaultive with her parents and according to mother with her 4 year old sister. She has no history of fire setting or cruelty to animals. She denies any use of cigarettes, alcohol, or illicit drugs. She has dated but denies any history of sexual activity.

FAMILY PSYCHIATRIC HISTORY: There is not enough information about the patient's biological family in this regard.

MENTAL STATUS EXAMINATION: When I interviewed Melinda she was dressed in a hospital gown. She is a short, thin Asian female with long dark hair in a ponytail and glasses. She was cooperative with the examiner but seemed to be somewhat of an evasive historian. She showed a mild degree of psychomotor agitation. She described her mood as "upset" and her affect seemed reactive. She spoke at a regular rate and in a normal volume. Her thought process was linear. She denied thoughts of wanting to kill herself despite her provacative acting out prior to admission. She denied any homicidal ideation. There was no evidence of overt psychosis. She denied any history of perceptual disturbance. She was alert and orientated in all spheres. She was able to attend to the conversation and answer questions appropriately. Her memory was intact. Her intelligence level seemed above average. Her reliability was questionable, her judgment impaired, and her insight poor.

IMPRESSIONS: Melinda Eubank is a 16 year old adopted Korean female who has had significant problems with being at odds with her parents for at least the past year. In addition she has shown mood lability and increasing difficulties with acting out. The history does not suggest a major depressive disorder nor does it suggest clear evidence for bipolar disorder at this time She does not meet the full criterion for posttraumatic stress disorder though this does not eliminate the potential that her early abuse experiences are contributing to her current presentation as she progresses through adolescence. She describes episodic dysphoria as well as irritability. The possibility of a dysthymic disorder should be entertained.

DSM4 DIAGNOSES:
AXIS I:      Depressive disorder, not otherwise specified
             Parent child relational problem
             Oppositional defiant disorder/rule out evolving conduct disorder
             Identity problem
AXIS II:     Borderline personality traits are evident
AXIS III:    Asthma
             Psoriasis
AXIS IV:     Psychosocial stressors are severe
AXIS V:      Current GAF is 30.

TREATMENT PLAN: Melinda will be admitted to the unit for a period of observation and for safety purposes. I interviewed her mother over the phone to obtain collateral information as well as consent for treatment. Mother complained openly about Melinda's problems with the suggestion that she felt she was not getting enough help from the mental health community in general. I explained to her that Melinda's problems were long time in the making and would likely take a great deal of counseling to be appropriately addressed. I suggested that in addition to individual counseling they should be getting regular family counseling. I also suggested that an SSRI such as Zoloft may be quite helpful in curtailing some of her lability and impulsivity. I discussed the side effects, risks, and benefits with a trial of Zoloft with her. Informed consent

PSYCH HISTORY

**CHART COPY**

NPP 0657

366697                              Page 5

was obtained and mother expressed some concern about the co-pay. In response to mother's questioning I informed her that there was no guarantee that their daughter would improve with Zoloft but that a trial of the medication was a recommendation. I feel that an SSRI trial may be more appropriate than a mood stabilizer given her overall presentation at this time. Melinda will remain on the unit for acute stabilization only. This was explained to mother as was the case that this is not a long term treatment facility. Mother did voice reluctance about Melinda's coming back home. I also suggest a family meeting with our social worker to help reassure mother and to assure that the proper outpatient follow up is arranged when she is deemed appropriate for discharge.

SD / smr
D: 05/20/2002
T: 05/21/2002
#051541


**Seth Dewey, M.D.**

cc:     Samson Adegbite, M.D.
        113 Main Street
        Second Floor
        Batavia NY 14020

        Kristin Brandel
        Niagara Falls Memorial
        Floor - s2
        Niagara Falls NY 14301

        Seth Dewey, M.D.
        621 10Th St
        Nfmmc s2
        Niagara Falls NY 14302


**THIS REPORT IS NOT TO BE RELEASED WITHOUT THE PERMISSION OF THE DICTATING PHYSICIAN**

PSYCH HISTORY

CHART COPY

NPP 0658

**DISCHARGE SUMMARY**
**Niagara Falls Memorial Medical Center**
NIAGARA FALLS, NEW YORK 14302

| | |
|---|---|
| Name:  Eubank, Melinda M | Date of Birth:  08/14/1985 |
| MR#: 366697 | Location:  Discharge |
| Admission Date:  05/20/2002 | Discharge Date:  05/29/2002 |
| Attending Physician:  Samson Adegbite, M.D. | |

STATUS ON DISCHARGE: WMA

FINAL DIAGNOSIS:
AXIS I:
a.  Depressive disorder, not otherwise specified.
b.  Oppositional Defiant Disorder.
c.  Parent/child relation problem.
AXIS II:        Borderline personality traits.
AXIS III:       Psoriasis, bronchial asthma.
AXIS IV:      Severe.
AXIS V:       Current GAF 50, past GAF 55-60.

OPERATIONS/PROCEDURES:  --

PRESENTING COMPLAINTS & PERTINENT PAST HISTORY: Melinda is a 16-year-old Korean American girl that was admitted with the chief complaint of "I got into a fight with my parents". According to Melinda she was having some problems with her adoptive parents who stated she has significant outbursts at home. She argued with her family constantly and on this occasion she grabbed a knife and cut her wrists superficially.  This came after an argument about whether or not she would be allowed to have friends come for a party by her description. Melinda has also been having significant problems working with this family and has had significant friction in relationship between her and the family. She believes that the intrapersonal relationship with them is not the best.

PHYSICAL EXAMINATION:  --

We observed her behavior on the unit. She was started with some medication but mostly the work done was family work due to the fact that the main problem with this young lady is acceptance of her adoption and also significant dysthymia. Her current medication is Zoloft 50-mg po q a.m. and she continued to compensate. In the last meeting it was decided that this girl has had maximum benefit from inpatient admission therefore could be discharged with follow up on an outpatient basis. She was discharged with Zoloft 50-mg one po q a.m. Sufficient medication given for one month.

PAST MEDICAL HISTORY: Insignificant.

LABORATORY DATA: All within normal limits.

CHART COPY

NPP 0661

366697                          Page 2

HOSPITAL COURSE AND TREATMENT: Initial hospital course was uneventful except that there was some conflict between her and the parents. They would not talk to each other and the parents would not talk but in the last few days they have been talking and they are arranging for her disposition. The patient will be discharged today with followup with Dr. Martin today, who will be following her with medications and also with counseling possibly.  The family work will continue to be the focus of this young lady's intervention.

CONDITION ON DISCHARGE: Stable.

PROGNOSIS: Fair with continued treatment and followup.

The patient is discharged to the mother with Zoloft 50-mg one q a.m. Sufficient medication was given for one month.  Follow up will addressed and schedule was given to them.

LETHALITY ON DISCHARGE: None.

SA / laj
D: 05/29/2002
T: 06/20/2002
#053604


Samson Adegbite, M.D.

cc:     Samson Adegbite, M.D.
        113 Main Street
        Second Floor
        Batavia NY 14020

DISCHARGE SUMMARY

CHART COPY

NPP 0662